UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COMMON CAUSE INDIANA; | ) |
| NAACP, by its Greater Indianapolis Branch 3053, | ) |
| and on behalf of its individual members; | ) |
| DORIS A. McDOUGAL; and | ) |
| JOHN WINDLE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CAUSE NO.: 1:17-cv-1388-SEB-TAB |
| | ) |
| MARION COUNTY ELECTION BOARD; and | ) |
| KEITH JOHNSON, MELISSA THOMPSON, and | ) |
| MYRA A. ELDRIDGE, each in their official | ) |
| capacities as members of the MARION | ) |
| COUNTY ELECTION BOARD; | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

Plaintiffs, Common Cause Indiana ("CCI"), the State and Greater Indianapolis Branches

of the NAACP (collectively "NAACP"), Doris A. McDougal, and John Windle, respectfully

request that this Court preliminarily enjoin Defendants Marion County Election Board

("MCEB"), and its members sued in their official capacities, from continuing to deny Plaintiffs

and their members the benefits of satellite voting sites to cast an early in-person ("EIP") absentee

ballot as provided by Indiana law.

On January 22, 2014, The Presidential Commission on Election Administration released

a report titled "The American Voting Experience: Report and Recommendations of the

Presidential Commission on Election Administration."[1] The Commission made a number of unanimous recommendations and best practices concerning a variety of issues related to election administration, including EIP absentee voting. According to the Commission, voting in the United States has undergone a "quiet revolution" in the expansion of time allotted for voting. In 2012, nearly a third of voters cast their ballot before Election Day, which was more than double the rate of the 2000 election; and of the more than 47 million Americans who cast ballots early in 2012, 18.5 million voted by EIP absentee ballots. The Commission further observed (at 54-55) that EIP voting offers Americans "opportunities to participate in the electoral process that simply cannot be afforded by the contained twelve-hour period of the traditional Election Day." Having chosen a day and time for voting that is convenient for them, the Commission observed (at 56) that early voters also had a higher tolerance for wait times than on Election Day. The Commission recommended (at 57) that States expand opportunities to vote before Election Day, noting the existence of a bipartisan consensus of election administrators in favor or EIP voting because of its effect of relieving some of the traffic that would occur on Election Day.  As the use of EIP absentee continues to grow, the Commission cautioned (at 58) it "must be administered in an equitable manner so all voters can have equal opportunity to vote."

Consistent with the Commission's observation of the bipartisan consensus and support for EIP voting, satellite voting locations have been routinely approved by county election boards in every county adjoining Marion County, except Shelby County, and in all but one of the twelve most heavily populated counties in Indiana.[2][3] Due to the combination of the unanimity

---

[1] The Commission's Report is publicly available at https://law.stanford.edu/publications/the-american-voting-experience-report-and-recommendations-of-the-presidential-commission-on-election-administration (last visited January 31, 2018).

[2] According to the United States Census Bureau, the twelve (12) most populous counties in Indiana are, in order, Marion (941,229), Lake (485,846), Allen (370,404), Hamilton (316,373),

requirement of the relevant statute and the intransigence of the Marion County Republican Party's appointees to the MCEB, no satellite sites have been authorized by the MCEB for EIP absentee voting in any federal election since the 2008 elections, when the MCEB unanimously approved two satellite sites for EIP absentee voting. During that election unprecedented numbers of Marion County voters took advantage of the convenience those satellite voting locations offered.

   After Marion County voters overwhelmingly voted in favor of the Democratic nominee for President that year, the Republican appointees to the MCEB changed positions, and in every election thereafter they have refused to support (and thus effectively vetoed) resolutions to authorize satellite sites for EIP absentee voting. A succession of the Republican appointees thereafter have blocked those proposed resolutions year after year because the establishment of satellite voting sites for EIP absentee voting is now regarded as a "party-line" issue; in other words, a structure that is no longer perceived as politically beneficial to the Marion County Republican Party and its candidates.

   The partisan obstructionism in Marion County since 2008 is unique and does not prevail in other Indiana counties, where resolutions to establish satellite sites for EIP absentee voting,

---

St. Joseph (269,141), Elkhart (203,781), Vanderburgh (181,721), Tippecanoe (188,059), Porter (167,791), Hendricks (160,610), Johnson (151,982), and Monroe (145,496). This census data is publicly available at https://factfinder.census.gov (last visited January 31, 2018). Reports generated from that website containing population statistics by county and race in Indiana are contained in Plaintiffs' Exhibits 5 and 6. Plaintiffs request that the Court take judicial notice of these facts pursuant to Federal Rule of Evidence 201. *See, e.g.*, *U.S. v. Shehadeh*, No. 14-cr-30046, 2016 U.S. Dist. LEXIS 36066, at *11-13 n.3 (C.D. Ill. Feb. 19, 2016) (taking judicial notice of "United States Census Bureau, QuickFacts, located at http://factfinder.census.gov," and citing *Belleville Catering Co. v. Champaign Market Place, LLC*, 350 F.3d 691, 693 (7th Cir. 2003)).

[3] Shelby County is the only county contiguous to Marion County that has never established satellite voting locations, and, other than Marion County, St. Joseph County is the most populous county not to have satellite voting locations. However, satellite voting locations were not proposed or discussed in either county. (Pls.' Ex. 1, 212-216).

when put forward, have routinely been approved. In fact, when the last federal elections were conducted in 2016, nowhere other than in Marion County was a resolution to establish satellite voting locations for EIP absentee voting rejected on a party-line vote. And in every county adjoining Marion County, each of which is overwhelmingly white and Republican, election boards have unanimously and routinely approved multiple satellite voting locations when proposed for EIP absentee voting. This has resulted both in a substantial increase in EIP voting and in the percentages of those voters casting an EIP absentee ballot in those counties *vis-a-vis* Election Day voting. By contrast in Marion County, the only Indiana county where partisan opposition has prevented the establishment of any satellite voting locations, the raw number and percentage of voters using EIP voting have sharply declined since 2008, the baseline year.

While Plaintiffs recognize that the members of the MCEB are inherently political creatures, they are also state actors with the responsibility under the United States Constitution to exercise their discretion when establishing rules and procedures for election administration in a fair and non-discriminatory way. Election administration should not be political, and achieving partisan advantage can never be justified if it treats voters differently, and less favorably, solely based on where they live. Moreover, the Constitution does not permit those members to exercise their discretion in such a way as to penalize Marion County voters based on how they have chosen to exercise their First Amendment rights in terms of the candidates for whom they choose to vote. Equally importantly, the members of the MCEB may not exercise their discretion in a manner that violates Section 2 of the Voting Rights Act.

