# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA; | ) | |
| NATIONAL ASSOCIATION for the | ) | |
| ADVANCEMENT OF COLORED PEOPLE, | ) | |
| by its Greater Indianapolis Branch 3053 | ) | |
| and on behalf of its individual members; | ) | |
| DORIS A. McDOUGAL; and | ) | |
| JOHN WINDLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| MARION COUNTY ELECTION BOARD; | ) | Case No.: 1:17-cv-01388-SEB-TAB |
| KEITH JOHNSON, MAURA HOFF, and | ) | |
| MYLA A. ELDRIDGE, each in their official | ) | |
| capacities as members of the MARION | ) | |
| COUNTY ELECTION BOARD; and | ) | |
| CONNIE LAWSON, in her official capacity | ) | |
| as the Indiana Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF AMICUS CURIAE STATE OF INDIANA IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

The State of Indiana, by Attorney General Curtis T. Hill, Jr., and Deputy Attorneys General Kelly S. Witte, Bryan R. Findley and Aleksandrina P. Pratt, hereby submits its Brief of Amicus Curiae in opposition to the motion for preliminary injunction.

## BACKGROUND

Under Indiana law, each County must provide an alternative to absentee mail voting by permitting early, in-person ("EIP") voting at the office of the circuit court clerk.  I.C. § 3-11-10-26(a)(1).  Beyond that single-location EIP requirement, the legislature has delegated to County election boards the authority, by unanimous vote, to establish additional EIP locations.  I.C. § 3-11-10-26.3.  The unanimity requirement was enacted in 2001 through bipartisan support with a Republican senate, a Democratic house, and a Democratic governor.  *See* (P.L. 167-2001, Sec 8

(SEA 395); P.L. 199-2001, Sec 24 (HEA 1510)). As all county election boards must be constituted with members from at least two political parties, Ind. Code § 3-6-5-2, the unanimity requirement is designed to ensure bipartisan support for additional EIP locations and to thwart creation of such locations based on purely partisan interests.

Though Plaintiffs disclaim any challenge to that unanimity requirement itself, they filed this lawsuit to require the Marion County Election Board, under both the Constitution and the Voting Rights Act, to vote unanimously to create Plaintiffs' preferred EIP locations. Plaintiffs appear to claim that, though the board need not ever have approved of additional EIP locations, once the Board voted unanimously in 2008 to create additional EIP locations, that vote vested a constitutional right in voters who prefer those locations—a right that the Board could not later refuse to extend absent some overriding justification.

There is no constitutional right to vote in a location and at a time one prefers, even if a local governing body at one time provided that right as a matter of policy. Accordingly, there is no call in this case to analyze the Board's refusal to approve additional EIP locations under the sliding-scale *Anderson-Burdick* rubric, which requires that a burden on some aspect of the constitutional right to vote be justified by a sufficiently weighty government interest. Here, there is no burden on any aspect of the constitutional right to vote that must be so justified.

Furthermore, even aside from whether a constitutional right is at stake, Plaintiffs have not even established that the Board's refusal to authorize additional EIP locations causes any injuries to any particular voters. Plaintiffs' evidence consists only of public records relating to other Indiana counties, election turnout data, population records, minutes from MCEB meetings, an expert report, and transcript excerpts of the depositions of Board members Myla Eldridge and Maura Hoff. [ECF 63, P's Designation of Evidence.] Plaintiffs Windle and McDougal provided

no evidence that they will be unable to vote, or even will be less likely to vote, absent the additional EIP locations. And plaintiffs Common Cause and NAACP provide no evidence that any of their combined 3,200 members will be affected by the lack of additional EIP locations. Plaintiffs' expert report purports to estimate negative aggregate impact on minority turnout, but fails both to do that and to establish any injury suffered by the Plaintiffs or their members. Finally, Plaintiffs have no evidence that the Board acted with unconstitutional purposes when refusing to authorize additional EIP locations.

Around the state, bi-partisan county election boards regularly approve additional EIP locations, and even alter those additional locations as conditions require. [Plaintiffs' Exhibit 1, ECF 63-1.] Indeed, the Marion County Board itself has proven able to achieve bipartisan agreement regarding additional EIP locations. Not only did it approve such locations in 2008, but it also has approved such locations for elections beginning in 2019. *See* Amicus Exhibit "A," Marion County, Indiana Election Board Resolution No. 01-18 ("In each election in the future, commencing with the 2019 Municipal Primary election, several of the vote center polling places will be open for early satellite voting.") *See also*, Amicus Exhibit "B," Myra Eldridge Deposition, pp. 40-41, (…there is an agreement that both major political parties have decided that for next year 2019 that Marion County will be allowed to have not only satellite sites… the resolution will be to have satellite sites and vote centers for Marion County for next year."); Fatima Hussein, *Marion County Election Board to Replace Precincts with Vote Centers*, IndyStar, January 24, 2018, https://www.indystar.com/story/news/2018/01/24/marion-county-election-board-replace-precincts-half-many-vote-centers/1057817001/ ("Russell Hollis, a spokesman for the Marion County Elections Board, said the decision "will definitely lend to an increase in the number of early voting sites in Marion County.") (last visited on February 14, 2018).

In the face of a fully functioning rule requiring bipartisan agreement regarding additional EIP locations, Plaintiffs demand a constitutional one-way EIP location ratchet: One election board, one unanimous vote, one time. The Constitution affords nothing of the sort. They also raise a Voting Rights Act challenge, but fail both to demonstrate unequal voting opportunities and to provide evidence that the Board's refusal to authorize additional EIP locations will have a negative disparate impact on minority turnout. Accordingly, that claim must also be rejected.

**ARGUMENT**

**I.      Plaintiffs' First and Fourteenth Amendment Claims Must Fail**

For there to be an unconstitutional result, there must first be a constitutional right. Plaintiffs' claim that the Board's refusal to authorize additional EIP locations since 2008 has resulted in a constitutional violation presupposes some constitutional right in either (1) a unanimous Board vote or (2) additional EIP locations. No such rights exist; accordingly, applying an *Anderson-Burdick* analysis to the Board's refusal to authorize additional EIP locations is unwarranted.

**A.  There is No Right to In-Person Early Voting**

The right to vote means the right to cast a ballot in an election, but "[i]t does not follow… that the right to vote in any manner and the right to associate for political purpose through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Accordingly, the Seventh Circuit has already held that there is no right to vote absentee and that states may require that ballots be cast on Election Day. *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004). Particularly notable for this case, in arriving at that conclusion, the court observed that "it is obvious that a federal court is not going to decree weekend voting, multi-day voting, all-mail voting, or Internet voting . . . ." *Id.* at 1130. From this binding circuit precedent it follows that

federal courts may not, as a matter of the constitutional right to vote, decree early in-person voting at multiple locations around a particular county. There is no need to re-balance the competing interests under the *Anderson-Burdick* test to arrive at that unremarkable conclusion.

Perhaps with that rather obvious barrier in mind, Plaintiffs instead assert a constitutional right to a voting procedure that, while not constitutionally mandated itself, was once afforded by local authorities and therefore (in Plaintiffs' view) cannot be removed without a sufficiently weighty justification. Similar to the plaintiffs in *Ohio Democratic Party v. Husted*, they ask this court to "adopt a broad rule that any expansion of voting rights must remain on the books forever." *Ohio Democratic Party v. Husted,* 834 F.3d 620, 635 (6th Cir. 2016). The 6th Circuit in *Husted* saw that "[s]uch a rule would have a chilling effect on the democratic process: states would have little incentive to pass bills expanding voting access if, once in place, they could never be modified in a way that might arguably burden some segment of the voting population's right to vote." *Ohio Democratic Party v. Husted,* 834 F.3d 620, 635 (6th Cir. 2016).

In support of that expansive and ill-considered theory, Plaintiffs cite *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016), which invalidated a statute limiting all Wisconsin counties to a single, in-person early voting location. *Id*. at 908. The District Court in that case, however, did not explain why it rejected "defendants' argument that… in-person absentee voting provisions does not implicate [] constitutional rights." *One Wisconsin Inst., Inc.* 198 F. Supp. 3d at 933. It ultimately relied on *Paul v. Davis*, 424 U.S. 693 (1976), but that case has nothing to do with elections and voting, and indeed is about due process for individualized deprivations of existing rights (such as a driver's license or parole conditions), not about cementing temporary statutory conveniences as new substantive constitutional rights. *Id.* at 710-11. The

Court expressly cabined its discussion "to consideration of the procedural guarantees of the Due Process Clause," not "substantive limitations upon state action…." *Id*. at 735 n. 5 (1976).

Critically, while *One Wisconsin* extended *Paul* beyond its express procedural limits, it did not even bother to confront *Griffin's* holding that there is no constitutionally protected right to cast an absentee ballot. Instead, it looked only to plaintiffs' allegation "that the state is denying them the opportunity to exercise a right that they already have" by virtue of a statute. *One Wisconsin* 198 F. Supp. 3d at 933. But if there is no constitutional compulsion for a state to provide multiple EIP locations in the first instance, it is hard to fathom how withdrawing such non-mandatory voting locations implicates constitutional rights.

In that regard, it bears re-emphasis that Plaintiffs do not purport to challenge the Constitutionality of Indiana Code § 3-11-10-26.3. [See ECF 50, Order on Motion to Reconsider, ("Plaintiffs do not actually ever challenge the constitutionality of § 3-11-10-26.3's unanimity requirement, only the result.").] Instead they challenge the result of votes made by the MCEB pursuant to Indiana Code § 3-11-10-26.3, which is a neutral and non-discriminatory procedural restraint on proliferation of costly (and potentially opportunistic) early voting sites. It does not create or remove any EIP Locations, but instead delegates that power to bi-partisan County Election Boards. Thus, the MCEB's reasons for internal division are irrelevant to a constitutional analysis. There is no constitutional right at stake, which means the constitutional challenge must fail.

### B. Neither the Statute nor the Board's Vote Draws Any Classifications Subject to an Equal Protection Challenge

Plaintiffs purport to raise an equal protection challenge, but they identify no classification actually drawn by the statute or the Board's vote. Instead, they attempt to establish that the Board's refusal to establish satellite early voting precincts will have a disparate negative impact on minority

voting.  Even assuming such a disparate impact will arise, however, does not establish an equal protection violation absent some proof of discriminatory intent.

Plaintiffs argue that the MCEB has violated the Supreme Court's "geographic discrimination precedent."  [ECF 62, P's Brief in Support, p. 21.]  Specifically, they assert that, "[t]hough Indiana was not constitutionally required to grant its citizens the right to cast an EIP absentee ballot, having made EIP absentee voting an integral part of Indiana's voting procedures, the MCEB may not grant or withhold that right on a discriminatory basis based upon geography." [*Id.*]  Plaintiffs' argument relies on the "self-evident" "geographic discrimination" that results from the MCEB "with[holding] satellite voting locations from Indiana's most populous and racially diverse county, while election boards in less populous counties routinely approve satellite voting locations."  [*Id.* at 22.]

The precedent cited by Plaintiffs to support their "geographic discrimination" claim does not stand for the assertion the Indiana General Assembly cannot authorize county election boards to administer their own elections. Plaintiffs rely on *Wesberry v. Sanders,* 376 U.S. 1 (1964), *Moore v. Ogilvie*, 394 U.S. 814 (1969) and *Idaho Coalition United for Bears v. Cenarrusa,* 342 F.3d 1073 (9th Cir. 2003).  [ECF 62, P's Brief in Support, pp. 21-22.]  But those cases involved statewide application of state laws providing preferential treatment to some regions of the state over others in terms of voting strength or representation.  They have nothing to do with the decisions of county election boards that exercise local control over election processes.  Plaintiffs also cite *Obama for America,* 697 F.3d at 435.  [ECF 62, P's Brief in Support, p. 21], but that case too involved statewide application of a statute that  itself created classifications, namely different limitations on military and non-military voters.  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).  It offers no support for an equal protection claim here.

Plaintiffs admit they "are not challenging the facial constitutionality of the Satellite Voting Statute," [ECF 62, P's Brief in Support, p. 25.], yet proceed to argue as though they had brought a facial challenge. In essence, Plaintiffs' "geographic discrimination" argument is that the MCEB treats Marion County residents differently than election boards in other counties treat their residents. Unless the Equal Protection Clause restricts the State from providing for local control over whether and where to locate EIP voting sites, however, such an outcome is unremarkable. The MCEB has no authority over EIP voting locations anywhere other than Marion County, so its decisions cannot plausibly be said to create county-by-county classifications subject to equal protection review.

Moreover, Plaintiffs assert that "the Indiana Legislature has granted to all registered voters the unconditional right to cast an EIP absentee vote." [ECF 62, P's Brief in Support, p. 15.] That is not an accurate statement of the Indiana Code or the actual applicable conditions. Indiana imposes *several* conditions upon the "right to cast an EIP absentee vote." Specifically, Indiana Code § 3-11-10-26(a) establishes that a voter may cast an absentee ballot *only* at either (1) "the office of the circuit court clerk;" or, (2) "a satellite office established under section 26.3." Ind. Code. § 3-11-10-26(a). These are conditions on EIP absentee votes. For its part, Indiana Code § 3-11-10-26.3 permits election boards to unanimously adopt "a resolution to authorize the circuit court clerk to establish satellite officers." Ind. Code. § 3-11-10-26.3. The requirement of unanimity is a condition on the right to cast an EIP absentee vote outside the clerk's office.