Plaintiffs respectfully request that the Court preliminarily enjoin the MCEB from continuing to obstruct the establishment of satellite EIP voting locations and order the MCEB to re-establish at least two satellite EIP voting sites for the 2018 primary and general elections until

the Court can decide this case on its final merits. Plaintiffs meet all the requirements for the grant

of a preliminary injunction, which the Court should issue to prevent Defendants from continuing

to violate the Equal Protection and First Amendment rights of Marion County voters, as well as

those rights guaranteed to Marion County African-American voters under Section 2 of the

Voting Rights Act.

## II.     UNDISPUTED FACTS

### A.  Parties

Plaintiffs Common Cause Indiana[4] and NAACP are voluntary associations which each

have long histories of working to expand voter registration and participation, and preserving

equal access to voting for all persons. Plaintiff NAACP devotes substantial time and resources to

protecting the constitutional right to vote of African-American citizens. (Dkt. No. 21, MCEB's

Answer, ¶¶ 4-6). Defendants Keith Johnson, Melissa Thompson[5], and Myla A. Eldridge are

members of the MCEB and are sued in their official capacities. Defendant Eldridge is the duly-

elected Marion County Circuit Court Clerk, and Defendants Johnson and Thompson are,

respectively, the appointees of the Marion County Democratic and Republican Parties. Ind. Code

§ 3-6-5-2. Dkt. No. 21, MCEB's Answer, ¶ 9.

Plaintiff John Windle, a resident of Lawrence Township, is a member of Common Cause

Indiana and will testify regarding his employment with the United States Postal Service; the

importance to him of voting prior to Election Day because of his work schedule and the risk of

---

[4]Common Cause Indiana is the Indiana affiliate of Common Cause, a national organization that advocates for, among other things, the fairness of elections and elimination of barriers to voting, thus giving it standing to bring this challenge. *Common Cause Indiana v. Individual Members of the Indiana Election Commission,* 800 F.3d 913, 914 (7th Cir. 2015).

[5] Plaintiffs originally sued Republican-appointee Maura Hoff, who resigned her position after this lawsuit was filed. Hoff was replaced by Melissa Thompson, who was automatically substituted as a party defendant pursuant to F. R. Civ. P. 25(d).

unforeseen emergencies on Election Day; and the difficulties he encountered when attempting to vote early at the City County Building in 2016 compared to his experience voting early in 2008 at the satellite site located at North Central High School.

Plaintiff Doris McDougal, an African American resident of Washington Township and long-time member of the NAACP, will testify regarding her difficulties ambulating due to her age and health; her role as primary caretaker of her 95-year-old mother who lives in Rush County; and the difficulties and burdens many African Americans in Marion County face when seeking to cast an EIP absentee ballot.

Plaintiffs reserve the right to call other non-party witnesses to elicit similar testimony from them about the burdens the absence of satellite voting sites imposes on Marion County voters.

### B. The Satellite Voting Statute

Indiana Code § 3-11-10-26 provides that a voter is legally entitled to cast an absentee ballot before an absentee voter board at the office of the circuit court clerk, or at a satellite office established under I.C. § 3-11-10-26.3 (the "Satellite Voting Statute"). Under the Satellite Voting Statute, a voter may vote before an absentee voter board not more than twenty-eight (28) days nor later than noon on the day before Election Day, and, except for counties with a population of less than 20,000, voters must also be permitted to cast absentee ballots at the office of the circuit court clerk for at least seven hours on each of the two Saturdays preceding Election Day. I.C. § 3-11-10-26(g), (h). The Satellite Voting Statute provides that a county election board may adopt a resolution to authorize the circuit court clerk "to establish satellite offices in the county where voters may cast absentee ballots before an absentee voter board." I.C. § 3-11-10-26.3(a). Such a resolution, however, requires the "unanimous vote of the board's entire membership." *Id.* at (b).

Thus, any such resolution to establish satellite voting sites for EIP absentee voting must have bipartisan support, a requirement which has not proved to be an obstacle anywhere except in Marion County.

### C. The History of Satellite Voting in Marion County

In 2008, the MCEB unanimously approved a resolution to establish two satellite voting offices for EIP voting in addition to the mandatory location at the Clerk's office. (Dkt. No. 21, MCEB's Answer, ¶ 15). The resolution established satellite voting locations for EIP absentee voting at North Central High School and the Southport Government Center. (Pls.' Ex. 8, Eldridge Dep., 7). Defendant Marion County Clerk Eldridge was the Deputy Director of Elections at that time, and it was her job to "assist . . . in the effort to have satellite sites in Marion County." *Id.* at 6. Specifically, she recruited poll workers and "provide[d] volunteers that would work at the satellite sites." *Id.* at 7. The two sites were provided at no cost. *Id.* She encountered no difficulties finding sufficient poll workers and volunteers. *Id.* She was present at the satellite voting locations a majority of the time they were open. *Id.*

Based on her experience with satellite voting locations, Clerk Eldridge testified that satellite sites for EIP absentee voting provided Marion County voters opportunities to participate in the electoral process that cannot be provided by the 12-hour voting period on Election Day. *Id.* She also observed that satellite voting locations alleviate traffic congestion and problems that often arise on Election Day, including assisting voters who show up at the wrong precinct or are not listed on the poll book due to administrative error. *Id.*

According to Clerk Eldridge, the satellite voting locations in 2008 were a success. *Id.* at 11-12. She did not receive any complaints about the locations. *Id.* at 12. No concerns were

expressed to her about any fraud committed by voters at those satellite locations. *Id*. Nor did the MCEB experience any difficulties in administering the locations. *Id*.

In the 2008 general election, 73,549 voters in Marion County cast an EIP absentee vote. (Dkt. No. 21, MCEB's Answer, ¶ 16). That year Indiana, for the first time since 1964, cast its electoral votes for the Democratic Party's nominee for President. Beginning in 2010 and in every subsequent federal election to date, the Marion County Republican Party's appointee to the MCEB has refused to support, and thus effectively vetoed, resolutions put forth by its other two members that would have established at least two satellite voting locations in Marion County for EIP absentee voting. (Dkt. No. 21, MCEB's Answer, ¶¶ 17-19).

### D.  The MCEB's More Recent Rejections of Satellite Voting

In 2016, a resolution to establish two satellite locations for the primary election failed after Defendant Hoff, without explanation, voted against it. (Dkt. No. 21, MCEB's Answer, ¶ 19). In her deposition, Hoff testified that she voted against the resolution because EIP absentee voting at satellite voting locations is what she called a "party line" issue. (Pls.' Ex. 9, Hoff Dep., 11). She made her decision on the primary resolution after talking it over with Jennifer Ping, then the chair of the Marion County Republican Party. According to Hoff, the two of them talked and "agree[d] on how I should vote." *Id.* at 8, 15. During the months preceding the November 2016 general election, when another resolution to establish two satellite sites for EIP absentee voting was under consideration, the Republican Party chair, Mike McQuillen (Ping's successor), appointed a proxy for Hoff who voted against the resolution. *Id.* at 23-24.