Furthermore, the unanimity condition serves a critical function: preventing one party from running roughshod over the other and establishing additional EIP locations purely as a matter of partisan advantage. County election boards are made up of the circuit court clerk and "two (2) persons appointed by the clerk" consisting of "one (1) *from each of the major political parties of*

8

*the county*. I.C. § 3-6-5-2. (emphasis added). Thus, the unanimity requirement inherently imposes bipartisan agreement before counties may add EIP locations. And Plaintiffs should not be scandalized if the Republican member of the MCEB rejected additional satellite voting locations "because the resolution was drafted by a Democrat Party appointee." [ECF 62, P's Brief in Support, p. 23.] Deterring the creation of additional polling places out of purely partisan motivation is exactly the point of the statute's unanimity requirement. Plaintiffs' claim of constitutional right to additional EIP locations would merely shift the default from what the statute prescribes (no additional EIP locations absent unanimous vote) to what the majority party prescribes (whatever EIP locations they prefer). So, far from removing partisanship from the MCEB's vote, Plaintiffs' theory would constitutionalize a partisan majority's demands. A partisan majority of the MCEB has no greater claim than the legislature to establish baseline voting mechanisms.

Ultimately, the MCEB has demonstrated the ability to come to an agreement when all members see the public benefits of additional EIP locations, and not mere partisan opportunism. Marion County, Election Board Resolution No. 01-18 on January 24, 2018. *See* Amicus Exhibit "A." That unanimous vote demonstrates that the legislature's unanimity requirement works exactly as intended and requires no judicial readjustment under Plaintiffs' constitutional theory.

## II.  Plaintiffs Provide Insufficient Evidence to Support a Voting Rights Act Claim

Section 2 of the Voting Rights Act of 1965 states that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). Subsection (b) of the Act, however provides that "A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination

or election in the State or political subdivision *are not equally open to* participation by members of a class of citizens protected by subsection (a) in that its members have *less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added).[1]

Here, Plaintiffs fail to demonstrate both that the Board's refusal to approve additional EIP locations provides minorities with unequal voting opportunities or even that it has caused a disproportionate negative impact on minority voting in Marion County.

## A. Plaintiffs Do Not Establish Less Voting *Opportunity* for Minorities

Plaintiffs assert that they need show only that there was a discriminatory impact and that the alleged burdens imposed are linked to the social and historical conditions that produce discrimination against members of the protected class. [ECF 62, pp. 26-27.] This overly simplistic and mechanistic approach does not pass muster for proving a Section 2 violation.

As the Seventh Circuit has made clear, "Section 2(b) tells us that § 2(a) does not condemn a voting practice just because it has a disparate effect on minorities." *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014). Rather, the voting practice must afford less *opportunity* for minorities to vote to run afoul of the Voting Rights Act. Even causing a disparate impact does not prove less opportunity; it proves at most that minorities use the opportunity less. *Id.* ("Act 23 does not draw any line by race, and the district judge did not find that blacks or Latinos have less 'opportunity' than whites to get photo IDs. Instead the judge found that, because they have lower income, these groups are less likely to *use* that opportunity. And that does not violate § 2.") To be sure, if the

---

[1] Subsection (b) goes on to say that "The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b).

reason the minorities use the opportunity less is owing to some other discriminatory action by the responsible jurisdiction (here, Marion County), the result may yet be a violation of the Voting Rights Act. *Id.* But Plaintiffs offer no proof in their preliminary injunction motion that Marion County is responsible for the socio-economic disadvantages that may deter minorities from making use of opportunities equally available to all, or that any such disadvantages are somehow logically connected to the need for additional EIP locations. *Frank*, 768 F.3d at 753 ("[U]nits of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination").

Even if Plaintiffs established that fewer satellite voting locations disproportionately affects African-American voters (and they do not, see Part II.B., *infra*), Plaintiffs still have no evidence that (1) those voters have unequal access or (2) are unable to elect the representative of their choice by virtue of fewer satellite voting sites. Under *Frank*, such lack of evidence necessarily dooms their Voting Rights Act claim. *See also Mark Wandering Medicine v. McCulloch*, 906 F. Supp. 2d 1083, 1088 (D. Mont. 2012) ("The issue is whether Plaintiffs can establish, based on the totality of the circumstances, that they, as Native Americans living on the three reservations, have less access to in-person absentee voting and late registration *and* that they are unable to elect representatives of their choice."), order vacated, appeal dismissed sub nom. *Medicine v. McCulloch*, 544 Fed. Appx. 699 (9th Cir. 2013) (unpublished).

### B. Plaintiffs' Evidence Does Not Prove That Minority Voter Turnout Declined Because the Board Refused to Add EIP Locations

In any event, Plaintiffs' evidence does not show that MCEB's refusal to add EIB locations causes a disproportionate negative impact on minority voters in Marion County. Plaintiffs have offered the expert report of Dr. Bernard Fraga, but that report does not establish that MCEB's refusal to authorize satellite voting locations for EIP voting has actually caused a disparity between

minority and majority access to voting. As the Seventh Circuit put it in *Frank*, "when the validity of the state's voting laws depends on disparate impact . . . it is essential to look at everything (the "totality of circumstances", § 2(b) says) to determine whether there has been such an impact." *Frank*, 768 F.3d at 754. For if a court does not consider all the circumstances, "§ 2 will dismantle every state's voting apparatus." *Id.*

1.     At best, Dr. Fraga demonstrates only that EIP voting rates declined from 2008 versus 2012 and 2016, and that African-American voters in Marion County were generally more likely to utilize EIP than white voters. Neither of these points shows that voter turn-out declined in Marion County because of a reduction in EIP satellite sites, or that such a decline disproportionately impacted African-Americans.

Undertaking that level of analysis would have been particularly challenging, as it would have required Dr. Fraga to name-match and geocode the entire county voter file for all three elections to show that African-American turnout declined (which Dr. Fraga did only for the much smaller subsample of voters who voted absentee). Even then, assuming the data still showed a significant decline, Dr. Fraga would still have had to rule out any other causes of decline in turnout between the elections, which is not possible looking only at Marion county data. *Frank* tells us that this failure to account for the totality of circumstances renders Dr. Fraga's report legally insufficient.

2.     Even on its own terms, a number of weaknesses in Dr. Fraga's report significantly undercut its usefulness. First, Dr. Fraga analyzed data only for 2008, 2012, and 2016, which were presidential election years. His report contains no analysis for 2010 and 2014 or a prediction for 2018 and, thus, presents an incomplete picture. Significantly, 2008 was a historically high turnout election across the United States and in Indiana. https://www.cnn.com/2016/11/11/

politics/popular-vote-turnout-2016/index.html (last visited on February 14, 2018) (noting that 2008 was "the high point for turnout"). And while Marion County voter turnout declined after 2008, it did so at a rate similar to the rest of the state, namely a little over 5% for each. https://www.in.gov/sos/elections/2983.htm (last visited on February 14, 2018). The differential decline in 2016 was larger, but that only underscores the presence of confounding variables in these data comparisons. With this data, there is an insufficient basis for attributing a decline in turnout to fewer EIP satellite sites.

**Turnout Relative to 2008: Marion County vs. Rest of State**

| Year | Ballots | Ballots Marion | Ballots Marion (% Change vs 2008) | Ballots RoS | Ballots RoS (% Change vs 2008) | Registered | Registered Marion | Registered Other |
|------|---------|----------------|-----------------------------------|-------------|--------------------------------|------------|-------------------|------------------|
| 2000 | 2,246,003 | 273,486 | -28.36% | 1,972,517 | -18.63% | 4,016,440 | 550,615 | 3,465,825 |
| 2004 | 2,512,142 | 323,673 | -15.22% | 2,188,469 | -9.73% | 4,296,602 | 603,390 | 3,693,212 |
| 2008 | 2,805,986 | 381,759 | 0.00% | 2,424,227 | 0.00% | 4,514,759 | 697,559 | 3,817,200 |
| 2012 | 2,663,368 | 361,278 | -5.36% | 2,302,090 | -5.04% | 4,555,257 | 640,525 | 3,914,732 |
| 2016 | 2,807,676 | 370,498 | -2.95% | 2,437,178 | 0.53% | 4,829,243 | 699,709 | 4,129,534 |

Second, Dr. Fraga predicted voters' race for 98% of *all* absentee voters, not simply those who voted EIP. He cannot establish that less opportunity for EIP voting affected African-American voters disproportionately to white non-Hispanic voters.

Next, Dr. Fraga's research demonstrates a decline by both "white" and "black" EIP voting, and shows a correlative incline in absentee voting by mail. (Fraga Report at 5-6.) In that regard, several researchers have concluded that EIP voting does not systematically increase overall voter turnout. *See* B. Burden, *et al.*, *Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform*, 58 Am. J. Pol. Sci. 95, 102 (Jan. 2014) ("we hypothesize that early voting facilitates participation by those individuals *already likely to vote*. All else equal, we

therefore do not expect the convenience of early voting to increate turnout") (emphasis in original); J. Giammo & B. Brox, *Reducing the Costs of Participation; Are States Getting a Return on Early Voting*, 63 Pol. Res. Q. 295, 300 (June 2010) ("counties that offer in-person early voting show no long-term increase in turnout"). Inversely, then, fewer EIP sites cannot systematically lower overall voter turnout. Accordingly, Dr. Fraga's report does not satisfy Plaintiffs' burden to show that African-American voters have, and will continue to, be disproportionately impacted by fewer satellite voting locations.

Finally, serious data issues plague Dr. Fraga's analysis. Namely, his turnout data does not match the official reports of the Indiana Secretary of State, available at http://www.in.gov/sos/elections/2983.htm. In every election, Dr. Fraga's data is missing substantial number of voters, as the table below demonstrates:

| Year | Official Turnout | Fraga Turnout |
|------|------------------|---------------|
| 2008 | 381,759 | 370,839 |
| 2012 | 361,278 | 356,022 |
| 2016 | 370,498 | 366,653 |

Yet, Dr. Fraga includes no discussion of the likely impact of this missing data on any of his findings. The lack of any accounting for these differences undermines the credibility of the report.

\*\*\*

In asserting their Section 2 claim, Plaintiffs attempted to rely on an inapplicable test aimed to look only at the discriminatory effect of an election mechanism. Not only is this the incorrect standard, Plaintiffs, through their expert, have failed to meet it. Plaintiffs are seeking an extraordinary remedy by asking this court to impose a voting mechanism that would render the unanimity requirement of Indiana Code § 3-11-10-26.3 hollow and would violate state law. The

MCEB has shown it can reach a unanimous agreement, just not as quickly as Plaintiffs might like.

This is not a sufficient reason to impose the extraordinary remedy of injunctive relief.

Respectfully submitted,

CURTIS T. HILL, JR.
Atty. No. 13999-20
Attorney General of Indiana

*/s/ Bryan R. Findley*
Bryan R. Findley
Atty. No. 34447-30
Deputy Attorney General

Kelly S. Thompson
Atty. No. 21846-49
Deputy Attorney General

Aleksandrina P. Pratt
Atty. No. 34377-49
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Kelly.Thompson@atg.in.gov
Bryan.Findley@atg.in.gov
Aleksandrina.Prat@atg.in.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2018, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

A. Scott Chin
Scott.chinn@faegrebd.com

Anne K. Ricchiuto
Anne.ricchiuto@faegrebd.com

Daniel E. Pulliam
Daniel.pualliam@faegrebd.com

Donald E. Morgan
Donald.morgan@indy.gov

William R. Groth
wgroth@fdgtlaborlaw.com

Daniel Bowman
dbowman@fdgtlaborlaw.com


/s/ Bryan R. Findley
Bryan R. Findley
Atty. No. 34447-30
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Kelly.Thompson@atg.in.gov
Bryan.Findley@atg.in.gov
Aleksandrina.Prat@atg.in.gov

# EXHIBIT A



## MARION COUNTY, INDIANA ELECTION BOARD
## RESOLUTION NO. 01-18

WHEREAS, the Marion County Election Board (the " Board") is charged with the responsibility to conduct elections in Marion County; and

WHEREAS, for many years, the Board and the community have had discussions regarding additional access to voting opportunities and improved voting methods in Marion County; and

WHEREAS, the Board and other officials with input into the election system have discussed and considered possible changes to the administration of elections in Marion County, including consideration of the use of e-pollbooks, vote centers and early voting at satellite offices; and

WHEREAS, those discussions have resulted in agreements and understandings among officials from both major political parties regarding those possible changes; and

WHEREAS, the Board now wishes to take official action to create a process to study, discuss, plan and implement various changes to Marion County election administration consistent with those discussions;

NOW THEREFORE, BE IT RESOLVED, by the Marion County Election Board as follows:

1. An election administration planning committee (the "EAPC") is hereby created as an informal advisory committee of the Board. The EAPC shall be made up of seven members. The Chair and Vice-Chair of the Board shall appoint three members each with one member from each appointing authority being a member or representative of the Indianapolis-Marion County City-County Council. The Secretary of the Board shall appoint the seventh member who shall serve as the chair of the EAPC. The Director of Elections shall provide advice and counsel to the EAPC and coordinate the provision of staff and vendor resources to the EAPC.

2. Pursuant to IC 3-11-18.1, the EAPC shall develop, subject to adoption by unanimous vote of the entire membership of the Board, a draft plan of administration and implementation for vote centers in Marion County that includes, but is not limited to, the following features:

   a. Commencing with the 2019 Municipal Primary Election, all of the approximately 300 polling places used in the 2018 General Election shall be vote center polling places, to the extent practicable.

   b. E-pollbooks will be used county-wide at each vote center polling place.



c. In each election in the future, commencing with the 2019 Municipal Primary Election, several of the vote center polling places will be open for early satellite voting for at least the two weeks prior to election day, with the EAPC to recommend the number of satellite sites for each type of election held in Marion County (primary, general, municipal).