The MCEB's minutes from the meetings during which the 2016 satellite voting resolutions were proposed contain no explanation or justification from Hoff or her proxy for her votes. (Pls.' Ex. 3). Hoff never offered any public explanation of her vote to kill the resolution.

(Pls.' Ex. 9, Hoff Dep., 8, 16, 25). After speaking with Ping and McQuillen, she did not return a call from *Indianapolis Star* reporter Matt Tully, who sought to have her publicly explain her vote to reject that resolution. *Id*. Hoff denied being a free agent regarding the satellite voting resolutions. *Id*. at 32. She indicated that the Marion County Republican Party's decision to oppose the satellite voting resolutions in 2016 "was made by someone else," and then acknowledged that "partisan politics probably plays a hand in decision making" by Marion County Republican Party officials relative to satellite voting locations. *Id.* at 48.

### E. The Impact of the Elimination of Satellite Voting Locations

EIP absentee voting numbers in Marion County dropped sharply after satellite voting lost the support of the Marion County Republican Party's appointees to the MCEB, falling from 73,549 in the baseline year of 2008, to 39,189 in 2012, and to 46,995 in 2016. (Dkt. No. 21, MCEB's Answer, ¶ 20). A smaller percentage of votes were cast via EIP absentee voting in Marion County in the general election, dropping from 19.3 % in 2008, to 10.8% in 2012, and recovering only slightly to 12.7% in 2016. (Dkt. No. 21, MCEB's Answer, ¶¶ 16, 20).

The MCEB's failure to establish satellite voting locations has resulted in marked disparities in the ratio of registered voters per EIP absentee voting location between Marion County and its neighboring, predominantly white counties.[6] *See* Pls.' Ex. 5 (Census Bureau's County Population Statistics for Indiana). While Marion County's 715,154 registered voters had a single EIP absentee voting location (Pls.' Ex. 8, Eldridge Dep., Ex. 2, p. 2), Hamilton County's

---

[6] Election results reported by the Secretary of State for the 2008, 2012, and 2016 elections are publicly available at http://www.in.gov/sos/elections/2400.htm (last visited January 31, 2018). Marion County was the only County in the Indianapolis metropolitan area where a majority of its voters cast their vote for the Democratic Party's nominee for president in 2008, 2012, and 2016.

230,786 registered voters had three EIP voting locations as a result of a bipartisan[7] resolution establishing satellite sites for EIP absentee voting, a ratio of one site for every 76,929 voters. *Cf.* Pls.' Ex. 1, 35-38 *with* Pls.' Ex. 2. Hendricks County's 109,903 registered voters were able to vote at three satellite voting locations plus the office of the circuit court clerk, a ratio of one site for every 27,476 voters. *Cf.* Pls.' Ex. 1, 50-54 *with* Pls.' Ex. 2. Johnson County's 107,546 registered voters were permitted to vote at five approved satellite voting sites in addition to the office of the circuit court clerk, a ratio of one early voting site for every 17,924 voters. *Cf.* Pls.' Ex. 1, 73-79 *with* Pls.' Ex. 2. And in Boone County, which has only 49,294 registered voters, the election board unanimously approved eight satellite voting locations plus the office of the circuit court clerk, a ratio of one site per every 5,477 voters. *Cf.* Pls.' Ex. 1, 13-16 *with* Pls.' Ex. 2.

A review of the relevant minutes from the meetings of the election boards in every other comparable county where satellite voting resolutions were offered establishes that election officials unanimously approved them in 2016 as well as in prior federal elections. (Pls.' Ex. 1). In Indiana's second most populous county, Lake, which has roughly half of Marion County's population, election officials unanimously approved at least nine satellite locations, (Pls.' Ex. 1, 133-160; Pls.' Ex. 5); and in Indiana's third most populous county, Allen, which has a little more than one-third of Marion County's population, election officials approved at least four satellite locations. (Pls.' Ex. 1, 1-6; Pls.' Ex. 5).

Thus, in all but one of Indiana's most populous counties voters were provided convenient access to satellite sites to cast an EIP absentee ballot as permitted by Indiana law, while Marion County's 715,154 registered voters were relegated to a single site for EIP absentee voting in the

---

[7] There is no evidence of any Democratic Party member of a county election board, even in predominantly Republican counties, vetoing a resolution to establish satellite EIP absentee voting locations. *See* Pls.' Ex. 1.

City-County Building, where there is virtually no free parking and access is problematic particularly for persons who lack private transportation, are disabled, or live outside the central core of Indianapolis. *See* (Pls.' Ex. 8, Eldridge Dep., 24-26, 31-32). In addition to being by far the most populous county in Indiana, Marion County is also home to the largest African-American population in the state. (Pls.' Ex. 6).

The consistent opposition of the Republican appointees to the MCEB in every federal election since 2008 to resolutions to establish satellite voting locations has caused voters in Marion County to experience longer lines to vote at the City-County Building, and longer wait times than would otherwise have existed at their home precincts on Election Day. (Dkt. No. 21, MCEB's Answer, ¶ 27; Pls.' Ex. 8, Eldridge Dep., 28). It has also caused a sharp decline in the number of voters casting an EIP absentee ballot, as noted in Plaintiffs' Expert Report. *See* Pls.' Ex. 7 (Expert Report of Dr. Bernard L. Fraga) 4-6. In no other Indiana county are hundreds of thousands of voters required to exercise their statutory right to cast an EIP absentee ballot at a single location so remote from where so many of those voters live, so inconvenient for them, and so devoid of nearby free parking.

The extra burdens and costs placed on Marion County voters who wish to exercise their statutory right to cast an EIP absentee ballot are aggravated[8] by Indiana's early poll closing time

---

[8] Courts have determined that the absence or existence of alternatives to Election Day voting may cut either in favor of or against an equal protection challenge to an election law or structure. *See, e.g., Mich. St. A. Philip Randolph Instit. v. Johnson,* 833 F.3d 656, 663-65 (6th Cir. 2016) (noting in challenge to elimination of straight-ticket voting that Michigan's lack of early voting exacerbated wait times on Election Day). It is axiomatic that longer lines impose additional monetary costs on voters who must stand in line to vote, which imposes a greater than slight burden on voters. *Id.* at 664-66.

(6 PM)[9] and the lack of any Indiana statute requiring employers to give employees time off to vote. Neither of those burdens is mitigated by the universal availability of no-excuse mail-in absentee voting, which is accessible only by disabled voters, those who are at least age 65, or those who are willing to swear an oath that they have a "specific, reasonable expectation" that they will be absent from Marion County during the entire 12 hours that the polls are open. I.C. § 3-11-10-24(a)(1).