3. The EAPC shall timely make recommendations to the Board regarding changes to equipment, staffing, process, and applicable law sufficient to carry out the purposes of this Resolution and implement the voting method changes provided herein.

ADOPTED AND APPROVED at a meeting of the Marion County Election Board on the 24th day of January, 2018.

MARION COUNTY ELECTION BOARD

Keith Johnson, Chair

Melissa Thompson, Vice-Chair

Myla A. Eldridge, Secretary

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


COMMON CAUSE INDIANA;          )
NATIONAL ASSOCIATION FOR       )
THE ADVANCEMENT OF COLORED     )
PEOPLE; by its Greater         )
Indianapolis Branch 3053       )
and on behalf of its           )
individual members; DORIS A.   )
MCDOUGAL; and JOHN WINDLE,     )         CASE NO.
                               ) 1:17-cv-01388-SEB-TAB
          Plaintiffs,          )
                               )
       vs.                     )
                               )
MARION COUNTY ELECTION BOARD;  )
KEITH JOHNSON, MAURA HOFF and  )
MYLA ELDRIDGE, each in their   )
official capacities as         )
members of the MARION COUNTY   )
ELECTION BOARD,                )
                               )
          Defendants.          )



        The deposition upon oral examination of
MYLA ELDRIDGE, a witness produced and sworn before
me, Deanne S. Hutson, a Notary Public in and for the
County of Marion, State of Indiana, taken on behalf
of the Plaintiffs at the law offices of Faegre Baker
Daniels, 300 North Meridian Street, Suite 2700,
Indianapolis, Marion County, Indiana, on the 10th day
of January, 2018, pursuant to the Indiana Rules of
Trial Procedure.

CIRCLE CITY REPORTING
135 North Pennsylvania Street
Suite 1720
Indianapolis, IN 46204
(317) 635-7857

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 2

1           A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:  William R. Groth
                        Daniel P. Bowman
4                       FILLENWARTH, DENNERLINE, GROTH &
                        TOWE, LLP
5                       429 East Vermont Street
                        Suite 200
6                       Indianapolis, Indiana 46202

7   FOR THE DEFENDANTS:  Anne Kramer Ricchiuto
                         FAEGRE BAKER DANIELS, LLP
8                        300 North Meridian Street
                         Suite 2700
9                        Indianapolis, Indiana 46204

10

11  FOR THE CITY OF      Donald E. Morgan
    INDIANAPOLIS:        OFFICE OF CORPORATION COUNSEL
12                       200 East Washington Street
                         Room 1601
13                       Indianapolis, Indiana 46204

14  FOR THE STATE OF     Aleksandrina Penkova Pratt
    INDIANA:             OFFICE OF THE INDIANA ATTORNEY
15                          GENERAL
                         302 West Washington Street
16                       Indiana Government Center South
                         Fifth Floor
17                       Indianapolis, Indiana 46204

18

19

20

21

22

23

24

25

Page 4

1          MS. RICCHIUTO: This is Anne Ricchiuto on

2   behalf of the Defendants and in particular on

3   behalf of the Marion County Clerk, Myla

4   Eldridge, who is also the secretary of the

5   Marion County Election Board.

6          I want to say one quick word on the

7   record about the State's attendance at this

8   deposition today.  It's really unusual to have a

9   non-party present at the deposition.  The

10  Defendants are not objecting based on our

11  understanding and my prior conversations with

12  the Attorney General's representatives that they

13  don't intend to ask any questions today.  That's

14  consistent with the Court's order just entered

15  at Docket No. 50 that declines to grant the

16  State permission to conduct any discovery.

17         So with that notation, we don't object to

18  the State's presence, but we want to make the

19  record clear on that point.

20

21

22

23

24

25

Page 3

1       I N D E X   O F   E X A M I N A T I O N

2                                             PAGE

3   DIRECT EXAMINATION...........................    5
        Questions by William R. Groth
4
    CROSS-EXAMINATION............................   36
5       Questions by Anne Kramer Ricchiuto
6   REDIRECT EXAMINATION.........................   38
        Questions by William R. Groth
7
    RECROSS-EXAMINATION..........................   41
8       Questions by Anne Kramer Ricchiuto

9

10

11

12

13       I N D E X   O F   E X H I B I T S

14                                             PAGE

15  Plaintiff(s) Deposition Exhibit(s):

16  1 - Biography of Marion County Clerk..........    5
        Myla A. Eldridge
17
    2 - Voter Turnout in Marion County, IN........   18

18

19

20

21

22

23

24

25

Page 5

1   M Y L A  E L D R I D G E, having been first duly

2       sworn or affirmed to tell the truth, the whole

3       truth, and nothing but the truth related to said

4       matter, was examined and testified as follows:

5   DIRECT EXAMINATION,

6       QUESTIONS BY MR. GROTH:

7   Q   Would you state your name, please?

8   A   Myla Eldridge.

9   Q   What is your current title or occupation?

10  A   I serve as the Marion County Clerk.

11  Q   And that's an elected position; is that correct?

12  A   That is correct.

13  Q   When were you elected to that office?

14  A   The year 2015.

15  Q   I noticed on the city's website that there is a

16      biography of you.  I wonder if, in the interest

17      of trying to save some questions, I could show

18      it to you and we'll have it marked as Exhibit 1

19      and just ask you to quickly review that and tell

20      me if that's substantially accurate.

21          (Plaintiff(s) Deposition Exhibit(s) 1

22      marked for identification.)

23          (Witness reviews document.)

24  A   Yes.

25  Q   I see from that bio that you served as deputy

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 6

1 director for the Marion County Election Board
2 from 2007 until 2012; is that correct?
3 A That is correct.
4 Q And you were elected clerk in 2015. What did
5 you do between 2012 and 2015?
6 A I served as a deputy clerk for the Marion County
7 Clerk's Office.
8 Q During that three-year period did you play any
9 role in election administration?
10 A No.
11 Q But as deputy director for the Marion County
12 Election Board I assume you did?
13 A Yes.
14 Q In your capacity as deputy director from 2007
15 until 2012, could you describe any efforts that
16 you were involved in establishing satellite
17 voting locations for voters in Marion County?
18 A Well, in 2008 my role was to assist the director
19 actually in the effort to have satellite sites
20 in Marion County.
21 Q Who was the director at the time?
22 A Tenley. I'm sorry. You said in 2008. Laurel
23 Judkins.
24 Q What activities did you conduct in connection
25 with implementing those satellite voting

Page 7

1 locations?
2 A At that time, serving as the deputy director, my
3 role was actually to recruit poll workers for
4 the elections and my assistance that I was given
5 was to help provide volunteers that would work
6 at the satellite sites.
7 Q And there were two satellite sites; is that
8 correct?
9 A Yes.
10 Q One at North Central High School?
11 A That's correct.
12 Q And the other was where?
13 A Southport Government Center.
14 Q Are those both locations that are public as
15 opposed to private?
16 A Yes, they're public.
17 Q Were you able to secure the use of those
18 facilities at no cost?
19 A That's correct.
20 Q In connection with your efforts to recruit poll
21 workers and other volunteers to staff those
22 early voting locations, did you encounter any
23 difficulties finding sufficient numbers of poll
24 workers or volunteers?
25 A No.

Page 8

1 Q Do you agree that early in-person absentee
2 voting offers Hoosiers opportunities to
3 participate in the electoral process that cannot
4 be afforded by the contained 12-hour period of
5 the traditional election day?
6 A I would agree.
7 Q Do you agree that early voting -- and I'm going
8 to use the term early voting as kind of a
9 shorthand. That early voting plays an important
10 roll in alleviating congestion and problems that
11 often arise during a single election day?
12 A I agree.
13 Q If, for example, a voter were to appear at a
14 satellite location or any other early location,
15 for that matter, and the voter is not listed on
16 the pollbook due to error, is it easier to
17 correct that error if it's discovered prior to
18 election day?
19 A Yes.
20 Q Did you physically attend any of the early
21 voting locations in 2008?
22 A Yes.
23 Q Were you present most of the time, all of the
24 time or just some of the time?
25 A Majority of the time.

Page 9

1 Q Would you agree that voters who cast their vote
2 early typically have a greater tolerance for
3 wait times because they've chosen the day and
4 the time that is convenient for them to vote?
5 A I would agree.
6 Q Does that early voting relieve some of the
7 traffic that occurs in the precincts on election
8 day? Do you want me to rephrase the question?
9 A Yeah.
10 Q If a person votes early, they are not going to
11 appear to vote on election day, are they?
12 A No.
13 Q So if, for example, 75,000 people in Marion
14 County vote early, that's 75,000 people
15 theoretically that won't be appearing to vote on
16 election day?
17 A That's correct.
18 Q Do you agree as a theoretical concept that early
19 voting opportunities should be administered in a
20 fair and equitable manner?
21 A I agree.
22 Q Now, how was it that Marion County came to have
23 two satellite voting locations in 2008? What
24 was the procedure that led up to that situation?
25 A Could you rephrase the question?

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 10

1 Q Typically how would one go about proposing the
2 implementation of satellite voting offices?
3 A There's a resolution that will be drafted and
4 presented to the election board, and at that
5 time then the election board would vote on if
6 the resolution is ratified or not.
7 Q The election board consists of three
8 individuals?
9 A That's correct.
10 Q And you are by statute automatically a member of
11 the election board in your capacity as circuit
12 court clerk?
13 A That's correct.
14 Q And the other two members are appointees of the
15 two major political parties?
16 A Correct.
17 Q So do you remember -- I know you weren't the
18 clerk and you weren't a member of the election
19 board in 2008, but were you present when the
20 election board considered a resolution to
21 establish these two satellite locations?
22 A Yes.
23 Q What do you recall about that particular
24 resolution or the procedure that led to its
25 enactment?

Page 11

1 A When the resolution was presented before the
2 board that it required a vote and at that time
3 all the board members voted for the resolution.
4 Q Was there any opposition to the resolution?
5 A Not in 2008.
6 Q Had there been similar resolutions offered in
7 years prior to 2008, to your knowledge?
8 A No.
9 Q No?
10 A Not to my knowledge.
11 Q So 2008, to your knowledge, was the first time
12 the board entertained a resolution to establish
13 satellite locations?
14 A Yes.
15 Q And it attracted bipartisan unanimous support;
16 is that correct?
17 A That is correct.
18 Q Was there any discussion or debate over how many
19 early voting locations there should be?
20 A There was actually a discussion on how many
21 there would be.
22 Q And was there any debate or disagreement over
23 how many there should be?
24 A No.
25 Q Now, looking back on 2008 and the experiment

Page 12

1 with satellite voting locations in Marion
2 County, from your perspective were those
3 successful?
4 MS. RICCHIUTO: Object to the form. You
5 can answer.
6 A Yes.
7 Q Did you receive any complaints from citizens
8 about these satellite voting locations?
9 A Not to my knowledge.
10 Q Did you ever hear anyone assert that having the
11 satellite voting locations facilitated voter
12 fraud, for example?
13 A No.
14 Q Did you encounter any unexpected administrative
15 difficulties in administering those sites?
16 A No.
17 Q Had you made estimates of the likely number of
18 voters who would use those sites?
19 A No.
20 Q Was there anything about that experience in 2008
21 that would cause you to change your views about
22 the benefits of early voting?
23 A No.
24 Q Now, since 2008 has satellite voting been used
25 in Marion County?

Page 13

1 A No.
2 Q Was it used in the special election in 2009?
3 I don't mean -- this isn't a trick question or
4 anything. Let me --
5 A The referendum --
6 Q I'm talking about the Wishard referendum, yes.
7 A Yes.
8 Q The Wishard referendum was not a partisan vote;
9 is that correct?
10 A Correct.
11 Q So with respect to the Wishard referendum in
12 2009, was satellite voting approved through the
13 same process you've described that existed in
14 2008?
15 A Yes.
16 Q Again, no opposition?
17 A No.
18 Q Unanimous agreement?
19 A Correct.
20 Q Again, did you encounter any administrative
21 difficulties in implementing those satellite
22 locations?
23 A No.
24 Q Do you remember how many there were for that
25 referendum?

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 14

1 A I'm going to say approximately four.
2 Q So there were more than there had been in 2008?
3 A That's correct.
4 Q Again, did you receive any complaints from any
5 citizens about how those operated or were
6 administered?
7 A No.
8 Q The next year after the Wishard referendum,
9 2010, there were federal elections conducted in
10 Marion County and Indiana; correct?
11 A Correct.
12 Q Were there satellite voting offices used in
13 2010?
14 A No.
15 Q Why not?
16 A Because the resolution for satellite sites
17 requires a unanimous vote by the election board.
18 Q By that you mean you weren't able to secure a
19 unanimous vote?
20 A That's correct.
21 Q Who was it that withheld their support in 2010?
22 A The Republican board member.
23 Q And if I were to ask you the same question in
24 2012, 2014 and 2016 would your response be the
25 same?

Page 15

1 A Yes.
2 Q On any of those occasions when the satellite
3 voting resolution was offered to the Marion
4 County Election Board and then not approved, did
5 the Republican member who was withholding their
6 support ever provide you with any reasons for
7 their vote against satellite voting either
8 publicly or privately?
9 A The reason was it did not increase voter turnout
10 and costs.
11 Q Anything more specific than that?
12 A No.
13 Q Had there been money budgeted to fund the
14 establishment of satellite voting offices had
15 they been approved?
16 A Could you repeat the question?
17 Q Had the election board budgeted money, included
18 money in its budget to pay for any additional
19 costs of staffing satellite voting locations had
20 they been approved in 2010 or any of the
21 subsequent years?
22 A No.
23 Q Why is that?
24 A Because the resolution requires a unanimous vote
25 by the board.