The absence of satellite sites in Marion County for EIP absentee voting also, unsurprisingly, increases the wait time at the one location where such voting is authorized—the office of the Circuit Court Clerk in the City-County Building. (Dkt. No. 21, MCEB's Answer, ¶ 27; Pls.' Ex. 8, Eldridge Dep. 23). Further, by depressing the number of voters able to cast EIP absentee ballots, wait times at Election Day polling locations are increased as fewer voters are able to avail themselves of EIP absentee voting. (Pls.' Ex. 8, Eldridge Dep., 28). This in turn leads to harried voters preoccupied with job, school and family obligations, and other personal and unforeseen issues, which results in additional monetary costs on voters and may cause some of them to forego voting on Election Day.

### III. PRELIMINARY INJUNCTION STANDARD

Injunctive relief is appropriate if the moving party is able to demonstrate by a preponderance of the evidence: (1) a reasonable likelihood of succeeding on the merits; (2) irreparable harm if preliminary relief is denied; and (3) an inadequate remedy at law. *Planned Parenthood of Indiana, Inc. v. Comm'r, Indiana Dept. of Health,* 699 F.3d 962, 972 (7th Cir. 2012); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,*

---

[9] Indiana has the earliest Election Day poll closing time (6 p.m.) in the nation. https://ballotpedia.org/State_Poll_Opening_and_Closing_Times_(2017) (last visited January 31, 2018).

549 F.3d 1079, 1086 (7th Cir. 2008). A reasonable likelihood of succeeding on the merits means a "greater than negligible chance of winning." *AM Gen. Corp. v. Daimlerchrysler Corp.,* 311 F.3d 797, 804 (7th Cir. 2002).

If these threshold conditions are met, the Court must then assess the balance of harm to the Plaintiffs if the injunction is not issued against the harm to Defendant if it is issued, and then whether the public interest favors granting injunctive relief. *Planned Parenthood of Indiana, Inc.*, 699 F.3d at 972. The more likely it is that the moving party will win its case on the merits, the less the balance of harms need weigh in its favor. *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1100. This is known as the 'sliding scale" approach, which means that "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir. 1992).

It is well established that "[w]hen an alleged deprivation of a constitutional right is involved, no further showing of irreparable injury is necessary." *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (internal quotation marks and citation omitted); *see also Mich. State A. Philip Randolph Instit.,* 833 F.3d at 669 ("A restriction on the fundamental right to vote therefore constitutes irreparable injury."); *Montano v. Suffolk Cty. Legislature,* 268 F.Supp. 2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes irreparable harm"); *Dillard v. Crenshaw Cty.,* 640 F.Supp. 1347, 1363 (M.D. Ala. 1986) (an infringement of the right to vote cannot be remedied through monetary damages).

Even a lesser likelihood of success, i.e., a "better than negligible" chance of winning, will suffice if the balance of harms tips heavily in plaintiffs' favor. *Ty, Inc.,* 237 F.3d at 897. In performing this sliding-scale analysis, "the court bears in mind that the purpose of a preliminary

injunction is 'to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.'" *AM Gen. Corp,* 311 F.3d at 804 (quoting *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir. 1998)).

## IV.    ARGUMENT

### A.  Plaintiffs are likely to prevail on the merits of their First and Fourteenth Amendment claims.

Plaintiffs' First and Fourteenth Amendment claims are evaluated under the framework established by the Supreme Court in *Burdick v. Takushi,* 504 U.S. 428, 434 (1992), and *Anderson v. Celebrezze,* 460 U.S. 780, 788-89 (1983). "The Supreme Court in Anderson explicitly imported the analysis used in equal protection cases to evaluate voting rights challenges brought under the First Amendment, thus creating a single standard for evaluating challenges to voting restrictions." *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) (citations omitted). Under the *Anderson-Burdick* test, the Court must first consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments the plaintiff seeks to vindicate." *Burdick*, 504 U.S. at 434. The Court must then identify and evaluate the precise interests put forward as justifications for the burden imposed by the challenged election practice, rule, or structure. *Id*. Finally, it must determine the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the Plaintiffs' rights. *Id*.

The *Anderson-Burdick* test is a flexible standard that depends on the severity of the burden imposed by the challenged law or procedure. *Harlan v. Scholz,* 866 F.3d 754, 759 (7th Cir. 2017). Where an election law or structure imposes only "reasonable, *nondiscriminatory* restrictions upon the rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id*. at 760 (emphasis added). Laws that impose severe

14

burdens on voters' rights must be narrowly drawn to advance a compelling state interest. *Id*. Most cases fall in between the two extremes, including cases such as this one where it is alleged that an electoral structure or practice not only burdens voting rights but does so selectively and non-uniformly. Even a *non*discriminatory law or structure must, however, be justified "by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Co. Election Board,* 533 U.S. 181,191 (2008) (quoting *Norman v. Reed,* 502 U.S. 279, 288-89 (1992)).

Under this "flexible standard," the Court compares the burden on voters with the governmental interest and the means it has chosen to advance that interest. *Harlan,* 866 F.3d at 760; *see also Obama for America v. Husted,* 697 F.3d at 429. There is no "litmus test" to separate valid from invalid voting regulations, and courts must "make the 'hard judgments' that our adversary system demands." *Crawford,* 553 U.S. at 190. The question of whether an election law or practice places an unacceptable or discriminatory burden on voters is "not a factual finding, but a legal determination." *Harlan,* 866 F.3d at 760 (quoting *Ohio Democratic Party v. Husted,* 834 F.3d 620, 628 (6th Cir. 2016)).

The fact that Plaintiffs' claims relate to EIP absentee voting rather than Election Day voting does not alter the constitutional analysis. Even though the Constitution does not require states to permit absentee voting, *McDonald v. Bd. of Election Comm'rs,* 394 U.S. 802 (1969), the Indiana Legislature has granted to all registered voters the unconditional right to cast an EIP absentee vote. Having granted its citizens the privilege of EIP absentee voting, the State must administer that right evenhandedly in order to comply with equal protection requirements. *Bush v. Gore,* 531 U.S. 98, 104-05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of

another"); *Paul v. Davis,* 424 U.S. 693, 710-12 (1979) (an otherwise protected interest can attain constitutional status by virtue of the fact that it has been initially recognized and protected by state law if as a result of the state action complained of a right previously recognized by state law was "distinctly altered or extinguished"); *see also, One Wisconsin Inst., Inc. v. Thomsen,* 198 F. Supp. 3d 896, 933 (W.D. Wis. 2016) (citing *Zessar v. Helander,* 2006 WL 642646, at *6 (N.D. Ill. 2006) and rejecting the state's argument that challenge to in-person absentee voting provisions did not implicate fundamental constitutional rights). It is not necessary for Plaintiffs to show that the challenged structure absolutely prohibits certain voters from voting, only that voters' ability to cast a ballot is "impeded by" the challenged practice or structure. *Obama for America,* 697 F.3d at 433 (affirming district court's finding that early voters tend to be members of demographic groups that may be unable to vote on Election Day because of work schedules and other conflicts, and that though the burden on those voters was not severe, neither was it slight).