Page 16

1 Q But my question went to funding. Had the board
2 set aside money in the event satellite voting
3 locations had been approved?
4 A Yes.
5 Q And so the funds were available?
6 A Yes.
7 Q Had the resolution been approved?
8 A Yes.
9 Q Have you ever had private conversations with the
10 Marion County Republican chairperson about why
11 the Marion County Republican party has
12 consistently since 2009 opposed the resolutions
13 that would establish satellite voting locations?
14 A Yes.
15 Q Tell me about the first such conversation.
16 A The conversation has always been to have
17 satellite sites for Marion County, and during
18 that conversation was just told again that it
19 requires a unanimous vote and also that it does
20 not increase voter turnout and that it is very
21 costly.
22 Q Do you agree with those claims?
23 A No.
24 Q Why not?
25 A Because anytime that you have other

Page 17

1 opportunities to vote outside of on election day
2 expands those opportunities and increases the
3 opportunity and gives voters actually the
4 opportunity to vote outside of election day.
5 I'm sorry. What was the end of the question?
6 Q You mentioned the cost and that it didn't --
7 supposedly the satellite sites didn't increase
8 voter turnout.
9 A And you asked me --
10 Q Do you agree with the positions that have been
11 stated to you by the Marion County Republican
12 party chair?
13 A And I said I disagreed because early voting does
14 increase voter turnout because it's an
15 opportunity for a voter to vote prior to
16 election day.
17 Q Have you looked at voter turnout figures for
18 Marion County both in 2008 and before and
19 subsequent?
20 A Yes.
21 Q Do you agree or disagree with the claim that
22 having satellite voter locations doesn't
23 increase voter turnout?
24 A I disagree.
25 Q While we're talking about that, let me ask the

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 18

1 reporter to mark this as Exhibit 2.
2 (Plaintiff(s) Deposition Exhibit(s) 2
3 marked for identification.)
4 Q Madam Clerk, I'll just represent to you that
5 this is a document that I pulled off the
6 official website of the City of Indianapolis and
7 Marion County. Is this a document that you're
8 familiar with?
9 A Yes.
10 Q Calling your attention to the first page at the
11 bottom where there's a line General 2008, and
12 the first column is the total number of
13 registered voters; is that correct?
14 A Yes.
15 Q And then the next column is the total number of
16 voters who participated in that election; is
17 that correct?
18 A That is correct.
19 Q So in the general election in 2008 381,759
20 voters in Marion County participated in the
21 general election; is that correct?
22 A That's correct.
23 Q And in the election presidential election 2012
24 that numbered declined by over 20,000; am I
25 reading that correctly?

Page 19

1 A Yes.
2 Q And in the most recent general election 370,498
3 voters participated in the general election is;
4 is that correct?
5 A Yes.
6 Q So does it appear to you that the highest number
7 of Marion County voters participated in a
8 presidential election in the one year that
9 Marion County offered voters satellite voting
10 opportunities?
11 A Yes.
12 MS. RICCHIUTO: Object to form.
13 Q We recently took the deposition of Maura Hoff,
14 the immediate past Republican member of the
15 board, and she testified in her deposition that
16 satellite voting offices were not approved for
17 the 2016 general election because, in her words,
18 the two political parties -- and I'm
19 paraphrasing -- were supposed to get together
20 and talk about it and those contacts never
21 happened because Jennifer Ping and you played
22 what Miss Hoff testified was a round of phone
23 tag and never got ahold of one another. Is that
24 true?
25 A That's not true.

Page 20

1 Q Did anyone from the Marion County Republican
2 party reach out to you anytime during 2016 and
3 propose to discuss with you the potential
4 establishment of satellite voting locations for
5 that election?
6 A No.
7 Q Miss Hoff also testified in her deposition that
8 in her view the public doesn't understand what
9 early voting is, that it's just filling out an
10 absentee ballot. Do you have any reason to
11 believe that the public doesn't understand what
12 early in-person absentee voting is?
13 A No.
14 Q Miss Hoff also testified in her deposition that
15 we really don't need in-person early absentee
16 voting because a person can fill out an absentee
17 ballot in their home. Is it true that anyone
18 can vote by absentee ballot and simply mail in
19 that absentee ballot?
20 A If they meet the requirements in order to vote
21 an absentee ballot by mail.
22 Q So there are requirements, there are limitations
23 on who can participate in mail-in absentee
24 voting?
25 A Yes.

Page 21

1 Q Could you describe what those are?
2 A All nine of them?
3 Q Let me see if I can short-cut it. If I'm a
4 voter and I'm not 65 and I'm not disabled and
5 there's no reason to believe that I won't be in
6 the county on election day, am I permitted to
7 vote by mail and absentee ballot?
8 A You said if you're not 65?
9 Q If I'm not 65.
10 A Yes, you can vote absentee by mail if you're not
11 going to be in the county on election day.
12 Q But if I am going to be in the county and I know
13 I'm going to be in the county, I'm not 65 and
14 I'm not disabled.
15 A No.
16 Q And is that because of statutory requirements?
17 MS. RICCHIUTO: Object to the extent it
18 calls for a legal conclusion. You can answer.
19 A Yes.
20 Q Also Miss Hoff in her deposition testimony
21 testified that the county's use of paper
22 pollbooks is what she described as a huge burden
23 on having satellite voting offices. Do you
24 agree with that?
25 A No.

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 22

1 Q Could you explain?
2 A In order to have satellite sites, you do not
3  have to have electronic pollbooks.
4 Q Does Marion County have electronic pollbooks?
5 A No.
6 Q It uses exclusively, at least as of this time,
7  paper pollbooks?
8 A That's correct.
9 Q Does it appear to you that the decision whether
10  to have satellite voting locations has become a
11  partisan issue in Marion County?
12 A I agree.
13 Q Republicans consistently oppose it and Democrats
14  consistently are in favor of it?
15 A That's correct.
16 Q Now, since 2008 all early in-person absentee
17  voting has been forced to take place in the
18  office of the circuit court clerk, your office;
19  is that correct?
20 A That's correct.
21 Q Is your office equipped to handle the crowds
22  that typically show up before election day to
23  cast early in-person absentee votes?
24 A Yes.
25 Q And how do you manage to deal with those crowds?

Page 23

1  If I could elaborate. There are other things
2  that go on in your office besides voting;
3  correct?
4 A Correct.
5 Q Do you have to make any modifications or
6  adjustments or accommodations to deal with the
7  crowds that show up prior to election day
8  seeking to vote early?
9 A I do restructure the office to accommodate early
10  voting.
11 Q What does that entail?
12 A Changing the office around to make sure that
13  every voter that wants to cast a ballot early
14  that they have an easy or a great experience.
15  That means just moving the office around, moving
16  our marriage license department to another area.
17  So just basically changing the office around to
18  accommodate early voting.
19 Q Do the lines sometimes extend out into the
20  hallway of the City-County Building?
21 A Yes.
22 Q And do they sometimes extend out into the
23  street?
24 A Yes.
25 Q When citizens enter the City-County Building to

Page 24

1  conduct business they have to go through a metal
2  detector, don't they?
3 A Not for early voting.
4 Q But generally speaking do they have to?
5 A Yes.
6 Q Have you arranged for an exception for those
7  voters who appear at the City-County Building
8  hoping to cast an early in-person absentee
9  ballot?
10 A That's correct.
11 Q So they can bypass the metal detector?
12 A Correct.
13 Q Is there any public parking available in the
14  City-County Building?
15 A No.
16 Q Is there any public parking available on the
17  perimeter of the City-County Building?
18 A No.
19 Q Where is the nearest public parking location to
20  the City-County Building?
21 A Probably two blocks south of the City-County
22  Building.
23 Q And is that a privately owned parking lot?
24 A Yes.
25 Q What was the parking situation there at the

Page 25

1  City-County Building for voters who wanted to
2  cast early in-person absentee ballots in the
3  days leading up to election day in 2016?
4 A Can you repeat the question?
5 Q Were there any -- do you know what the parking
6  situation was there for voters who wanted to
7  vote early prior to the 2016 general election?
8  Were there special or additional obstacles or
9  activities that were going on at the time?
10 A Parking is not convenient downtown. There are
11  really no accessible lots leading up to an
12  election or surrounding the City-County
13  Building.
14 Q There used to be parking immediately to the east
15  of the City-County Building on the site of the
16  old Market Square Arena, wasn't there?
17 A Yes.
18 Q And that parking no longer exists because of
19  Cummins and the other building that's being
20  constructed?
21 A Yes, that's correct.
22 Q How do you accommodate disabled voters who
23  appear and want to cast an early in-person
24  absentee ballot? For example, someone in a
25  wheelchair.

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 26

1   A   In regard to parking or just --
2   Q   Are you able to provide any special
3      accommodation for a voter in a wheelchair?
4   A   Once they arrive to the City-County Building, we
5      have a special area set aside for anyone that
6      may be disabled.
7   Q   But those voters are on their own in terms of
8      getting to the City-County Building, parking and
9      getting from the parking lot to the City-County
10      Building?
11   A   That's correct.
12   Q   Madam Clerk, have you made any attempts to
13      determine what any of the counties adjacent to
14      Marion County did in 2016 with respect to
15      providing satellite voting locations?
16   A   Yes.
17   Q   What investigation have you made in that
18      respect?
19   A   We have learned that surrounding counties were
20      able to come to an agreement or everyone voted
21      for those counties to be able to have satellite
22      sites.
23   Q   Let's talk about one of them. Hamilton County,
24      do you know the clerk in Hamilton County, Kathy
25      Richardson?

Page 27

1   A   Yes.
2   Q   Do you occasionally speak with her about clerk
3      business?
4   A   Yes, I have before.
5   Q   Do you know how many satellite voting locations
6      they were able to provide in Hamilton County for
7      their voters?
8   A   I don't.
9   Q   You know, though, that satellite voting was
10      approved, in other words, there wasn't any
11      partisan disagreement in Hamilton County?
12   A   That's correct.
13   Q   Do you know if that's also true with regards to
14      Boone County?
15   A   Correct.
16   Q   Do you know of any county in the State of
17      Indiana where a resolution to provide satellite
18      voting locations was offered and defeated
19      because of lack of the unanimous vote? Let's
20      talk about 2016 most recently.
21   A   I don't.
22   Q   Are you aware that voters in the second most
23      populous county in Indiana, Lake County, were
24      provided somewhere between 9 and 14 satellite
25      locations?

Page 28

1   A   I am.
2   Q   And that voters in the next most populous
3      county, Allen County, were also provided a
4      number of satellite early voting locations?
5   A   I am aware.
6   Q   So it's only in Marion County that there's this
7      partisan disagreement over whether Marion County
8      voters should be afforded satellite sites?
9   A   To my knowledge.
10   Q   Do you agree that because of the failure of
11      satellite voting resolutions voters in Marion
12      County experience longer lines at the
13      City-County Building to cast early in-person
14      votes than they would if they had other
15      locations to cast those votes at?
16   A   I agree.
17   Q   What are the kinds -- I'm asking you this from
18      your experience as an election administrator.
19      What are the kinds of last-minute problems
20      voters sometimes encounter on election day that
21      prevents them from casting a vote that will be
22      counted?
23   A   I'm sorry. You have to re -- the question
24      again.
25   Q   From your experience, what kind of problems is a

Page 29

1      voter likely to encounter on election day that
2      might prevent that voter from being able to cast
3      a vote that will be counted? I'm talking about
4      personal problems. I'm talking about
5      potentially things like leaving their ID at
6      home, that sort of thing. If you could shed any
7      light on that.
8   A   Illness. They may be out of town.
9   Q   What about job-related issues?
10   A   May have to work on election day. A student may
11      have class on election day that would prevent
12      them from being able to cast a ballot on
13      election day.
14   Q   What about an unexpected problem of not being on
15      the pollbook?
16   A   That can be fixed because a voter can cast a
17      provisional ballot on election day, if
18      necessary.
19   Q   Going back to Clerk Richardson in Hamilton
20      County. Do you agree or disagree with her that
21      the 63 percent increase in early in-person
22      absentee voting in Hamilton County was largely
23      the result of the addition of two early voting
24      locations in 2016?
25   A   I agree.

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 30

1      MS. RICCHIUTO: Objection. Foundation.
2  Q  Do you recall reading her comment in that
3     respect that was reported in the public media?
4  A  Yes.
5  Q  Have you spoken with her personally about her
6     experiences with satellite voting in Hamilton
7     County?
8  A  No.
9  Q  Have you spoken with any of your fellow circuit
10    court clerks about their experiences of
11    satellite voting?
12 A  Yes.
13 Q  About how many?
14 A  One.
15 Q  Who is that?
16 A  Mike Brown, Lake County.
17 Q  What did that clerk tell you about his
18    experience with satellite voting in Lake County?
19 A  That satellite voting locations are good for
20    Lake County and that they have seen the voter
21    turnout increase because of satellite sites,
22    having satellite sites.
23 Q  And the office of the circuit court clerk in
24    Lake County is in Crown Point; is that correct?
25 A  Yes.