The MCEB's persistent refusal since 2008 to establish satellite voting locations in Marion County is both arbitrary and discriminatory. Thus, its decisions cannot be justified by regulatory interests alone. The MCEB has not proffered *any* regulatory interest that is served by its refusal to provide any satellite voting locations in Indiana's most populous and racially diverse county. The lack of any satellite voting locations in Marion County has imposed and will continue to impose a more than slight burden on Plaintiffs' and their members' access to cast an EIP absentee ballot. That burden outweighs whatever regulatory interests the MCEB may ultimately proffer for arbitrarily limiting access to early EIP absentee voting in Marion County.

*1. The burdens imposed by the MCEB's application of the Satellite Voting Statute are subject to heightened scrutiny.*

The MCEB's refusal since 2008 to establish satellite voting locations in Marion County is subject to heightened scrutiny. Only an election law or structure that is administered evenhandedly, does not place discriminatory burdens on (or accord special voting privileges to)[10] similarly situated voters depending on where they live, and does not burden the right to vote, is entitled to the lowest tier of constitutional review, *i.e.*, rational basis. *Harlan,* 866 F.3d at 760. On the other hand, the application of a law or structure that restricts the rights of some voters but not others who are similarly situated, or which "dole[s] out special voting privileges…to groups that traditionally support the party in power and impose[s] corresponding burdens on the other party's core constituents," is subject to heightened judicial scrutiny and must be justified by "precise" governmental interests that are "sufficiently weighty." *Crawford*, 553 U.S. at 190-91; *Obama for America v. Husted,* 697 F.3d at 435-36 (Ohio limitation on EIP absentee voting on all non-military voters held to violate equal protection; noting the lack of any relevant distinction between military and non-military voters). There is similarly no relevant distinction between Indiana voters who reside in Marion County and those who reside elsewhere in Indiana.

The accessibility of polling places undeniably has an effect on a person's ability to exercise his or her franchise. *Perkins v. Matthews,* 400 U.S. 379, 387 (1971). A law which, for example, allowed county election boards at their discretion to set the number of voting machines per county in a manner that allowed vast disparities in the ratio of voting machines to registered voters would violate the premise that it is unconstitutional to more heavily weigh votes in some

---

[10] *Hooper v. Bernalillo Cty. Assessor,* 472 U.S. 612, 619 n. 8 (1985) (observing that a selective *burden* on a right that has achieved a constitutionally-protected status is to be analyzed consistent with equal protection principles in the same manner as a selective *incentive*).

parts of a state rather than others. *Reynolds v. Sims,* 377 U.S. 533 (1963). Indiana law in other contexts—the creation and use of vote centers—has recognized the importance of having a sufficient number of polling locations available on Election Day, expressed as a ratio of active voters to polling places. For example, a plan for the administration of vote centers in a county with more than 25,000 active voters is required to provide at least one (1) vote center for each ten thousand (10,000) active voters. I.C. § 3-11-18.1-6.

In *One Wisconsin,* the district court addressed a constitutional challenge to a Wisconsin statue that limited the state's municipalities, regardless of their size, to one location for EIP absentee voting. The district court held that this statute imposed greater burdens on the right to cast an EIP absentee ballot upon voters in Wisconsin's most populous county, Milwaukee, than it did on voters in smaller towns. 198 F.Supp. 3d at 934-35. The district court noted that the state's "changes to its in-person absentee voting regime came amidst an increase in the use of absentee voting, both nationally and in Wisconsin." *Id*. at 931. Wisconsin advanced four regulatory interests, the most relevant of which was to "save[ ] money." *Id*. at 933. The court rejected this interest (as well as the other three), and went on to hold that the "challenged absentee voting provisions" violated the First and Fourteenth Amendments because they imposed "moderate burdens" that were "not justified by the state's proffered interests." *Id*. at 934-35.

The MCEB's actions have impeded the exercise of a voting right that has achieved constitutionally protected status, and have increased waiting times at polling locations, the hassle for voters with inflexible job, class schedules or childcare responsibilities, and thus the tangible and intangible costs of voting. These impediments, which only the Marion County voters who are members of Plaintiff organizations are forced to endure, are discriminatory and impose more than a slight burden on the right to vote and thus should be subjected to heightened judicial

scrutiny. *Mich. State A. Philip Randolph Inst. v. Johnson,* 833 F.3d at 665-66; *Obama for America,* 697 F.3d at 429-432; *One Wisconsin Inst., Inc. v. Thomsen,* 198 F.Supp. 3d at 931-35.

The county-by-county disparities in this case are even starker than those in *One Wisconsin*. In Indiana, every county with a population exceeding 20,000 must allow at least one early voting location, but those counties may also establish satellite locations to make casting an EIP absentee ballot more convenient. No county adjacent to Marion County that has been presented with and voted on a resolution to establish satellite voting offices has denied voters that right, nor has any other urban, populous county rejected a satellite voting resolution. (Pls.' Ex. 1). The county with by far the largest population of African-American voters is the sole outlier. As a result of the MCEB's failure to approve satellite voting locations, Marion County's more than 700,000 registered voters are forced to cast their EIP absentee ballot at a single location that is sorely lacking in accessibility and free parking. By contrast, voters in much less populated counties have a variety of convenient locations with ample free parking at which to cast an EIP absentee ballot, and they enjoy a much smaller ratio of voters per EIN absentee voting location.

The consistent partisan opposition to satellite voting locations, especially when considered in conjunction with Indiana's earliest-in-the-nation Election Day poll closing time, has and continues to impose non-trivial and discriminatory burdens on Marion County voters, particularly those who lack the resources, transportation, or flexible work, school or childcare schedules to vote in-person on Election Day. These burdens uniquely and disproportionately fall on Marion County non-affluent voters who want to cast an EIP absentee ballot, all of whom are limited to doing so at a single, and for most, an inconvenient and often nearly inaccessible location. *See Obama for America,* 697 F.3d at 431, 433 (holding that because early voters tend to

be members of demographic groups that may be unable to vote on Election Day because of work schedules, they are more than slightly burdened by the statutory scheme). The unique burdens placed on Marion County voters by this structure are self-evident. As one district court observed, "we would be blind to reality if we did not recognize that many individuals have a limited window of opportunity to go to the polls due to their jobs, child care and family responsibilities, or other weighty commitments. Life does not stop on election day. Many must vote early or in the evening if they are to vote at all." *NAACP State Conference v. Cortes*, 591 F. Supp. 2d 757, 765 (E.D. Pa. 2008).