Page 31

1  Q  So without satellite voting locations, voters in
2     Hammond or Gary or East Chicago would have to
3     make the trip to Crown Point?
4  A  Correct.
5  Q  When we had satellite sites in 2008 was there
6     any difficulty with arranging for a sufficient
7     amount of free parking either around North
8     Central High School or the Southport Community
9     Center?
10 A  No.
11 Q  Do you agree that voting has a cost both
12    tangible and intangible?
13 A  Yes.
14 Q  In terms of time and resources?
15 A  Yes.
16 Q  And do you agree that those costs are more
17    consequential per persons with fewer resources?
18 A  Yes.
19 Q  And do you agree that higher income or wealth
20    makes it easier to afford transportation and
21    meeting those other financial costs of voting?
22 A  Can you explain that?
23 Q  In other words, if I'm living from hand to
24    mouth, the $1.75 one-way bus trip is going to be
25    more burdensome to me than if I have a job that

Page 32

1     pays me $50,000 a year.
2  A  Yes.
3  Q  Have you ever been without private
4     transportation in your life?
5  A  No.
6  Q  Have you ever had to rely on the IndyGo system
7     to move about the county?
8  A  Yes.
9  Q  Do you have an estimate as to how long it would
10    take a voter in Pike Township to make the trip
11    via IndyGo from Pike Township to the City-County
12    Building?
13 A  My estimate would be about 30 minutes.
14 Q  One way, I assume?
15 A  Yeah, one way.
16 Q  That's assuming they were on a direct line
17    downtown; right?
18 A  Uh-huh.
19 Q  Didn't have to transfer.
20 A  Okay.
21 Q  As a member of the Marion County Election Board,
22    have you engaged in any discussions with other
23    members of the board about the concept of vote
24    centers?
25 A  Yes.

Page 33

1  Q  When have those discussions taken place?
2      MS. RICCHIUTO: So I'm going to object to
3     the extent any discussions took place during an
4     executive session, and I'm going to object to
5     the extent that any of those discussions are
6     related to efforts at settling this lawsuit.
7  Q  With that understanding, would you respond to
8     the question?
9  A  During executive sessions, we had a couple
10    executive sessions last year.
11     MS. RICCHIUTO: He doesn't want to know
12    what happened in those.
13 Q  Do you know how much it would cost to implement
14    vote centers in Marion County?
15 A  I can just give you an estimate amount.
16 Q  What's your best estimate?
17 A  Highest estimate maybe $10 million.
18 Q  And is that primarily to purchase the electronic
19    pollbooks that are required in order to have
20    vote centers operate?
21 A  Yes.
22 Q  Any other components of that cost besides the
23    electronic pollbooks?
24 A  Probably that would include the purchase of more
25    express vote voting machines. Those are the

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 34

1   electronic voting machines.
2 Q   Does the board currently have an additional
3   $10 million budgeted to pay those expenses?
4 A   No.
5 Q   Would those additional funds have to be
6   appropriated by the Marion County City-County
7   Council?
8 A   Yes.
9       MR. GROTH: Could we have a minute?
10       MS. RICCHIUTO: Sure.
11       (A short break was taken.)
12   (Mr. Groth continuing:)
13 Q   One thing I realized I neglected to do, Madam
14   Clerk, is to have you identify who the
15   Democratic party appointee on the Marion County
16   Election Board is presently.
17 A   Keith Johnson.
18 Q   And how long has Mr. Johnson served on the
19   board?
20 A   Two years.
21 Q   Do you have any reason to believe that he does
22   not fully share the views that you've set forth
23   today about the benefits of satellite voting and
24   early voting?
25 A   No.

Page 35

1 Q   Does the board have any current plans or you or
2   any other member of the board, to your
3   knowledge, have any current plans to offer
4   another resolution that would establish
5   satellite voting locations for either the
6   primary or the general election this year?
7 A   Yes.
8 Q   Do you know what board meeting that resolution
9   would be offered at?
10 A   The upcoming election board meeting, which I
11   believe it's the 24th of this month. It would
12   be this month.
13 Q   So at the January 24th public meeting of the
14   Marion County Election Board there will be, to
15   your knowledge, a resolution offered by one of
16   the members to establish satellite voting
17   locations for the May '18 primaries?
18 A   Yes.
19 Q   Do you know who will offer that resolution?
20 A   No.
21 Q   Do you anticipate it will meet the same fate as
22   the other resolutions that have been offered
23   over the last several elections?
24 A   Yes.
25

Page 36

1 Q   You have no reason to believe that the
2   Republican party member or appointee will take
3   any different views about that resolution?
4 A   No.
5 Q   Other than enforcing or complying with the
6   unanimity requirement of state law, is there any
7   other reason, policy or otherwise, that the
8   board opposes or would oppose the establishment
9   of satellite locations?
10 A   No.
11       MS. RICCHIUTO: Object to form.
12 Q   I think that's all I have. Thank you very much.
13 CROSS-EXAMINATION,
14     QUESTIONS BY MS. RICCHIUTO:
15 Q   I have just a few. I want to follow up, Madam
16   Clerk, on one of those last questions that Mr.
17   Groth asked you about the upcoming January 24th
18   meeting.
19     Is it your understanding that there's
20   going to be a resolution presented that would
21   propose implementation of satellite sites for
22   this upcoming primary in May of '18?
23 A   No.
24 Q   And what about a resolution that would propose
25   satellite sites for the November '18 general?

Page 37

1 A   No.
2 Q   With respect to Exhibit 2 that Mr. Growth showed
3   you, that was that voter turnout sheet of data
4   that I think he said he got from the clerk's
5   website. Is this something that you've done any
6   kind of independent analysis on these figures?
7 A   No, it is not.
8 Q   Do you have any reason to think they're not
9   accurate?
10 A   No.
11 Q   Mr. Groth asked you about some budgeting that
12   the clerk's office may or may not do for
13   satellite voting, and I want to just get into a
14   little more detail about that.
15     Do you have any information one way or
16   another prior to when you became clerk about
17   whether or not the election board formally
18   budgeted for satellite sites?
19 A   I do not.
20 Q   Since you've been clerk have you or the election
21   board attempted to budget for satellite sites?
22 A   If my memory serves me correctly, I believe that
23   we did in 2015, but not since then.
24 Q   And why not since then?
25 A   Because we just -- every time that we would

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 38

1 present the resolution to the board and by
2 requiring a unanimous vote, we would never get
3 that vote. So for future budgets we just didn't
4 budget for satellite sites.
5 Q So notwithstanding the status of budgeting, do
6 you have any reason to believe that if the
7 election board unanimously passed a resolution
8 for satellite voting would that resolution be
9 funded?
10 A Yes.
11 Q And you don't have a concern that not having it
12 in the budget would prohibit implementation of
13 the resolution?
14 A No.
15 MS. RICCHIUTO: That's all the questions
16 I have.
17 REDIRECT EXAMINATION,
18 QUESTIONS BY MR. GROTH:
19 Q Just real quickly to follow up. What is your
20 best estimate as to what it would cost to staff
21 two early voting sites?
22 A I'm not really sure.
23 Q Would it be more or less than a hundred thousand
24 dollars?
25 A Probably more.

Page 39

1 Q Is that using the assumption that you would not
2 have to pay to lease a location?
3 A Correct.
4 Q So the cost primarily would be labor costs?
5 A Staffing, uh-huh.
6 Q So as I understand your answer now on what the
7 future is going to hold here in terms of this
8 next meeting, am I correct in understanding that
9 you will not be making a resolution for
10 satellite voting locations at the meeting in two
11 weeks?
12 A There will be a resolution. However, it's not
13 only for satellite sites.
14 Q Is it in part for satellite sites?
15 A Yes.
16 Q Has that resolution been drafted?
17 A We're working on it.
18 Q Will that resolution be addressed to the 2018
19 election or to some future election?
20 A Future elections.
21 Q So there won't be any resolution directed to the
22 2018 elections?
23 A Correct.
24 Q What changed?
25 MS. RICCHIUTO: Object to form,

Page 40

1 foundation and vague. I don't even understand
2 the question.
3 Q Your testimony has been that in every election
4 from 2008 up until 2016 there has always been a
5 resolution proposed to establish satellite
6 voting locations. Now your testimony is there
7 will be no such resolution offered or voted on
8 for the 2018 elections. What is different about
9 2018 than any of those other years?
10 MS. RICCHIUTO: Object to form, and I
11 think it may misstate the testimony a little
12 bit, but you can answer.
13 A The reason that there not be a resolution for
14 satellite sites only for this year for the
15 general election is because there is an
16 agreement that both major political parties have
17 decided that for next year 2019 that Marion
18 County will be allowed to have not only
19 satellite sites, but also vote centers, and that
20 is the resolution that is being drafted to be
21 presented at the next election board meeting.
22 So the difference is instead of having satellite
23 locations -- a resolution for satellite
24 locations for Marion County of this year, the
25 resolution will be to have satellite sites and

Page 41

1 vote centers for Marion County for next year.
2 Q Who is this agreement between?
3 A The two major political parties.
4 Q The respective chairs?
5 A Democratic Chairwoman Kate Sweeney Bell
6 and Senator Merritt.
7 Q James Merritt?
8 A Yes, Republican chairman.
9 Q Is this agreement presently in writing?
10 A We're drafting it now.
11 Q Do you have any assurances, to your knowledge,
12 that this agreement is a permanent stable
13 agreement that cannot be changed in the future
14 by majority vote?
15 A My response to that is going to be good faith.
16 Q Good faith?
17 A Yeah.
18 Q Thank you.
19 MS. RICCHIUTO: Is that all your
20 questions, Bill?
21 MR. GROTH: Uh-huh.
22 MS. RICCHIUTO: I have a couple more.
23 RECROSS-EXAMINATION,
24 QUESTIONS BY MS. RICCHIUTO:
25 Q Madam Clerk, do you understand that the

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

Page 42

1  resolution that you anticipate introducing at
2  the January 24th meeting will identify and
3  include assurances and information about how the
4  proposal will be implemented and how potential
5  changes could be implemented in the future that
6  would impact whether or not this is I think, as
7  Mr. Groth suggested, a permanent and stable
8  agreement because that can be addressed in the
9  resolution?
10 A  Yes.
11 Q  As to a resolution regarding 2018 satellite
12    sites, a resolution introduced in 2018 for 2018,
13    as far as you know, does Indiana law require
14    such a resolution to pass unanimously before
15    satellite sites can be implemented?
16 A  Yes, it does.
17 Q  And do you have information about whether a
18    resolution in 2018 for 2018 would pass
19    unanimously?
20 A  No, it would not.
21          MS. RICCHIUTO: That's all the questions
22    I have.
23          MR. GROTH: Thank you.
24
25

Page 43

1          AND FURTHER THE DEPONENT SAITH NOT.
2
3
4
5    _____
6          MYLA ELDRIDGE
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 44

1  STATE OF INDIANA  )
                     )  SS:
2  COUNTY OF MARION  )
3
4      I, Deanne S. Hutson, a Notary Public in and for
5  said county and state, do hereby certify that MYLA
6  ELDRIDGE, the deponent herein, was by me first duly
7  sworn to tell the truth, the whole truth and nothing
8  but the truth in the aforementioned matter;
9      That the foregoing deposition was taken on
10 behalf of the Plaintiffs at the law offices of Faegre
11 Baker Daniels, 300 North Meridian Street, Suite 2700,
12 Indianapolis, Marion County, Indiana, on the 10th day
13 of January, 2018, pursuant to the Applicable Rules;
14     That said deposition was taken down in
15 Stenograph notes and afterwards reduced to
16 typewriting under my direction; and that the
17 typewritten transcript is a true record of the
18 testimony given by said deponent;
19     And that the deposition upon oral examination
20 was taken down in Stenograph notes and afterwards
21 reduced to typewriting under my direction and
22 thereafter presented to said witness for signature;
23     I do further certify that I am a disinterested
24 person in this cause of action; that I am not a
25 relative or attorney of any of the parties.