Because the Satellite Voting Statute, as it has been applied by the MCEB in Marion County, treats the voters who live in Marion County less favorably than similarly situated voters in all other Indiana counties, the application of the law by MCEB imposes disparate burdens on Marion County voters in violation of the Equal Protection Clause. *Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 542 n. 4 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014) (the Equal Protection Clause can be triggered by either disparate treatment or burdens). The MCEB's failure to establish satellite voting locations has imposed at least a moderate burden on Plaintiffs' First and Fourteenth Amendment rights. Therefore, heightened scrutiny applies, and the Court should thus require the MCEB to support its decisions with something more substantial than mere administrative convenience. *One Wisconsin Inst., Inc.,* 198 F. Supp. 3d at 934. Moreover, because there is no credible evidence of prior administrative difficulties with satellite locations, in Marion County or elsewhere, there is likely no regulatory interest the MCEB could proffer that would justify these discriminatory, non-trivial burdens. *Obama for America v. Husted,* 786 F.3d at 434 (absent evidence that local

election boards have struggled to cope with early voting in the past, any regulatory interest is not sufficiently weighty to justify the burden it has placed on voters).

> 2. *The MCEB's application of the Satellite Voting Statute in Marion County also runs afoul of the Supreme Court's geographic discrimination precedent.*

Citizens have a "constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein,* 405 U.S. 330, 336 (1972). As noted above, the protections of the right to vote afforded by the Equal Protection Clause are not limited to the act of casting a ballot on Election Day. Rather, "[e]qual protection applies as well to the manner of its exercise." *League of Women Voters v. Brunner,* 548 F.3d 463, 477 (6th Cir. 2008) (quoting *Bush v. Gore,* 531 U.S. 98, 104-05 (2000)). The Equal Protection Clause applies when the government "classifies voters in disparate ways . . . or places restrictions on the right to vote." *Obama for America v. Husted,* 697 F.3d at 428 (internal citations omitted) (affirming preliminary injunction enjoining the enforcement of election law to the extent it prevented non-military voters from casting EIP early ballots during the 3 days before the November 2012 election).

Though Indiana was not constitutionally required to grant its citizens the right to cast an EIP absentee ballot, having made EIP absentee voting an integral part of Indiana's voting procedures, the MCEB may not grant or withhold that right on a discriminatory basis based upon geography. *Moore v. Ogilvie*, 394 U.S. 814 (1969); *Idaho Coalition United for Bears v. Cenarrusa,* 342 F.3d 1073, 1077 (9th Cir. 2003). It is axiomatic that an election law's effect may not more heavily weight votes in some counties than others, *Wesberry v. Sanders,* 376 U.S. 1 (1964), or grant special voting privileges in some jurisdictions but not others. *Obama for America,* 697 F.3d at 435.

In *Moore*, the Supreme Court struck down as a violation of the Equal Protection Clause an Illinois statute governing the nomination of newly formed political parties' candidates that required each candidate to collect 25,000 signatures, including from at least 50 of the state's 102 counties, because the statute applied the same "rigid, arbitrary formula" to all of those counties which were of widely unequal populations. 394 U.S. at 819. In so holding, the Court observed that the election law "granted greater voting strength" to sparsely populated counties than to the state's more populous counties. *Id.*

Because the MCEB has withheld satellite voting locations from Indiana's most populous and racially diverse county, while election boards in less populous counties routinely approve satellite voting locations, the geographic discrimination in this case is self-evident. Thus, voters in the county with nearly twice the population of the next most populous Indiana county and with the largest number and percentage of African-American voters are restricted by the MCEB's application of the Satellite Voting Statute to the single statutorily-mandated location for EIP voting, while the voters of other counties with much smaller populations are afforded multiple satellite locations at which they may exercise their statutory right to cast an EIP absentee ballot. The MCEB cannot justify this significant geographic disparity and disparate treatment of Marion County voters in the exercise of their fundamental right to vote.

> 3. *The MCEB cannot posit any governmental interests that are sufficiently weighty to justify the burden imposed on Plaintiffs' and their members' fundamental voting rights.*

The MCEB has not and cannot put forth precise interests that are sufficiently weighty to justify the burden imposed on Plaintiffs' First and Fourteenth Amendment rights by its refusal to establish satellite voting locations in Marion County. *Crawford*, 553 U.S. at 190-91. In her deposition, Hoff gave several reasons for her vote against the resolutions that would have

established satellite voting locations. (Pls.' Ex. 9, Hoff Dep., 15-17). She claimed that the Democrats did not collaborate with the Republicans on the resolution for the primary election because Clerk Eldridge did not return a phone call from the Republican County chair or engaged in "phone tag." (*Id*. at 16, 25). Hoff also cited the "cost and administrative headache [satellite voting locations] would bring." (*Id*. at 16). However, she did not inform the other members of the MCEB or the general public of that position. (*Id*. at 16-17).

The Court should not credit the justifications proffered by Hoff because they are both insufficiently weighty and clearly pretextual. None of her various ex post facto explanations is recorded in the MCEB's official minutes. (Pls.' Ex. 3). Hoff also never offered any public explanation of her vote to kill the satellite voting resolution. (Pls.' Ex. 9, Hoff Dep., 8, 16, 25). After speaking with Ping and McQuillen, Ping's successor as Republican Party Chair, Hoff did not return a call from *Indianapolis Star* reporter Matt Tully, who sought to have her publicly explain the decisions by her and her Republican colleagues to reject the 2016 satellite voting resolutions. *Id*. Thus, any governmental interest that Defendants may subsequently proffer in the course of this litigation is properly viewed as an *ex post facto*, litigation-inspired pretext.

Not one of the reasons provided by Hoff is sufficiently weighty to justify the burdens on Plaintiffs and their members as a result of the rejection of satellite voting sites. Depriving the voters of Marion County of satellite voting locations because the resolution was drafted by a Democrat Party appointee is not a governmental interest at all, and is an astonishingly arbitrary reason for depriving Marion County voters of the benefits and conveniences of satellite voting locations in a presidential election year.

Moreover, Hoff's invocation of the "cost and administrative headache" of satellite voting location is similarly contrived and pretextual. When asked if she conducted an investigation into

23

the cost of two or three satellite voting locations, she claimed that she could not "remember any specific numbers." *Id*. at 16. The MCEB has also admitted that satellite voting locations would be fully funded if the MCEB had approved a resolution for their establishment. (Pls.' Ex. 4, Admission No. 1). Finally, Clerk Eldridge testified in her deposition that in 2008 the MCEB experienced no undue difficulties administering the satellite voting locations. She further noted that the MCEB was able to procure the two satellite locations at no cost and that she personally had no trouble recruiting poll workers and volunteers. (Pls.' Ex. 9, Hoff Dep., 26; Pls.' Ex. 8, Eldridge Dep., 6-8, 12).