Page 45

1      IN WITNESS WHEREOF, I have hereunto set my hand
2  and affixed my notarial seal this _____ day of
3  _____, 2018.
4
5
6
7
8
                    _____
9                    Deanne S. Hutson, Notary Public
10
11
12 My Commission Expires:
   October 21, 202
13 Residing in Marion County, Indiana
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   (Originating Party)
     William R. Groth
 2   FILLENWARTH, DENNERLINE, GROTH & TOWE, LLP
     429 East Vermont Street
 3   Suite 200
     Indianapolis, Indiana 46202
 4
               NOTICE OF DEPOSITION FILING
 5
               UNITED STATES DISTRICT COURT
 6             SOUTHERN DISTRICT OF INDIANA
                  INDIANAPOLIS DIVISION
 7
     COMMON CAUSE INDIANA;        )
 8   NATIONAL ASSOCIATION FOR     )
     THE ADVANCEMENT OF COLORED   )
 9   PEOPLE; by its Greater       )
     Indianapolis Branch 3053     )
10   and on behalf of its         )
     individual members; DORIS A. )
11   MCDOUGAL; and JOHN WINDLE,   )        CASE NO.
                                  ) 1:17-cv-01388-SEB-TAB
12             Plaintiffs,        )
13        vs.                     )
                                  )
14   MARION COUNTY ELECTION BOARD;)
     KEITH JOHNSON, MAURA HOFF and)
15   MYLA ELDRIDGE, each in their )
     official capacities as       )
16   members of the MARION COUNTY )
     ELECTION BOARD,              )
17                                )
               Defendants.        )
18
19        In compliance with the Indiana Rules of
     Procedure, Federal Rules of Civil Procedures and/or
20   the rules of the Industrial Board, you are notified
     that the signed original deposition of MYLA ELDRIDGE,
21   taken on the 10th day of January, 2018, has been
     sealed and submitted to the originating party, along
22   with the attached Errata Sheet(s), if applicable.
23
24
               (Date received by Circle City Reporting)
25
```

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

## $

**$1.75 (1)**
31:24
**$10 (2)**
33:17;34:3
**$50,000 (1)**
32:1

## A

**able (8)**
7:17;14:18;26:2,
20,21;27:6;29:2,12
**absentee (17)**
8:1;20:10,12,15,16,
18,19,21,23;21:7,10;
22:16,23;24:8;25:2,
24;29:22
**accessible (1)**
25:11
**accommodate (3)**
23:9,18;25:22
**accommodation (1)**
26:3
**accommodations (1)**
23:6
**accurate (2)**
5:20;37:9
**action (1)**
44:24
**activities (2)**
6:24;25:9
**actually (4)**
6:19;7:3;11:20;
17:3
**addition (1)**
29:23
**additional (4)**
15:18;25:8;34:2,5
**addressed (2)**
39:18;42:8
**adjacent (1)**
26:13
**adjustments (1)**
23:6
**administered (2)**
9:19;14:6
**administering (1)**
12:15
**administration (1)**
6:9
**administrative (2)**
12:14;13:20
**administrator (1)**
28:18
**affirmed (1)**
5:2
**affixed (1)**
45:2
**afford (1)**
31:20

**afforded (2)**
8:4;28:8
**aforementioned (1)**
44:8
**afterwards (2)**
44:15,20
**Again (5)**
13:16,20;14:4;
16:18;28:24
**against (1)**
15:7
**agree (20)**
8:1,6,7,12;9:1,5,18,
21;16:22;17:10,21;
21:24;22:12;28:10,
16;29:20,25;31:11,
16,19
**agreement (8)**
13:18;26:20;40:16;
41:2,9,12,13;42:8
**ahold (1)**
19:23
**Allen (1)**
28:3
**alleviating (1)**
8:10
**allowed (1)**
40:18
**always (2)**
16:16;40:4
**amount (2)**
31:7;33:15
**analysis (1)**
37:6
**anticipate (2)**
35:21;42:1
**appear (6)**
8:13;9:11;19:6;
22:9;24:7;25:23
**appearing (1)**
9:15
**Applicable (1)**
44:13
**appointee (2)**
34:15;36:2
**appointees (1)**
10:14
**appropriated (1)**
34:6
**approved (8)**
13:12;15:4,15,20;
16:3,7;19:16;27:10
**approximately (1)**
14:1
**area (2)**
23:16;26:5
**Arena (1)**
25:16
**arise (1)**
8:11
**around (4)**
23:12,15,17;31:7
**arranged (1)**

24:6
**arranging (1)**
31:6
**arrive (1)**
26:4
**aside (2)**
16:2;26:5
**assert (1)**
12:10
**assist (1)**
6:18
**assistance (1)**
7:4
**assume (2)**
6:12;32:14
**assuming (1)**
32:16
**assumption (1)**
39:1
**assurances (2)**
41:11;42:3
**attempted (1)**
37:21
**attempts (1)**
26:12
**attend (1)**
8:20
**attention (1)**
18:10
**attorney (1)**
44:25
**attracted (1)**
11:15
**automatically (1)**
10:10
**available (3)**
16:5;24:13,16
**aware (2)**
27:22;28:5

## B

**back (2)**
11:25;29:19
**Baker (1)**
44:11
**ballot (11)**
20:10,17,18,19,21;
21:7;23:13;24:7;
25:24;29:12,17
**ballots (1)**
25:2
**basically (1)**
23:17
**became (1)**
37:16
**become (1)**
22:10
**behalf (1)**
44:10
**Bell (1)**
41:5
**benefits (2)**

12:22;34:23
**besides (2)**
23:2;33:22
**best (2)**
33:16;38:20
**Bill (1)**
41:20
**bio (1)**
5:25
**biography (1)**
5:16
**bipartisan (1)**
11:15
**bit (1)**
40:12
**blocks (1)**
24:21
**Board (34)**
6:1,12;10:4,5,7,11,
19,20;11:2,3,12;
14:17,22;15:4,17,25;
16:1;19:15;32:21,23;
34:2,16,19;35:1,2,8,
10,14;36:8;37:17,21;
38:1,7;40:21
**Boone (1)**
27:14
**both (4)**
7:14;17:18;31:11;
40:16
**bottom (1)**
18:11
**break (1)**
34:11
**Brown (1)**
30:16
**budget (4)**
15:18;37:21;38:4,
12
**budgeted (4)**
15:13,17;34:3;
37:18
**budgeting (2)**
37:11;38:5
**budgets (1)**
38:3
**Building (16)**
23:20,25;24:7,14,
17,20,22;25:1,13,15,
19;26:4,8,10;28:13;
32:12
**burden (1)**
21:22
**burdensome (1)**
31:25
**bus (1)**
31:24
**business (2)**
24:1;27:3
**bypass (1)**
24:11

## C

**Calling (1)**
18:10
**calls (1)**
21:18
**came (1)**
9:22
**can (16)**
12:5;20:16,18,23;
21:3,10,18;24:11;
25:4;29:16,16;31:22;
33:15;40:12;42:8,15
**capacity (2)**
6:14;10:11
**cast (11)**
9:1;22:23;23:13;
24:8;25:2,23;28:13,
15;29:2,12,16
**casting (1)**
28:21
**cause (2)**
12:21;44:24
**Center (2)**
7:13;31:9
**centers (5)**
32:24;33:14,20;
40:19;41:1
**Central (2)**
7:10;31:8
**certify (2)**
44:5,23
**chair (1)**
17:12
**chairman (1)**
41:8
**chairperson (1)**
16:10
**chairs (1)**
41:4
**Chairwoman (1)**
41:5
**change (1)**
12:21
**changed (2)**
39:24;41:13
**changes (1)**
42:5
**Changing (2)**
23:12,17
**Chicago (1)**
31:2
**chosen (1)**
9:3
**circuit (4)**
10:11;22:18;30:9,
23
**citizens (3)**
12:7;14:5;23:25
**City (1)**
18:6
**City-County (16)**

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

23:20,25;24:7,14,
17,20,21;25:1,12,15;
26:4,8,9;28:13;
32:11;34:6
**city's (1)**
5:15
**claim (1)**
17:21
**claims (1)**
16:22
**class (1)**
29:11
**Clerk (18)**
5:10;6:4,6;10:12,
18;18:4;22:18;26:12,
24;27:2;29:19;30:17,
23;34:14;36:16;
37:16,20;41:25
**clerks (1)**
30:10
**Clerk's (3)**
6:7;37:4,12
**column (2)**
18:12,15
**comment (1)**
30:2
**Commission (1)**
45:12
**Community (1)**
31:8
**complaints (2)**
12:7;14:4
**complying (1)**
36:5
**components (1)**
33:22
**concept (2)**
9:18;32:23
**concern (1)**
38:11
**conclusion (1)**
21:18
**conduct (2)**
6:24;24:1
**conducted (1)**
14:9
**congestion (1)**
8:10
**connection (2)**
6:24;7:20
**consequential (1)**
31:17
**considered (1)**
10:20
**consistently (3)**
16:12;22:13,14
**consists (1)**
10:7
**constructed (1)**
25:20
**contacts (1)**
19:20
**contained (1)**

8:4
**continuing (1)**
34:12
**convenient (2)**
9:4;25:10
**conversation (3)**
16:15,16,18
**conversations (1)**
16:9
**correctly (2)**
18:25;37:22
**cost (7)**
7:18;17:6;31:11;
33:13,22;38:20;39:4
**costly (1)**
16:21
**costs (5)**
15:10,19;31:16,21;
39:4
**Council (1)**
34:7
**counted (2)**
28:22;29:3
**counties (3)**
26:13,19,21
**County (62)**
5:10;6:1,6,11,17,
20;9:14,22;12:2,25;
14:10;15:4;16:10,11,
17;17:11,18;18:7,20;
19:7,9;20:1;21:6,11,
12,13;22:4,11;26:14,
23,23;28:3,3,6,7,12;
29:20,22;30:7,16,18,
20,24;32:7,21;33:14;
34:6,15;35:14;40:18,
24;41:1;44:2,5,12;
45:13
**county's (1)**
21:21
**couple (2)**
33:9;41:22
**court (4)**
10:12;22:18;30:10,
23
**CROSS-EXAMINATION (1)**
36:13
**crowds (3)**
22:21,25;23:7
**Crown (2)**
30:24;31:3
**Cummins (1)**
25:19
**current (3)**
5:9;35:1,3
**currently (1)**
34:2

**D**

**Daniels (1)**
44:11

data (1)
37:3
**day (23)**
8:5,11,18;9:3,8,11,
16;17:1,4,16;21:6,11;
22:22;23:7;25:3;
28:20;29:1,10,11,13,
17;44:12;45:2
**days (1)**
25:3
**deal (2)**
22:25;23:6
**Deanne (2)**
44:4;45:9
**debate (2)**
11:18,22
**decided (1)**
40:17
**decision (1)**
22:9
**declined (1)**
18:24
**defeated (1)**
27:18
**Democratic (2)**
34:15;41:5
**Democrats (1)**
22:13
**department (1)**
23:16
**DEPONENT (3)**
43:1;44:6,18
**Deposition (10)**
5:21;18:2;19:13,
15;20:7,14;21:20;
44:9,14,19
**deputy (5)**
5:25;6:6,11,14;7:2
**describe (2)**
6:15;21:1
**described (2)**
13:13;21:22
**detail (1)**
37:14
**detector (2)**
24:2,11
**determine (1)**
26:13
**difference (1)**
40:22
**different (2)**
36:3;40:8
**difficulties (3)**
7:23;12:15;13:21
**difficulty (1)**
31:6
**DIRECT (2)**
5:5;32:16
**directed (1)**
39:21
**direction (2)**
44:16,21
**director (6)**

6:1,11,14,18,21;7:2
**disabled (4)**
21:4,14;25:22;26:6
**disagree (3)**
17:21,24;29:20
**disagreed (1)**
17:13
**disagreement (3)**
11:22;27:11;28:7
**discovered (1)**
8:17
**discuss (1)**
20:3
**discussion (2)**
11:18,20
**discussions (4)**
32:22;33:1,3,5
**disinterested (1)**
44:23
**document (3)**
5:23;18:5,7
**dollars (1)**
38:24
**done (1)**
37:5
**down (2)**
44:14,20
**downtown (2)**
25:10;32:17
**drafted (3)**
10:3;39:16;40:20
**drafting (1)**
41:10
**due (1)**
8:16
**duly (2)**
5:1;44:6
**During (6)**
6:8;8:11;16:17;
20:2;33:3,9

**E**

**early (35)**
7:22;8:1,7,8,9,14,
20;9:2,6,10,14,18;
11:19;12:22;17:13;
20:9,12,15;22:16,23;
23:8,9,13,18;24:3,8;
25:2,7,23;28:4,13;
29:21,23;34:24;
38:21
**easier (2)**
8:16;31:20
**east (2)**
25:14;31:2
**easy (1)**
23:14
**effort (1)**
6:19
**efforts (3)**
6:15;7:20;33:6
**either (3)**

15:7;31:7;35:5
**elaborate (1)**
23:1
**Eldridge (3)**
5:8;43:6;44:6
**elected (3)**
5:11,13;6:4
**Election (59)**
6:1,9,12;8:5,11,18;
9:7,11,16;10:4,5,7,
11,18,20;13:2;14:17;
15:4,17;17:1,4,16;
18:16,19,21,23,23;
19:2,3,8,17;20:5;
21:6,11;22:22;23:7;