Hoff offered other speculative and arbitrary reasons in support of her votes, including that the "public seems to misunderstand what early voting is," and that "[she] personally feel[s] that an absentee ballot can be filled out at your home, which is even more convenient." (Pls.' Ex. 9, Hoff Dep., 26). She added her view that Marion County's use of paper poll books "was going to significantly delay voting on Election Day." *Id*.

There is no evidence that Marion County voters do not know what early voting is. In fact, Clerk Eldridge, who has significantly more experience administering elections in Marion County, testified that she had no reason to believe that the public does not understand EIP voting. (Pls.' Ex. 8, Eldridge Dep., 20). Hoff's testimony regarding the alternative of mail-in absentee voting is at odds with state law, which allows mail-in absentee voting only under very limited circumstances. *See* I.C. § 3-11-10-24(a)(1). In other words, mail-in absentee voting, which many voters distrust for good reasons, is not a substitute for EIP absentee voting in Indiana. Finally, as for Hoff's purported concern about the "huge burden" of paper poll books, the Clerk, who—unlike Hoff[11]—administered the only federal election in which Marion County had satellite

---

[11] Hoff was appointed to the MCEB in 2016. (Pls.' Ex. 9, Hoff Dep., 7).

voting locations, testified that the paper poll books were not an obstacle to EIP absentee voting at satellite locations in 2008. (Pls.' Ex. 8, Eldridge Dep., 21).

Although Plaintiffs are not challenging the facial constitutionality of the Satellite Voting Statute, it is worth noting that the statute contains no standards or criteria to protect against arbitrary and discriminatory decision making by partisan county election boards. In other words, it permits the arbitrary imposition by a single partisan appointee of selective and discriminatory burdens on Marion County voters, while according EIP voting privileges—*i.e.,* the right to vote at convenient satellite locations with free parking—in nearly all other urban counties. *See, e.g., Northeast Ohio Coalition for the Homeless v. Husted,* 837 F.3d 612, 635 (6th Cir. 2016) (citing *League of Women Voters of Ohio v. Brunner,* 548 F. 3d 463, 477-78 (6th Cir. 2008) (holding that a plaintiff may state an equal protection claim by alleging that lack of statewide standards results in a system that deprives citizens of voting rights based on where they live)).[12] Plaintiffs highlight this omission to emphasize that one of the reasons courts are required to carefully weigh the asserted injury against the "precise interests" proffered by the government, *Burdick,* 504 U.S. at 434, is to insure that partisan state actors do not use their discretion to manipulate election results. As Justice O'Connor explained in her concurrence in *Clingman v. Beaver*, applying heightened scrutiny helps to ensure that the government's asserted interests are not merely a "pretext for exclusionary or anticompetitve restrictions." 544 U.S. 581, 603 (2005).

### B. Plaintiffs are likely to prevail on the merits of their Section 2 claim.

Plaintiffs are also likely to prevail on their claim under Section 2 of the Voting Rights Act of 1965. That section provides that "[n]o voting qualification or prerequisite to voting or

---

[12] In *Husted,* the court upheld the rejection of an equal protection claim because, despite differences in the local applications concerning ballot rejection, Ohio's election boards were "guided by clear prescriptive statewide rules that apply equally to all voters." 837 F.3d at 636. The Satellite Voting Statute contains no prescriptive guidelines whatsoever.

standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). Unlike other federal legislation, Section 2 as amended does not require proof of discriminatory intent. *Chisom v. Roemer,* 501 U.S. 380, 391 (1991) ("Under the amended statute, proof of intent is no longer required to prove a § 2 violation"); *Ketchum v. Byrne,* 740 F.2d 1398, 1403 (7th Cir. 1984) (observing that the 1982 amendments to the Voting Rights Act replaced the requirement of a "racially discriminatory motivation" with a "results" standard, meaning that a court must assess the impact of the challenged election law or practice on the basis of objective factors, rather than focusing on the motivations of those who adopted or maintained that practice); *Mich. State A. Philip Randolph Inst.,* 833 F.3d at 667 (Section 2 does not require proof of discriminatory intent); *see also Veasey v. Abbott,* 830 F.3d 216, 243 (5th Cir. 2016) *en banc*, *cert. denied* 137 S. Ct. 612 (2017) ("violations of Section 2(a) can be proved by showing discriminatory effect alone") (internal citation omitted).

Section 2 provides that a violation may be established "if, based on the totality of the circumstances, it is shown that the political processes…are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Section 2 is not limited to vote-dilution claims but also applies to vote-abridgement claims such as a challenge to early voting procedures. *Ohio State Conf. NAACP v. Husted,* 768 F.3d at 552; *Veasey, supra,* at 244; *see also League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 239 (4th Cir. 2014) (Section 2 prohibits all forms of voting discrimination, not just vote dilution).

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986). Plaintiffs' initial burden is to show that African American voters are disproportionately impacted by the challenged election practice or structure, and that the burdens imposed by the challenged practice are "linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." *Veasey v. Abbott,* 830 F.3d at 244 (quoting *League of Women Voters of N.C.*, 769 F.3d at 240, and citing *Ohio St. Conf. NAACP v. Husted,* 768 F.3d at 554).

With regard to the first prong of this test, Plaintiffs demonstrate through the report of their expert, Dr. Bernard Fraga, that the elimination of satellite voting locations after their initial use in 2008 disproportionately impacted African-American voters in Marion County. (Pls.' Ex. 7). Dr. Fraga, an associate professor of political science at Indiana University Bloomington, analyzed election data from the voter file in Marion County to determine whether the lower number of EIP votes cast in 2016 and 2012 as compared to 2008 was related to MCEB's failure to approve satellite voting locations in 2016 and 2012, and to determine if the impact of the MCEB's decisions on Marion County's African-American voters was greater than the impact upon non-Hispanic white voters. *Id*. at 2.

Based on his analysis, Dr. Fraga arrived at four significant conclusions: (1) that the MCEB's failure to approve any satellite voting locations for 2012 and 2016 decreased the proportion of voters voting EIP in Marion County relative to 2008; (2) that African-Americans who voted absentee were more likely to use EIP absentee voting in Marion County than non-Hispanic whites who voted absentee in 2008, 2012, and 2016; (3) that after the MCEB's failure

to approve any satellite voting locations in 2012 and 2016, rates of EIP absentee voting among African-American voters declined to a greater degree than rates of EIP absentee voting for non-Hispanic whites, relative to 2008; and (4) that given this evidence, the MCEB's failure to approve any satellite voting locations for the 2012 and 2016 elections likely had a disproportionate, negative impact on African-Americans in Marion County relative to non-Hispanic whites, and that the continued non-approval of such locations is likely to continue to have a disproportionate impact on African-Americans in the future. *Id.* at 3, 9.