25:3,7,12;28:18,20;
29:1,10,11,13,17;
32:21;34:16;35:6,10,
14;37:17,20;38:7;
39:19,19;40:3,15,21
**elections (1)**
7:4;14:9;35:23;
39:20,22;40:8
**electoral (1)**
8:3
**electronic (5)**
22:3,4;33:18,23;
34:1
**enactment (1)**
10:25
**encounter (5)**
7:22;12:14;13:20;
28:20;29:1
**end (1)**
17:5
**enforcing (1)**
36:5
**engaged (1)**
32:22
**entail (1)**
23:11
**enter (1)**
23:25
**entertained (1)**
11:12
**equipped (1)**
22:21
**equitable (1)**
9:20
**error (2)**
8:16,17
**establish (6)**
10:21;11:12;16:13;
35:4,16;40:5
**establishing (1)**
6:16
**establishment (3)**
15:14;20:4;36:8
**estimate (2)**
32:9,13;33:15,16,
17;38:20
**estimates (1)**
12:17

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

**even (1)**
40:1
**event (1)**
16:2
**everyone (1)**
26:20
**EXAMINATION (3)**
5:5;38:17;44:19
**examined (1)**
5:4
**example (4)**
8:13;9:13;12:12;
25:24
**exception (1)**
24:6
**exclusively (1)**
22:6
**executive (3)**
33:4,9,10
**Exhibit (3)**
5:18;18:1;37:2
**Exhibits (2)**
5:21;18:2
**existed (1)**
13:13
**exists (1)**
25:18
**expands (1)**
17:2
**expenses (1)**
34:3
**experience (6)**
12:20;23:14;28:12,
18,25;30:18
**experiences (2)**
30:6,10
**experiment (1)**
11:25
**Expires (1)**
45:12
**explain (2)**
22:1;31:22
**express (1)**
33:25
**extend (2)**
23:19,22
**extent (3)**
21:17;33:3,5

**F**

**facilitated (1)**
12:11
**facilities (1)**
7:18
**Faegre (1)**
44:10
**failure (1)**
28:10
**fair (1)**
9:20
**faith (2)**
41:15,16

**familiar (1)**
18:8
**far (1)**
42:13
**fate (1)**
35:21
**favor (1)**
22:14
**federal (1)**
14:9
**fellow (1)**
30:9
**few (1)**
36:15
**fewer (1)**
31:17
**figures (2)**
17:17;37:6
**fill (1)**
20:16
**filling (1)**
20:9
**financial (1)**
31:21
**finding (1)**
7:23
**first (6)**
5:1;11:11;16:15;
18:10,12;44:6
**fixed (1)**
29:16
**follow (2)**
36:15;38:19
**follows (1)**
5:4
**forced (1)**
22:17
**foregoing (1)**
44:9
**form (5)**
12:4;19:12;36:11;
39:25;40:10
**formally (1)**
37:17
**forth (1)**
34:22
**Foundation (2)**
30:1;40:1
**four (1)**
14:1
**fraud (1)**
12:12
**free (1)**
31:7
**fully (1)**
34:22
**fund (1)**
15:13
**funded (1)**
38:9
**funding (1)**
16:1
**funds (2)**

16:5;34:5
**FURTHER (2)**
43:1;44:23
**future (6)**
38:3;39:7,19,20;
41:13;42:5

**G**

**Gary (1)**
31:2
**General (10)**
18:11,19,21;19:2,3,
17;25:7;35:6;36:25;
40:15
**generally (1)**
24:4
**given (2)**
7:4;44:18
**gives (1)**
17:3
**good (3)**
30:19;41:15,16
**Government (1)**
7:13
**great (1)**
23:14
**greater (1)**
9:2
**GROTH (9)**
5:6;34:9,12;36:17;
37:11;38:18;41:21;
42:7,23
**Growth (1)**
37:2

**H**

**hallway (1)**
23:20
**Hamilton (7)**
26:23,24;27:6,11;
29:19,22;30:6
**Hammond (1)**
31:2
**hand (2)**
31:23;45:1
**handle (1)**
22:21
**happened (2)**
19:21;33:12
**hear (1)**
12:10
**help (1)**
7:5
**hereby (1)**
44:5
**herein (1)**
44:6
**hereunto (1)**
45:1
**High (2)**
7:10;31:8

**higher (1)**
31:19
**highest (1)**
19:6;33:17
**Hoff (5)**
19:13,22;20:7,14;
21:20
**hold (1)**
39:7
**home (2)**
20:17;29:6
**Hoosiers (1)**
8:2
**hoping (1)**
24:8
**huge (1)**
21:22
**hundred (1)**
38:23
**Hutson (2)**
44:4;45:9

**I**

**ID (1)**
29:5
**identification (2)**
5:22;18:3
**identify (2)**
34:14;42:2
**Illness (1)**
29:8
**immediate (1)**
19:14
**immediately (1)**
25:14
**impact (1)**
42:6
**implement (1)**
33:13
**implementation (3)**
10:2;36:21;38:12
**implemented (3)**
42:4,5,15
**implementing (2)**
6:25;13:21
**important (1)**
8:9
**include (2)**
33:24;42:3
**included (1)**
15:17
**income (1)**
31:19
**increase (7)**
15:9;16:20;17:7,
14,23;29:21;30:21
**increases (1)**
17:2
**independent (1)**
37:6
**Indiana (7)**
14:10;27:17,23;

42:13;44:1,12;45:13
**Indianapolis (2)**
18:6;44:12
**individuals (1)**
10:8
**IndyGo (2)**
32:6,11
**information (3)**
37:15;42:3,17
**in-person (10)**
8:1;20:12,15;
22:16,23;24:8;25:2,
23;28:13;29:21
**instead (1)**
40:22
**intangible (1)**
31:12
**interest (1)**
5:16
**into (3)**
23:19,22;37:13
**introduced (1)**
42:12
**introducing (1)**
42:1
**investigation (1)**
26:17
**involved (1)**
6:16
**issue (1)**
22:11
**issues (1)**
29:9

**J**

**James (1)**
41:7
**January (4)**
35:13;36:17;42:2;
44:13
**Jennifer (1)**
19:21
**job (1)**
31:25
**job-related (1)**
29:9
**Johnson (2)**
34:17,18
**Judkins (1)**
6:23

**K**

**Kate (1)**
41:5
**Kathy (1)**
26:24
**Keith (1)**
34:17
**kind (3)**
8:8;28:25;37:6
**kinds (2)**

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

28:17,19
**knowledge (8)**
  11:7,10,11;12:9;
  28:9;35:3,15;41:11

**L**

**labor (1)**
  39:4
**lack (1)**
  27:19
**Lake (5)**
  27:23;30:16,18,20,
  24
**largely (1)**
  29:22
**last (3)**
  33:10;35:23;36:16
**last-minute (1)**
  28:19
**Laurel (1)**
  6:22
**law (3)**
  36:6;42:13;44:10
**lawsuit (1)**
  33:6
**leading (2)**
  25:3,11
**learned (1)**
  26:19
**lease (1)**
  39:2
**least (1)**
  22:6
**leaving (1)**
  29:5
**led (2)**
  9:24;10:24
**legal (1)**
  21:18
**less (1)**
  38:23
**license (1)**
  23:16
**life (1)**
  32:4
**light (1)**
  29:7
**likely (2)**
  12:17;29:1
**limitations (1)**
  20:22
**line (2)**
  18:11;32:16
**lines (2)**
  23:19;28:12
**listed (1)**
  8:15
**little (2)**
  37:14;40:11
**living (1)**
  31:23
**location (4)**

8:14,14;24:19;39:2
**locations (35)**
  6:17;7:1,14,22;
  8:21;9:23;10:21;
  11:13,19;12:1,8,11;
  13:22;15:19;16:3,13;
  17:22;20:4;22:10;
  26:15;27:5,18,25;
  28:4,15;29:24;30:19;
  31:1;35:5,17;36:9;
  39:10;40:6,23,24
**long (2)**
  32:9;34:18
**longer (2)**
  25:18;28:12
**looked (1)**
  17:17
**looking (1)**
  11:25
**lot (2)**
  24:23;26:9
**lots (1)**
  25:11

**M**

**machines (2)**
  33:25;34:1
**Madam (5)**
  18:4;26:12;34:13;
  36:15;41:25
**mail (4)**
  20:18,21;21:7,10
**mail-in (1)**
  20:23
**major (3)**
  10:15;40:16;41:3
**Majority (2)**
  8:25;41:14
**makes (1)**
  31:20
**making (1)**
  39:9
**manage (1)**
  22:25
**manner (1)**
  9:20
**many (6)**
  11:18,20,23;13:24;
  27:5;30:13
**Marion (39)**
  5:10;6:1,6,11,17,
  20;9:13,22;12:1,25;
  14:10;15:3;16:10,11,
  17;17:11,18;18:7,20;
  19:7,9;20:1;22:4,11;
  26:14;28:6,7,11;
  32:21;33:14;34:6,15;
  35:14;40:17,24;41:1;
  44:2,12;45:13
**mark (1)**
  18:1
**marked (3)**

5:18,22;18:3
**Market (1)**
  25:16
**marriage (1)**
  23:16
**matter (3)**
  5:4;8:15;44:8
**Maura (1)**
  19:13
**may (9)**
  26:6;29:8,10,10;
  35:17;36:22;37:12,
  12;40:11
**maybe (1)**
  33:17
**mean (2)**
  13:3;14:18
**means (1)**
  23:15
**media (1)**
  30:3
**meet (2)**
  20:20;35:21
**meeting (9)**
  31:21;35:8,10,13;
  36:18;39:8,10;40:21;
  42:2
**member (8)**
  10:10,18;14:22;
  15:5;19:14;32:21;
  35:2;36:2
**members (4)**
  10:14;11:3;32:23;
  35:16
**memory (1)**
  37:22
**mentioned (1)**
  17:6
**Meridian (1)**
  44:11
**Merritt (2)**
  41:6,7
**metal (2)**
  24:1,11
**might (1)**
  29:2
**Mike (1)**
  30:16
**million (2)**
  33:17;34:3
**minute (1)**
  34:9
**minutes (1)**
  32:13
**Miss (4)**
  19:22;20:7,14;
  21:20
**misstate (1)**
  40:11
**modifications (1)**
  23:5
**money (4)**
  15:13,17,18;16:2

month (2)
  35:11,12
**more (9)**
  14:2;15:11;31:16,
  25;33:24;37:14;
  38:23,25;41:22
**most (5)**
  8:23;19:2;27:20,
  22;28:2
**mouth (1)**
  31:24
**move (1)**
  32:7
**moving (2)**
  23:15,15
**much (2)**
  33:13;36:12
**Myla (3)**
  5:8;43:6;44:5

**N**

**name (1)**
  5:7
**nearest (1)**
  24:19
**necessary (1)**
  29:18
**need (1)**
  20:15
**neglected (1)**
  34:13
**next (7)**
  14:8;18:15;28:2;
  39:8;40:17,21;41:1
**nine (1)**
  21:2
**North (3)**
  7:10;31:7;44:11
**notarial (1)**
  45:2
**Notary (2)**
  44:4;45:9
**notes (2)**
  44:15,20
**noticed (1)**
  5:15
**notwithstanding (1)**
  38:5
**November (1)**
  36:25
**number (5)**
  12:17;18:12,15;
  19:6;28:4
**numbered (1)**
  18:24
**numbers (1)**
  7:23

**O**

**Object (8)**
  12:4;19:12;21:17;

33:2,4;36:11;39:25;
  40:10
**Objection (1)**
  30:1
**obstacles (1)**
  25:8
**occasionally (1)**
  27:2
**occasions (1)**
  15:2
**occupation (1)**
  5:9
**occurs (1)**
  9:7
**October (1)**
  45:12.5
**off (1)**
  18:5
**offer (2)**
  35:3,19
**offered (8)**
  11:6;15:3;19:9;
  27:18;35:9,15,22;
  40:7
**offers (1)**
  8:2
**office (12)**
  5:13;6:7;22:18,18,
  21;23:2,9,12,15,17;
  30:23;37:12
**offices (6)**
  10:2;14:12;15:14;
  19:16;21:23;44:10
**official (1)**
  18:6
**often (1)**
  8:11
**old (1)**
  25:16
**Once (1)**
  26:4
**One (12)**
  7:10;10:1;19:8,23;
  26:23;30:14;32:14,
  15;34:13;35:15;
  36:16;37:15
**one-way (1)**
  31:24
**only (4)**
  28:6;39:13;40:14,
  18
**operate (1)**
  33:20
**operated (1)**
  14:5
**opportunities (5)**
  8:2;9:19;17:1,2;
  19:10
**opportunity (3)**
  17:3,4,15
**oppose (2)**
  22:13;36:8
**opposed (2)**

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

7:15;16:12
**opposes (1)**
36:8
**opposition (2)**
11:4;13:16
**oral (1)**
44:19
**order (3)**
20:20;22:2;33:19
**otherwise (1)**
36:7
**out (6)**
20:2,9,16;23:19,
22;29:8
**outside (2)**
17:1,4
**over (5)**
11:18,22;18:24;
28:7;35:23
**own (1)**
26:7
**owned (1)**
24:23

**P**

**page (1)**
18:10
**paper (2)**
21:21;22:7
**paraphrasing (1)**
19:19
**parking (13)**
24:13,16,19,23,25;
25:5,10,14,18;26:1,8,
9;31:7
**part (1)**
39:14
**participate (2)**
8:3;20:23
**participated (4)**
18:16,20;19:3,7
**particular (1)**
10:23
**parties (5)**
10:15;19:18;40:16;
41:3;44:25
**partisan (4)**
13:8;22:11;27:11;
28:7
**party (5)**
16:11;17:12;20:2;
34:15;36:2
**pass (2)**
42:14,18
**passed (1)**
38:7
**past (1)**
19:14
**pay (3)**
15:18;34:3;39:2
**pays (1)**
32:1

**people (2)**
9:13,14
**per (1)**
31:17
**percent (1)**
29:21
**perimeter (1)**
24:17
**period (2)**
6:8;8:4
**permanent (2)**
41:12;42:7
**permitted (1)**
21:6
**person (3)**
9:10;20:16;44:24