With respect to the second prong of the Section 2 analysis, Plaintiffs will show through lay and expert testimony that the MCEB's failure to approve satellite voting locations for EIP absentee voting since 2008 "interacts with" social and historical conditions "to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* 478 U.S. at 47.

### C. Plaintiffs meet the other requirements for the issuance of a preliminary injunction.

> *1. Absent the issuance of a preliminary injunction, Plaintiffs will suffer irreparable harm to their right to equally participate in the electoral system.*

Having demonstrated a likelihood of success on the merits of their claims, Plaintiffs must also demonstrate irreparable harm. For some kinds of constitutional violations, irreparable harm is presumed. *Ezell v. City of Chicago,* 651 F.3d 684, 699 (7th Cir. 2011). This presumption applies when First Amendment rights are implicated, *id.,* and in equal protection violations. *Baskin v. Bogan,* 983 F.Supp.2d 1021, 1028 (S.D. Ind. 2014), aff'd F.3d 766 F.3d 648 (7th Cir. 2014), *cert. denied* 135 S. Ct. 316 (2014). The denial or abridgement of the right to vote is without redress; there is simply no way to recompense violations of this fundamental right after the fact. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir.

2014); *accord Obama for Am. v. Husted.*, 697 F.3d at 436; *see also Williams v. Salerno*, 792

F.2d 323, 326 (2d Cir. 1986).

A constitutional violation does not cause irreparable harm when it can be rectified by an

award of damages. No such damages remedy is sought or possible here, and if Plaintiffs are

denied access to satellite voting locations in 2018, they will have lost those rights forever without

legal recourse.

### 2. *The balance of harms favors the issuance of injunctive relief.*

While the harm flowing from the *denial* of an injunction is concrete, substantial, and

irreparable, the harm caused to the MCEB, if any, by *granting* an injunction is not. Indeed, two

of the three members of the MCEB have consistently supported establishing satellite locations

since 2010. Moreover, funding has always been sufficient and available for satellite voting

locations, and in 2008—the first and only federal election in which satellite voting locations

were used in Marion County—they were utilized without any administrative difficulties. (Pls.'

Ex. 4, Admission Nos. 1-3; Pls.' Ex. 8, Eldridge Dep., 8-12). Rather than being harmed by an

order from this Court mandating the re-establishment of satellite voting locations for EIP

absentee voting, such an order would greatly benefit the voters of Marion County by increasing

their accessibility to EIP absentee voting, which has become an integral part of Indiana's election

system. The absence of any harm to the Defendants is also shown by the minutes and resolutions

of the counties contiguous to Marion County and Indiana's most populous counties, which have

routinely approved satellite voting locations. (Pls.' Ex. 1). There is no objective basis on which

to conclude that the MCEB will be harmed in any way by this Court enjoining its members to

establish the same number of satellite voting locations it approved in 2008.

A mandatory preliminary injunction is appropriate where the harm is substantial and maintaining the status quo would mean further harm and possibly make a final determination on the merits futile. *Ferry-Morse Seed. Co. v. Food Corp., Inc.* 729 F.2d 589, 593 (8th Cir. 1984) (citing cases). A preliminary injunction, like the one Plaintiffs seek, that grants the plaintiffs less than the full relief requested is viewed with less disfavor than one that grants full relief.[13] *Norman v. Johnson,* 739 F. Supp. 1182, 1190 (N.D. Ill. 1990) (citing *Bricklayers Union No. 7 of Nebraska v Lueder Construction Co.,* 346 F. Supp. 558, 561 (D. Neb. 1972)); *see also Kimbley v. Lawrence County,* 119 F.Supp.2d 856, 874 (S.D. Ind. 2000) (citing, *inter alia, Ferry-Morse Seed Co.*, and noting that a court may restore the status quo ante when the continuation of the changed situation would inflict irreparable harm on plaintiff). Accordingly, the balance of the harms favors the issuance of a preliminary injunction ordering the MCEB to restore at least two (2) satellite voting locations, the same number established for the 2008 elections, for the 2018 elections.

3. *The public interest will be served by the granting of a preliminary injunction.*

Finally, the public interest is served by a preliminary injunction ordering the restoration of satellite voting locations in Marion County until the Court can decide this case on a full record. "Injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). The United States Supreme Court has likewise held that "the public has a strong interest in exercising the fundamental political right to vote." *Purcell v.* Gonzalez, 549 U.S. 1, 4 (2006). It is hard to envision how providing the voters in Marion County with access to the same number of satellite voting

---

[13] At trial on the merits, because of the large number of eligible voters in Marion County, Plaintiffs would expect to seek more than just two satellite voting locations.

locations as were provided in 2008, and that are routinely provided to voters in every other urban county in Indiana, would be anything but beneficial to the public interest.

Because Plaintiff's proposed preliminary injunction would "eliminate[ ] a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process," it is in the public interest. *U.S. Student Assoc. Found v. Land*, 546 F.3d 373, 388-89 (6th Cir. 2008).

### D. The injunction should issue without bond.

The issuance of a preliminary injunction will not impose any monetary injuries on the Defendants. In the absence of such injuries, there is no reason to require Plaintiffs to post a bond. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health,* 984 F. Supp. 2d 912, 931 (S.D. Ind. 2013).

### V.    CONCLUSION

It is apparent that the opportunity for EIP absentee voting is administered equally everywhere except in Indiana's most populous and racially diverse county. Arbitrary partisan obstructionism has resulted in the Satellite Voting Statute being used to deny Marion County voters the same EIP voting rights that are routinely accorded to other eligible Indiana voters, in violation of the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, and Section 2 of the Voting Rights Act.

For all of the foregoing reasons, Plaintiffs respectfully request that the Court set this matter for hearing, and after listening to the testimony and reviewing the evidence, grant their motion for preliminary injunction and order Defendants to restore at least two satellite voting locations in Marion County for the 2018 primary and general elections, pending final resolution of the merits of Plaintiffs' claims.

Respectfully submitted,

/s/ *William R. Groth*

William R. Groth (7325-49)
Daniel Bowman (31691-49)
FILLENWARTH DENNERLINE
GROTH & TOWE LLP
429 East Vermont Street, Suite 200
Indianapolis, IN 46202
(317) 353-9363
wgroth@fdgtlaborlaw.com
dbowman@fdgtlaborlaw.com

*Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2018, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/William R. Groth</u>
William R. Groth

FILLENWARTH DENNERLINE GROTH & TOWE, LLP
Suite 200, 429 East Vermont Street
Indianapolis, IN 46202
Telephone: (317) 353-9363
Fax: (317) 351-7232
E-mail: wgroth@fdgtlaborlaw.com