**personal (1)**
29:4
**personally (1)**
30:5
**persons (1)**
31:17
**perspective (1)**
12:2
**phone (1)**
19:22
**physically (1)**
8:20
**Pike (2)**
32:10,11
**Ping (1)**
19:21
**place (3)**
22:17;33:1,3
**Plaintiffs (3)**
5:21;18:2;44:10
**plans (2)**
35:1,3
**play (1)**
6:8
**played (1)**
19:21
**plays (1)**
8:9
**please (1)**
5:7
**Point (2)**
30:24;31:3
**policy (1)**
36:7
**political (4)**
10:15;19:18;40:16;
41:3
**poll (3)**
7:3,20,23
**pollbook (2)**
8:16;29:15
**pollbooks (6)**
21:22;22:3,4,7;
33:19,23
**populous (2)**
27:23;28:2
**position (1)**

5:11
**positions (1)**
17:10
**potential (2)**
20:3;42:4
**potentially (1)**
29:5
**precincts (1)**
9:7
**present (3)**
8:23;10:19;38:1
**presented (5)**
10:4;11:1;36:20;
40:21;44:22
**presently (2)**
34:16;41:9
**presidential (2)**
18:23;19:8
**prevent (2)**
29:2,11
**prevents (1)**
28:21
**primaries (1)**
35:17
**primarily (2)**
33:18;39:4
**primary (2)**
35:6;36:22
**prior (6)**
8:17;11:7;17:15;
23:7;25:7;37:16
**private (3)**
7:15;16:9;32:3
**privately (2)**
15:8;24:23
**Probably (3)**
24:21;33:24;38:25
**problem (1)**
29:14
**problems (4)**
8:10;28:19,25;29:4
**procedure (2)**
9:24;10:24
**process (2)**
8:3;13:13
**prohibit (1)**
38:12
**proposal (1)**
42:4
**propose (3)**
20:3;36:21,24
**proposed (1)**
40:5
**proposing (1)**
10:1
**provide (5)**
7:5;15:6;26:2;27:6,
17
**provided (2)**
27:24;28:3
**providing (1)**
26:15
**provisional (1)**

29:17
**public (11)**
7:14,16;20:8,11;
24:13,16,19;30:3;
35:13;44:4;45:9
**publicly (1)**
15:8
**pulled (1)**
18:5
**purchase (2)**
33:18,24
**pursuant (1)**
44:13

**Q**

**quickly (2)**
5:19;38:19

**R**

**ratified (1)**
10:6
**re (1)**
28:23
**reach (1)**
20:2
**reading (2)**
18:25;30:2
**real (1)**
38:19
**realized (1)**
34:13
**really (3)**
20:15;25:11;38:22
**reason (2)**
15:9;20:10;21:5;
34:21;36:1,7;37:8;
38:6;40:13
**reasons (1)**
15:6
**recall (2)**
10:23;30:2
**receive (2)**
12:7;14:4
**recent (1)**
19:2
**recently (2)**
19:13;27:20
**record (1)**
44:17
**RECROSS-EXAMINATION (1)**
41:23
**recruit (2)**
7:3,20
**REDIRECT (1)**
38:17
**reduced (2)**
44:15,21
**referendum (6)**
13:5,6,8,11,25;14:8
**regard (1)**
26:1

**regarding (1)**
42:11
**regards (1)**
27:13
**registered (1)**
18:13
**related (2)**
5:3;33:6
**relative (1)**
44:25
**relieve (1)**
9:6
**rely (1)**
32:6
**remember (2)**
10:17;13:24
**repeat (2)**
15:16;25:4
**rephrase (2)**
9:8;25
**reported (1)**
30:3
**reporter (1)**
18:1
**represent (1)**
18:4
**Republican (9)**
14:22;15:5;16:10,
11;17:11;19:14;20:1;
36:2;41:8
**Republicans (1)**
22:13
**require (1)**
42:13
**required (2)**
11:2;33:19
**requirement (1)**
36:6
**requirements (3)**
20:20,22;21:16
**requires (3)**
14:17;15:24;16:19
**requiring (1)**
38:2
**Residing (1)**
45:13
**resolution (41)**
10:3,6,20,24;11:1,
3,4,12;14:16;15:3,24;
16:7;27:17;35:4,8,15,
19;36:3,20,24;38:1,7,
8,13;39:9,12,16,18,
21;40:5,7,13,20,23,
25;42:1,9,11,12,14,
18
**resolutions (4)**
11:6;16:12;28:11;
35:22
**resources (2)**
31:14,17
**respect (2)**
13:11;26:14,18;
30:3;37:2

**respective (1)**
41:4
**respond (1)**
33:7
**response (2)**
14:24;41:15
**restructure (1)**
23:9
**result (1)**
29:23
**review (1)**
5:19
**reviews (1)**
5:23
**RICCHIUTO (16)**
12:4;19:12;21:17;
30:1;33:2,11;34:10;
36:11,14;38:15;
39:25;40:10;41:19,
22,24;42:21
**Richardson (2)**
26:25;29:19
**right (1)**
32:17
**role (3)**
6:9,18;7:3
**roll (1)**
8:10
**round (1)**
19:22
**Rules (1)**
44:13

**S**

**SAITH (1)**
43:1
**same (4)**
13:13;14:23,25;
35:21
**satellite (72)**
6:16,19,25;7:6,7;
8:14;9:23;10:2,21;
11:13;12:1,8,11,24;
13:12,21;14:12,16;
15:2,7,14,19;16:2,13,
17;17:7,22;19:9,16;
20:4;21:23;22:2,10;
26:15,21;27:5,9,17,
24;28:4,8,11;30:6,11,
18,19,21,22;31:1,5;
34:23;35:5,16;36:9,
21,25;37:13,18,21;
38:4,8;39:10,13,14;
40:5,14,19,22,23,25;
42:11,15
**save (1)**
5:17
**School (2)**
7:10;31:8
**seal (1)**
45:2
**second (1)**

27:22
**secure (2)**
7:17;14:18
**seeking (1)**
23:8
**Senator (1)**
41:6
**serve (1)**
5:10
**served (3)**
5:25;6:6;34:18
**serves (1)**
37:22
**serving (1)**
7:2
**session (1)**
33:4
**sessions (2)**
33:9,10
**set (4)**
16:2;26:5;34:22;
45:1
**settling (1)**
33:6
**several (1)**
35:23
**share (1)**
34:22
**shed (1)**
29:6
**sheet (1)**
37:3
**short (1)**
34:11
**short-cut (1)**
21:3
**shorthand (1)**
8:9
**show (3)**
5:17;22:22;23:7
**showed (1)**
37:2
**signature (1)**
44:22
**similar (1)**
11:6
**simply (1)**
20:18
**single (1)**
8:11
**site (1)**
25:15
**sites (27)**
6:19;7:6,7;12:15,
18;14:16;16:17;17:7;
22:2;26:22;28:8;
30:21,22;31:5;36:21,
25;37:18,21;38:4,21;
39:13,14;40:14,19,
25;42:12,15
**situation (2)**
9:24;24:25;25:6
**someone (1)**

25:24
**sometimes (3)**
23:19,22;28:20
**somewhere (1)**
27:24
**sorry (3)**
6:22;17:5;28:23
**sort (1)**
29:6
**south (1)**
24:21
**Southport (2)**
7:13;31:8
**speak (1)**
27:2
**speaking (1)**
24:4
**special (4)**
13:2;25:8;26:2,5
**specific (1)**
15:11
**spoken (2)**
30:5,9
**Square (1)**
25:16
**SS (1)**
44:1,5
**stable (2)**
41:12;42:7
**staff (2)**
7:21;38:20
**staffing (2)**
15:19;39:5
**state (5)**
5:7;27:16;36:6;
44:1,5
**stated (1)**
17:11
**status (1)**
38:5
**statute (1)**
10:10
**statutory (1)**
21:16
**Stenograph (2)**
44:15,20
**street (2)**
23:23;44:11
**student (1)**
29:10
**subsequent (2)**
15:21;17:19
**substantially (1)**
5:20
**successful (1)**
12:3
**sufficient (2)**
7:23;31:6
**suggested (1)**
42:7
**Suite (1)**
44:11
**support (3)**

11:15;14:21;15:6
**supposed (1)**
19:19
**supposedly (1)**
17:7
**sure (3)**
23:12;34:10;38:22
**surrounding (2)**
25:12;26:19
**Sweeney (1)**
41:5
**sworn (2)**
5:2;44:7
**system (1)**
32:6

**T**

**tag (1)**
19:23
**talk (3)**
19:20;26:23;27:20
**talking (4)**
13:6;17:25;29:3,4
**tangible (1)**
31:12
**Tenley (1)**
6:22
**term (1)**
8:8
**terms (3)**
26:7;31:14;39:7
**testified (6)**
5:4;19:15,22;20:7,
14;21:21
**testimony (5)**
21:20;40:3,6,11;
44:18
**theoretical (1)**
9:18
**theoretically (1)**
9:15
**thereafter (1)**
44:22
**though (1)**
27:9
**thousand (1)**
38:23
**three (1)**
10:7
**three-year (1)**
6:8
**times (1)**
9:3
**title (1)**
5:9
**today (1)**
34:23
**together (1)**
19:19
**told (1)**
16:18
**tolerance (1)**

9:2
**took (2)**
19:13;33:3
**total (2)**
18:12,15
**town (1)**
29:8
**Township (2)**
32:10,11
**traditional (1)**
8:5
**traffic (1)**
9:7
**transcript (1)**
44:17
**transfer (1)**
32:19
**transportation (2)**
31:20;32:4
**trick (1)**
13:3
**trip (3)**
31:3,24;32:10
**true (5)**
19:24,25;20:17;
27:13;44:17
**truth (6)**
5:2,3,3;44:7,7,8
**trying (1)**
5:17
**turnout (8)**
15:9;16:20;17:8,
14,17,23;30:21;37:3
**two (12)**
7:7,9;23;10:14,15,
21;19:18;24:21;
29:23;34:20;38:21;
39:10;41:3
**typewriting (2)**
44:16,21
**typewritten (1)**
44:17
**typically (3)**
9:2;10:1;22:22

**U**

**unanimity (1)**
36:6
**unanimous (8)**
11:15;13:18;14:17,
19;15:24;16:19;
27:19;38:2
**unanimously (3)**
38:7;42:14,19
**under (2)**
44:16,21
**unexpected (2)**
12:14;29:14
**up (8)**
9:24;22:22;23:7;
25:3,11;36:15;38:19;
40:4

COMMON CAUSE INDIANA, ET AL. VS.
MARION COUNTY ELECTION BOARD, ET AL.

MYLA ELDRIDGE
January 10, 2018

**upcoming (3)**
35:10;36:17,22
**upon (1)**
44:19
**use (4)**
7:17;8:8;12:18;
21:21
**used (4)**
12:24;13:2;14:12;
25:14
**uses (1)**
22:6
**using (1)**
39:1

**V**

**vague (1)**
40:1
**via (1)**
32:11
**view (1)**
20:8
**views (3)**
12:21;34:22;36:3
**volunteers (3)**
7:5,21,24
**vote (34)**
9:1,4,11,14,15;
10:5;11:2;13:8;
14:17,19;15:7,24;
16:19;17:1,4,15;
20:18,20;21:7,10;
23:8;25:7;27:19;
28:21;29:3;32:23;
33:14,20,25;38:2,3;
40:19;41:1,14
**voted (3)**
11:3;26:20;40:7
**voter (20)**
8:13,15;12:11;
15:9;16:20;17:8,14,
15,17,22,23;21:4;
23:13;26:3;29:1,2,
16;30:20;32:10;37:3
**voters (22)**
6:17;9:1;12:18;
17:3;18:13,16,20;
19:3,7,9;24:7;25:1,6,
22;26:7;27:7,22;
28:2,8,11,20;31:1
**votes (4)**
9:10;22:23;28:14,
15
**voting (67)**
6:17,25;7:22;8:2,7,
8,9,21;9:6,19,23;
10:2;11:19;12:1,8,11,
22,24;13:12;14:12;
15:3,7,14,19;16:2,13;
17:13;19:9,16;20:4,9,
12,16,24;21:23;
22:10,17;23:2,10,18;

24:3;26:15;27:5,9,
18;28:4,11;29:22,23;
30:6,11,18,19;31:1,
11,21;33:25;34:1,23,
24;35:5,16;37:13;
38:8,21;39:10;40:6

**W**

**wait (1)**
9:3
**wants (1)**
23:13
**way (3)**
32:14,15;37:15
**wealth (1)**
31:19
**website (3)**
5:15;18:6;37:5
**weeks (1)**
39:11
**weren't (3)**
10:17,18;14:18
**What's (1)**
33:16
**wheelchair (2)**
25:25;26:3
**WHEREOF (1)**
45:1
**whole (2)**
5:2;44:7
**Wishard (4)**
13:6,8,11;14:8
**withheld (1)**
14:21
**withholding (1)**
15:5
**without (2)**
31:1;32:3
**Witness (3)**
5:23;44:22;45:1
**wonder (1)**
5:16
**words (3)**
19:17;27:10;31:23
**work (2)**
7:5;29:10
**workers (3)**
7:3,21,24
**working (1)**
39:17
**writing (1)**
41:9

**Y**

**year (10)**
5:14;14:8;19:8;
32:1;33:10;35:6;
40:14,17,24;41:1
**years (4)**
11:7;15:21;34:20;
40:9

**1**

**1 (2)**
5:18,21
**10th (1)**
44:12
**12-hour (1)**
8:4
**14 (1)**
27:24
**18 (3)**
35:17;36:22,25

**2**

**2 (3)**
18:1,2;37:2
**20,000 (1)**
18:24
**2007 (2)**
6:2,14
**2008 (19)**
6:18,22;8:21;9:23;
10:19;11:5,7,11,25;
12:20,24;13:14;14:2;
17:18;18:11,19;
22:16;31:5;40:4
**2009 (3)**
13:2,12;16:12
**2010 (4)**
14:9,13,21;15:20
**2012 (5)**
6:2,5,15;14:24;
18:23
**2014 (1)**
14:24
**2015 (4)**
5:14;6:4,5;37:23
**2016 (9)**
14:24;19:17;20:2;
25:3,7;26:14;27:20;
29:24;40:4
**2018 (11)**
39:18,22;40:8,9;
42:11,12,12,18,18;
44:13;45:3
**2019 (1)**
40:17
**202 (1)**
45:12.5
**21 (1)**
45:12.5
**24th (4)**
35:11,13;36:17;
42:2
**2700 (1)**
44:11

**3**

**30 (1)**
32:13

**300 (1)**
44:11
**370,498 (1)**
19:2
**381,759 (1)**
18:19

**6**

**63 (1)**
29:21
**65 (4)**
21:4,8,9,13

**7**

**75,000 (2)**
9:13,14

**9**

**9 (1)**
27:24