UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMON CAUSE INDIANA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01388-SEB-TAB |
| | ) | |
| MARION COUNTY ELECTION BOARD, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DKTS. 61, 67)**

Plaintiffs brought this lawsuit under 42 U.S.C. § 1983 alleging and seeking to enjoin violations of the First and Fourteenth Amendments to the Constitution and Section 2 of the Voting Rights Act of 1965 (VRA), 52 U.S.C. § 10301.[1] Now before the Court is Plaintiffs' motion for a preliminary injunction. For the reasons below, that motion is granted in part and denied in part.

**Facts and Procedural History**

Plaintiffs are two public-interest groups and two private residents of Marion County, Indiana. The public-interest groups are Common Cause Indiana, which "has long

---

[1] Section 2 "does not expressly confer a right of action, though the Supreme Court has routinely allowed private enforcement of this provision. *See, e.g., Johnson v. De Grandy*, 512 U.S. 997 (1994); *Chisom v. Roemer*, 501 U.S. 380 (1991). . . . In one of the few cases to address the question expressly . . . a federal district court concluded that § 2 was enforceable through § 1983. *Gray v. Main*, 291 F. Supp. 998, 999–1000 (M.D. Ala. 1966)." Daniel P. Tokaji, *Public Rights and Private Rights of Action: The Enforcement of Federal Election Laws*, 44 Ind. L. Rev. 113, 138 n.198 (2010).

worked to expand voter registration and . . . equal access to voting[,]" Am. Compl. (Dkt. 55) ¶ 4, and the Greater Indianapolis Branch 3053 of the NAACP, which "[t]hroughout its [more than one-hundred-year] history . . . has led and continues to lead the fight for civil rights, voting rights[,] and economic justice for African-American residents of Indianapolis and Marion County." *Id.* ¶ 56. The private plaintiffs are John Windle ("Windle") and Doris A. McDougal, who are registered and active Marion County voters.[2]

Defendants are the Marion County Election Board ("the Board") and its three members in their official capacities: Myla A. Eldridge ("Eldridge"), Keith Johnson ("Johnson"), and Melissa Thompson ("Thompson"). By law, *see* Ind. Code § 3-6-5-2, the three-member Board consists of the elected clerk of Marion Circuit Court (Eldridge) and her two appointees, one from the county Democratic Party (Johnson) and one from the county Republican Party (Thompson). The Republican member of the Board was formerly, at times relevant to this lawsuit, Maura J. Hoff ("Hoff"). Hoff was originally named as a defendant, but Thompson was substituted for Hoff when the former succeeded to the latter's seat on the Board. *See* Fed. R. Civ. P. 25(d).

## I. Early In-Person Voting Under Indiana Election Law

Under Indiana election law, Ind. Code tit. 3, a voter may cast her vote otherwise than at the polls on election day by what is known as "absentee" voting. *See id.* ch. 3-11-10. An absentee vote may be cast by mail if the voter meets one of thirteen conditions,

---

[2] No Article III standing issues have been raised as to either the organizational or the individual plaintiffs. *See* Pls.' Reply Br. (Dkt. 68) 10 n.2.

*see id.* § 3-11-10-24(a)(1) through (13), such as having "a specific, reasonable expectation of being absent from the county [where she is registered] on election day during the entire twelve . . . hours that the polls are open[,]"[3] *id.* § 24(a)(1), or being "a serious sex offender" as that term is defined under state criminal law. *Id.* § 24(a)(12). An absentee vote may also be cast in person, without the voter having to satisfy any of the thirteen conditions for voting absentee by mail, *id.* § 26(a), no earlier than twenty-eight days before, and no later than noon on the day before, election day. *Id.* § 26(f). For this reason, in-person absentee voting is sometimes called "early in-person" or "EIP" voting.

The county circuit court clerk (or simply, "the county clerk"), as already noted, is *ex officio* a member of the county election board, and is charged by statute with much of the responsibility for election administration. *See id.* § 33-32-2-6. The county clerk's office must be open for early in-person voting for at least seven hours on each of the two Saturdays before election day. *Id.* §§ 3-11-10-26(a)(1), (h). But a county election board may also establish "satellite offices in the county where voters may cast" EIP votes. *Id.* § 26.3(a). *See also id.* § 26(a)(2) (entitling voters to vote early in person at satellite office established under § 26.3). Satellite offices may be established only by unanimous resolution of a county election board, *id.* § 26.3(b), which, if adopted, "expires January 1 of the year immediately after the year in which the resolution is adopted." *Id.* § 26.3(i). As relevant here, the statute does not constrain a county election board's discretion to decide whether to establish satellite offices, where such offices should be, how many

---

[3] Indiana polls are open on election day from 6:00 a.m. to 6:00 p.m. Plaintiffs allege Indiana's 6:00 p.m. poll closing time to be the earliest in the nation. Am. Compl. ¶¶ 52, 61.

should be established, or how long they should be open for voting; and the statute provides no guidance on reaching such decisions.

## II. Early In-Person Voting in Marion County

Marion County is Indiana's most populous and most racially diverse (that is, having the highest nonwhite population in both absolute and relative terms). Dkt. 63 Ex. 6, at 18. Marion County first experimented with satellite offices for early in-person voting in 2008, a presidential election year. That year, the Board unanimously approved two satellite offices, one at North Central High School and another at the Southport Government Center. Dkt. 66 Ex. A (Eldridge Dep.) 7:7–13, 11:11–14. More than 73,000 Marion County voters cast EIP votes. Answer Am. Compl. (Dkt. 60) ¶ 15. "Indiana, for the first time since 1964, cast its electoral votes for the Democratic Party's nominee for President." Pls.' Br. Supp. (Dkt. 62) 8.

Eldridge, then the Board's deputy director, deemed 2008's satellite-office experiment a success. Dkt. 63 Ex. 8 (Eldridge Dep.) 11:25–12:6. Eldridge did not encounter "any difficulties" in "finding sufficient numbers of poll workers or volunteers" to "staff those early voting locations[.]" *Id.* at 7:20–25. Eldridge never received or heard of any complaints of fraud, "unexpected administrative difficulties . . . [,]" *id.* at 12:14–16, or any other "complaints from citizens about the[] satellite voting locations[.]" *Id.* at 12:7–9. As both satellite offices were located on public property, the Board was able to secure their use at no cost. *Id.* at 7:14–19. In Eldridge's experience, "early voting plays an important rol[e] in alleviating congestion and problems that often arise during a single election day[.]" *Id.* 8:9–12. Naturally, the greater the number of early voters, the fewer

the voters crowding the polling places on election day. But further, for example, administrative errors are easier to correct when earlier discovered, and "voters who cast their vote early typically have a greater tolerance for wait times because they've chosen the day and the time that is convenient for them to vote." *Id.* 9:1–5.

Jennifer Ping ("Ping") reported a different experience. Ping is a former chair of the Marion County Republican Party but, in 2008, was co-owner of a lobbying firm and did not then appear to have any role (at least any formal role) in county politics or county election administration. She reported,

> I myself did vote early at the Southport location in 2008, and in addition to having that concern of verifying a voter actually voted—might have voted earlier, the process of printing nearly a thousand different ballots styles [*sic*] on demand did not go smoothly and created a lot of chaos for the workers there as well as the voters, myself included.

Dkt. 66 Ex. B (Ping Dep.) 14:1–8. However, Ping was not aware of "any evidence that any voter in 2008 in Marion County voted more than once[,]" *id.* at 14:9–12, and did not, in the materials designated to the Court, explain why the demands of ballot-printing were greater at satellite offices than at the clerk's office, or greater at satellite offices before election day than at polling places on election day.

The Board again approved the use of satellite offices, four of them this time, for a local, nonpartisan referendum in 2009. Dkt. 66 Ex. A (Eldridge Dep.) 13:2–14:1. But resolutions to re-establish satellite offices in Marion County failed in every federal general election year thereafter—2010, 2012, 2014, and 2016—each time for lack of the Republican Board member's or her proxy's vote. *Id.* at 14:12–22 (2010); *id.* at 14:23–

15:1 (2012, 2014, 2016); Dkt. 63 Ex. 3, at 4 (2016 May primary election); *id.* at 11 (2016 November general election).

### III. The 2016 Resolutions

Hoff was the Republican Board member for 2016; her predecessor was Mindy Brown. Hoff was "recruited" for, Dkt. 63 Ex. 9 (Hoff Dep) 8:19–20, and *de facto* appointed to,[4] that position in January or February 2016 by Ping, then the chair of the county Republican Party; Mike McQuillen ("McQuillen") succeeded Ping in that position in the summer of 2016. (As of September 2017, the party chairmanship was held by state senator Jim Merritt.) As a "political appointee," Hoff "would not say that [she] felt obliged to follow the party line, but as an appointee, [she] would give deference to the opinion of the party on those matters [before the Board]." Dkt. 63 Ex. 9 (Hoff Dep.) 11:2–5.

In Hoff's experience, "[s]atellite voting . . . tend[s] to be party divided." *Id.* at 11:17–18. When a satellite-office resolution was introduced in spring 2016, ahead of the May primary election, Ping and Hoff "talked through it and agreed on how [Hoff] should vote[,]" *id.* at 15:15–16, which is to say, in the negative. "[T]he two main points" Ping brought to Hoff's attention were, first, "that the resolution had solely been drafted by the

---

[4] The statute clearly provides that the other two members of a county election board are "appointed by the circuit court clerk[.]" Ind. Code § 3-6-5-2(2). In Marion County practice, however, the appointments appear to have been made by the respective county party chairs. *See* Dkt. 63 Ex. 8 (Eldridge Dep.) 10:14–16 ("other two [Board] members are appointees of the two major political parties"); Dkt. 63 Ex. 9 (Hoff Dep.) 8:2–4 ("Q. [You] [j]ust serve at the pleasure of the Marion County Republican chair? A. Correct."); Dkt. 66 Ex. B (Ping Dep.) 9:20–25 (Republican Board member appointed by Marion County Republican Party chair).

Democrat[ic] Party and had not been discussed with [Ping]," and, second, "the cost and administrative headache that it would bring." *Id.* at 16:9–18. Hoff did not know how great the expense would be and conducted no independent investigation. Hoff did not discuss her or Ping's concerns with the other Board members or voice them at the Board meeting at which a vote on the spring satellite-office resolution was taken; she simply voted against the resolution without comment.

A second satellite-office resolution was introduced in 2016 ahead of the November general election. Hoff was apparently unable to attend the Board meeting at which a vote on the resolution was to be taken, so she contacted McQuillen, the newly installed county party chair, Ping, now serving as county party vice chair, and Joey Fox ("Fox"), executive director of the county party, asking if any of the three party officials could serve as her proxy at the Board meeting. Fox responded that he was available to serve as Hoff's proxy.

Hoff informed him that "it would be [her] preference for him to vote no on [the satellite-office resolution]." *Id.* at 24:1–2. She explained her preference to Fox as follows:

> After we [the Marion County Republican Party] opposed [the satellite-office resolution] in the spring, it was understood that the Republican Party and the Democrat[ic] Party were going to get together and work in collaboration, and I was told that those contacts never happened, that there was a round of phone tag between [Ping] and [Eldridge] and they never got ahold of one another, so no discussion ever happened.

*Id.* at 25:12–19. But that was not the only reason Hoff maintained for voting against the satellite-office resolution (though whether she also discussed these reasons with Fox is unclear):

> Gosh, there are many [reasons]. One is that the public seems to misunderstand what early voting is, that it's not actually voting, that it's filling out an absentee ballot in another location. And I personally feel that an absentee ballot can be filled out at your home, which is even more convenient, so the necessity of providing additional locations is—it's just not needed. The staff that would be needed to work each location, plus the huge burden that we still have paper poll books in Marion County makes the process very difficult. And we knew that the Clerk's Office was planning to have all—I'm going to try to word this correctly. I hope that I understood it correctly. That everyone who voted early, all those names would have to go to the correct precinct on Election Day and be marked off in the paper poll books because we didn't have an electronic system to do so, and that that was going to significantly delay voting on Election Day, which I felt was a burden to the voter who showed up on Election Day.

*Id.* at 26:3–24. Finally, though "partisan politics" was "not a reason [Hoff] was given for voting" against the satellite-office resolutions, and, if partisanship did play a role, "that decision was made by someone else[,]" *id.* at 32:3–6, Hoff "[didn't] deny that partisan politics probably plays a hand in decision making" on this issue. *Id.* at 48:11–12.

Eldridge, for her part, agreed with Hoff that "the decision whether to have satellite voting locations has become a partisan issue in Marion County[,]" Dkt. 63 Ex. 8 (Eldridge Dep.) 22:9–12, but otherwise disagreed with Hoff's assessment of EIP voting in Marion County (which, in any event, was never communicated to Eldridge by Hoff). First, Eldridge had no "reason to believe that the public doesn't understand what early in-person absentee voting is[.]" *Id.* at 20:10–13. Second, Eldridge disputed Hoff's conclusion that satellite offices were duplicative of voting absentee by mail and therefore unnecessary, because a voter's right to vote absentee by mail is limited by statute, whereas the right to vote early in person is not. Third, Eldridge denied that Marion

County's use of paper poll books was a "huge burden on having satellite voting offices." *Id.* at 21:22–25. Marion County uses exclusively paper poll books for all voters, no matter their chosen means of voting; "[i]n order to have satellite sites, you do not have to have electronic pollbooks[,]" *id.* at 22:2–3; and Hoff did not further explain why marking off voters in a paper poll book would be more burdensome with respect to early in-person voters than either absentee by-mail voters or election day voters. Indeed, before this Court, the Board and each of its members have conceded that "early voters *and Election Day voters* in Marion County are likely to experience longer lines and wait times than would otherwise exist" following the Board's rejection of satellite offices. Answer ¶ 26 (emphasis added).

In this way, both resolutions for satellite offices in 2016 failed for lack of the Republican Board member's vote—just as similar resolutions had failed in every federal general election year since 2008. As Hoff's (and Fox's) nay votes had been cast without public discussion or comment, a columnist of the Indianapolis *Star* newspaper was prompted to contact Hoff for a statement of her reasons in so voting. Hoff did not respond immediately, but first "consulted [McQuillen] and [Ping] as to whether they wanted to make a party statement about the issue, and they advised that it would be better not to comment." Dkt. 63 Ex. 9 (Hoff Dep.) 25:2–5.

## IV.  The Impact of the Board's Decisions

As a result of the Board's decision not to re-establish satellite offices, early voting in Marion County is more difficult for voters than it otherwise would be. *See* Answer ¶ 26. The Marion County clerk's office is located in the City-County Building in central

downtown Indianapolis. For plaintiff Windle, it is "exactly 21 miles from [his] home on the northeast side of Marion County."[5] Dkt. 69 Ex. 10 (Windle Aff.) ¶ 4. For Julie Petrison ("Petrison"), "a registered voter who resides in Washington Township, Marion County," Dkt. 69 Ex. 11 (Petrison Aff.) ¶ 1, it is an "approximately twenty-five (25) to thirty (30) minute[]" drive to the clerk's office from her home.[6] *Id.* ¶ 3. Eldridge estimated that, by bus, a trip to the City-County Building from Pike Township in northwestern Marion County "would be about 30 minutes[,] . . . assuming they were on a direct line downtown[.]" Dkt. 63 Ex. 8 (Eldridge Dep.) 32:9–18.

Voters taking public transportation to the City-County Building must pay the bus fare, $1.75 per one-way ticket. *Id.* at 31:24; Dkt. 75 Ex. 13 (Vaughn Aff.) ¶ 20. Voters taking private transportation must find parking in downtown Indianapolis. In Eldridge's opinion, "[p]arking is not convenient downtown. There are really no accessible lots leading up to an election or surrounding the City-County Building." Dkt. 63 Ex. 8 (Eldridge Dep.) 25:10–13. In 2016 particularly, downtown parking was limited by ongoing construction projects. *See* Dkt. 63 Ex. 9 (Hoff Dep) 32:15–19. Windle learned

---

[5] Windle desired to vote early in person in the 2016 general election because he was apparently ineligible to vote absentee by mail but had a "work schedule [which] at the time required [him] to be at work by 9:30 a.m. and on the clock until 6 p.m. on Election Day . . . , thus allowing [him] only an approximately one and [one] half to two-hour window in the morning in which to vote . . . ." Dkt. 69 Ex. 10 (Windle Aff.) ¶ 3.

[6] Petrison desired to vote early in person in the 2016 general election because she was apparently ineligible to vote absentee by mail but "was scheduled to work from 3:00 p.m. Monday [before election day] until 8:00 a.m. Tuesday, [election day,] and then scheduled to return to work at 3:00 p.m. until 11:00 p.m. on that Tuesday[.] . . . So [Petrison] had to decide between either early voting or foregoing any sleep . . . [,]" Dkt. 69 Ex. 11 (Petrison Aff.) ¶ 2, an unattractive choice for any worker, and potentially a dangerous one for registered nurses like Petrison.

that the Board "had chosen a particular parking lot on Pearl Street as the designated no-charge parking place for early voters. But although [he] tried multiple times over numerous days, [he] was never able to secure a parking spot there, [n]or along the one block stretch . . . of Delaware Street . . . also so designated." Dkt. 69 Ex. 10 (Windle Aff.) ¶ 6. The Pearl Street lot may be entered and exited only by a narrow side-street, and Windle "witnessed absolute gridlock on several occasions [there] where[] frustrated drivers were exiting their vehicles and warning others to turn away." *Id.* ¶ 7. Moreover, though Windle had "naively" expected that the Pearl Street lot had been designated for the exclusive use of early voters, *id.*, that was not so, "so that what [Windle] estimated were 50–60 spots set aside for voters were actually only a handful of unreserved parking spaces." *Id.* Petrison, being "unfamiliar with the downtown area[,]" Dkt. 69 Ex. 11 (Petrison Aff.) ¶ 4, was unable to find the Pearl Street lot at all, and "ended up . . . driving around downtown for forty-five (45) minutes before giving up" and parking in a parking garage at the cost of $2. *Id.* Other voters at the City-County Building told Petrison they had found parking only at a cost of $5 to $7.

At the City-County Building, Eldridge has observed that lines to cast EIP votes "sometimes extend out into the hallway" and "sometimes extend out into the street[.]" Dkt. 63 Ex. 8 (Eldridge Dep.) 23:19–24. Petrison found "a line extending out the door[,]" in which she stood for "nearly an hour" before casting her ballot. Dkt. 69 Ex. 11 (Petrison Aff.) ¶ 5. When Petrison left, "the line had grown and by that time stretched out onto the sidewalk for about half a block." *Id.* ¶ 6. Petrison's 77-year-old mother had wanted to cast an EIP vote as well but she "did not want to go downtown as she has trouble walking

and normally uses a cane or walker[.]" *Id.* ¶ 7. By contrast to her experience at the City-County Building in 2016, Petrison found voting at the North Central High School satellite office in 2008 "very easy and convenient[.]" *Id.* ¶ 8. "After four or five attempts to vote early at the City-County Building," Windle gave up the effort entirely and instead voted on election day during the brief window permitted by his work schedule. Dkt. 69 Ex. 10 (Windle Aff.) ¶ 8.

The burdens imposed by EIP voting in Marion County have caused a decline in early voting in Marion County that has not been demographically agnostic. Specifically, as found by Prof. Bernard L. Fraga, professor of political science at Indiana University—Bloomington:

1.  The [Board's] failure to approve any satellite voting locations for 2012 and 2016 decreased the proportion of voters voting early in-person absentee in Marion County, relative to 2008.

2.  African-Americans who voted absentee were more likely to use early in-person absentee voting in Marion County than non-Hispanic whites who voted absentee in 2008, 2012, and 2016.

3.  After the [Board's] failure to approve any satellite voting locations in 2012 and 2016, rates of early in-person absentee voting among African-American absentee voters declined to a greater degree than rates of early in-person absentee voting for non-Hispanic whites, relative to 2008.

4.  . . . [T]he [Board's] failure to approve any satellite voting locations for the 2012 and 2016 elections likely had a disproportionate, negative impact on African-Americans in Marion County relative to non-Hispanic whites.

Dkt. 63 Ex. 7 (Fraga Rep.) 5.

But across all demographic groups, the difference in voting patterns between 2008 and 2016 (both presidential election years) is stark: in 2008, 370,839 Marion County voters cast ballots; 72,543 of these were EIP votes. *Id.* at 6. In 2016, 366,653 Marion County voters cast ballots, more than 4,000 fewer votes than in 2008, and a mere 46,986 of these were EIP votes, *id.*, a 34.5 percent decline which may be instructively compared with the 5.6 percent decline in absentee by-mail votes over the same period. *Id.* at 7. Notably, this decline is contrary to national trends, as "the proportion of individuals casting ballots before Election Day has increased nationwide since 2008." *Id.* at 8. Overall voter turnout in Marion County has declined as well, from 54.73 percent in 2008 and 56.41 percent in 2012, to 52.93 percent in 2016 (all presidential election years). Dkt. 63 Ex. 8, at 25.

By comparison, other Indiana counties, in particular the next-most populous after Marion and those surrounding Marion, have taken consistent advantage of satellite offices. Early voting has concomitantly grown in popularity in those counties, in line with national trends. For example, Plaintiffs allege that Hamilton County, Marion's whiter, richer, and more Republican northern neighbor, established two satellite offices for the 2016 election, a ratio of one EIP site (including the clerk's office) for every 76,929 voters. Am. Compl. ¶ 22. Marion County, by contrast, provided one EIP site (the clerk's office) for all of its 699,709 registered voters. *Id.* ¶ 21. In addition to Hamilton, Allen, Boone, Elkhart, Hancock, Hendricks, Johnson, Lake, Monroe, Morgan, Porter, Tippecanoe, and Vanderburgh Counties—all either adjacent to Marion, or one of Indiana's most populous counties, or both—have each established multiple satellite

offices in recent federal election years. Dkt. 63 Ex. 1 (resolutions of county election boards).

## V.  The Instant Motion

This lawsuit was filed on May 2, 2017. Dkt. 1. Plaintiffs filed their *Amended Complaint* on January 10, 2018, seeking declaratory and injunctive relief against violations of the First and Fourteenth Amendments and Section 2 of the VRA. Dkt. 57. The instant motion for a preliminary injunction, together with supporting evidentiary designations, was filed on January 31, 2018, seeking an order directing the Board to establish two satellite offices in Marion County (the same number as in 2008) for the 2018 primary and general elections. Dkt. 61.

Defendants responded to Plaintiffs' motion on February 15, 2018, together with their own evidentiary designations. Dkt. 66. Defendants take "no position" on the constitutional or statutory merits of Plaintiffs' claims. Defs.' Br. Opp. (Dkt. 66) 4. Defendants, writing as of February 15, 2018, do object to an order directing the establishment of satellite offices for the May primary election as too burdensome at such a late hour. *Id.* at 5. The Board concedes, however, that the burden of an order directing the establishment of satellite offices for the November general election would be "far less without a compressed timeframe, and would be consistent with the burden to establish such satellite offices as part of a [B]oard resolution the majority would support in any event." *Id.* at 5–6.

Plaintiffs replied on February 22, 2018. Dkt. 68. To facilitate an expeditious resolution of the instant motion, Plaintiffs waived an evidentiary hearing and waived their

VRA claim solely for purposes of this motion. Pls.' Reply Br. (Dkt. 68) 2. Accordingly, only Plaintiffs' constitutional claim is presented for decision here.

Consistent with the parties' implied and express representations that a hearing was not necessary on either the law or the facts, on our own motion, we vacated the hearing on Plaintiffs' motion originally set for April 19, 2018. Dkt. 74.

## Standard of Decision

"[P]laintiff[s] seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[T]he more likely it is the plaintiff[s] will succeed on the merits, the less the balance of irreparable harms need weigh towards [their] side; the less likely it is the plaintiff[s] will succeed, the more the balance need weigh towards [their] side." *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013) (quoting *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013)).[7] The movant's burden is proof by a preponderance of the evidence. *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1024 (S.D. Ind. 2014).

---

[7] The Seventh Circuit has held this "sliding scale" analysis to be "consistent with" the Supreme Court's decision in *Winter*. *Id. See, e.g., Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010) (reciting *Winter* and sliding-scale standards).

"[A] mandatory preliminary injunction, that is, an injunction requiring an affirmative act by the defendant," is "'cautiously viewed and sparingly issued.'" *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quoting *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)). Nevertheless, "[a] mandatory injunction can be used to compel restoration of the status quo, . . . [*i.e.*,] 'the last peaceable uncontested status that existed before the dispute arose.'" *Kimbley v. Lawrence Cty.*, 119 F. Supp. 2d 856, 874 (S.D. Ind. 2000) (quoting *Mass. Mut. Life. Ins. Co. v. Associated Dry Goods Corp.*, 786 F. Supp. 1403, 1427 (N.D. Ind. 1992)).

## Analysis

## I.  Likelihood of Success on the Merits

To merit balancing of the injunction factors, Plaintiffs must, at a minimum, show a "'better than negligible' chance of success on the merits of at least one of [their] claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)). "Only after we . . . proceed to the balancing phase of the analysis must we determine how likely [Plaintiffs'] success must be for us to issue the requested injunction." *Id.*

This lawsuit is one of several in recent years in which it is alleged that the majority party has leveled restrictions on voting rights that are often facially innocuous but in reality targeted at the minority party or its traditional constituencies. *See, e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) (affirming *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006)); *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016); *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204

(4th Cir. 2016); *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016). In this case, Plaintiffs contend that the Board may not burden the exercise of early in-person voting in Marion County based solely on partisan considerations without any justifying legitimate interest, and that they have a better than negligible chance of showing that is what happened here. We agree.

A.  *Scope of Analysis*

Before proceeding to the merits of Plaintiffs' constitutional claim, we consider the proper scope of our analysis. As noted above, the Board takes "no position on whether Plaintiffs have satisfied their burden to establish that they are likely to prevail on the merits of the First and Fourteenth Amendment claim[] . . . ." Defs.' Br. Opp. 4. We deem this a waiver of opposition to the merits and Plaintiffs' motion is to that extent unopposed. *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007). As the Board has taken this litigation posture unanimously, there is no concern that state governmental defendants are evading the requirements of state law (that is, the unanimity requirement of Indiana Code § 3-11-10-26.3(b)) by consenting to the exercise of federal power. *See Perkins v. City of Chicago Heights*, 47 F.3d 212, 217 (7th Cir. 1995). We could therefore summarily rule for Plaintiffs on this element, consistent with the principle of judicial restraint and our obligation not to issue advisory opinions. *See, e.g., Youth Justice Coal. v. City of Los Angeles*, No. LA CV 16-07932, 2017 WL 396141, at *3 (C.D. Cal. Jan. 27, 2017) (summarily granting unopposed motion for preliminary injunction) (citing cases).

The State of Indiana ("the State") offers to supply the lacking adversity of argument, if not of interest,[8] by means of an *amicus curiae* brief in opposition to Plaintiffs' motion. Dkt. 67. But because the State's brief proceeds from a flawed premise of constitutional law and applies it to a flawed reading of Plaintiffs' constitutional claim, as elaborated somewhat below, we do not find the State's brief helpful to a correct disposition of the issue. The State's motion is therefore denied.

We conclude that the better course is to hold Plaintiffs to at least a *prima facie* showing of likelihood of success on the merits. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is . . . never awarded as of right."); *W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) (rejecting plaintiff's position that complaint allegations deemed admitted for lack of answer) ("[A] preliminary injunction should not . . . issue[] unless the complaint can be construed to make out a prima facie case."), *cited in Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). *See also Bonvolanta v. Delnor Cmty. Hosp.*, 413 F. Supp. 2d 906, 908 (N.D. Ill. 2005) (citing *Nabozny v. Podlesny,* 92 F.3d 446, 457 n.9 (7th Cir. 1996)) ("[T]he Seventh Circuit . . . requires that before granting a dispositive motion as unopposed, the trial judge must look at the motion to determine whether it states adequate grounds for the relief requested.").

As explained below, we conclude Plaintiffs have carried this burden.

---

[8] On the State's motion to intervene, Dkt. 26, opposed by Plaintiffs, Dkt. 31, we granted the State limited intervention rights to participate in settlement discussions, object to and appeal an eventual settlement, and file an *amicus* brief on eventual motions for summary judgment. Dkt. 40.

*B. First and Fourteenth Amendment* Anderson-Burdick *Claim*

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure[,]'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)), a "fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Equally incontestable is a state's "power to regulate [its] own elections." *Burdick*, 504 U.S. at 433 (citing *inter alia* U.S. Const. art. I, § 4, cl. 1). "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). "To achieve these necessary objectives, States have enacted comprehensive . . . election codes[,] [e]ach provision of [which], whether it governs the registration and qualifications of voters, the selection . . . of candidates, or the voting process itself, inevitably affects . . . the individual's right to vote . . . ." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). "Any such restriction is going to exclude, either de jure or de facto, some people from voting; the constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

Under the First and Fourteenth Amendments, a court considering a challenge to a state's election regulation as unduly and impermissibly burdening voting rights

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed

> by its rule. In passing judgment, the [c]ourt must not only
> determine the legitimacy and strength of each of those
> interests; it also must consider the extent to which those
> interests make it necessary to burden the plaintiff's rights.

*Anderson*, 460 U.S. at 789. A court must "then make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) (op. of Stevens, J., Roberts, C.J., Kennedy, J.)[9] (quoting *Storer*, 415 U.S. at 730).

"This balance," the so-called *Anderson-Burdick* balance, "means that, if the regulation severely burdens the First and Fourteenth Amendment rights of voters, the regulations 'must be narrowly drawn to advance a state interest of compelling importance.'" *Common Cause Ind. v. Individ. Members of the Ind. Election Comm'n*, 800 F.3d 913, 917 (7th Cir. 2015) (quoting *Burdick*, 504 U.S. at 434). By contrast "[w]hen the state election [regulation] 'imposes only reasonable, nondiscriminatory restrictions upon the rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Id.* (quoting *Burdick*, 504 U.S. at 434). "However slight th[e] burden [imposed on voters] may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).

"[E]ven rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications." *Id.* at 189. In *Harper v. Virginia Board of Elections*, 383 U.S.

---

[9] All subsequent citations to *Crawford* refer to this three-Justice lead opinion of the Court unless otherwise indicated. *Crawford* sharply divided the Court. Justices Scalia, Thomas, and Alito concurred in the judgment, *see* 553 U.S. at 204; Justices Souter and Ginsburg dissented, *see id.* at 209; and Justice Breyer dissented separately. *See id.* at 237.

663 (1966), the Court struck down Virginia's $1.50 poll tax (less than $10 in today's money, *Crawford*, 553 U.S. at 239 (Breyer, J., dissenting)), annual payment of which was a precondition to the franchise, as an "invidious discrimination" violative of the Equal Protection Clause of the Fourteenth Amendment. *Harper*, 383 U.S. at 668 (quotations, citation omitted). Notwithstanding that the poll tax applied to all Virginia voters neutrally and without discrimination on its face, and without finding that the tax "was born of a desire to disenfranchise" black voters or any other group, *id.* at 666 n.3 (quotations, citation omitted), the Court held that a state "violates the Equal Protection Clause . . . whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Crawford*, 553 U.S. at 189 (quoting *Harper*, 383 U.S. at 666) (quotations omitted). "Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. . . . . To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." *Harper*, 383 U.S. at 668. The "general rule" remains "'that evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not invidious and satisfy the standard set forth in *Harper*." *Crawford*, 553 U.S. at 189–90 (quoting *Anderson*, 460 U.S. at 788 n.9).

We turn to the case at bar. Two preliminary problems require comment: the proper characterization of Plaintiffs' constitutional claim and of the Board's decision it challenges.

First, we affirm that the Board's decision is the only matter Plaintiffs have asked us to review. The only question presented here is whether the Board has unduly and

impermissibly burdened the rights of Marion County voters. The mechanism by which the Board reached its decision is irrelevant to Plaintiffs' cause of action[10] except insofar as it may speak to the legitimacy of the governmental interest advanced in justification. Thus, the State's insistence to the contrary notwithstanding, this is not a challenge to the unanimity requirement of Indiana Code § 3-11-10-26.3(b). Plaintiffs argue neither that Section 26.3(b) is unconstitutional in every application, nor in this application. They are not complaining about *the statute* at all; they complain of *the decision* reached by the decisional process authorized by the statute. We did previously characterize Plaintiffs' claim as an "as applied" challenge to the statute, Dkt. 40, at 2, but that was under Plaintiffs' then-operative original *Complaint*, Dkt. 1, and only for the purposes of establishing that this is not a case in which the State is entitled to intervene to defend its statute against facial invalidation. Here, it is more precise to say that the constitutionality of the statute is not implicated at all.[11]

Second, we must consider whether the Board's decision (*i.e.*, its failure to re-establish satellite offices in general election years after 2008 and 2009) is properly characterized as a restriction of voting rights or a failure to expand them. The Equal Protection Clause has never been held to require a unit of government to bankrupt itself

---

[10] For example, in in *One Wisconsin Institute, Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016), state law imposed a "one-location rule" limiting municipalities to one location for EIP voting. *See id.* at 904. The operation and effect of the governmental action is the same there as here.

[11] Indeed, to the extent that the State believes the purpose of the unanimity requirement is to check opportunities for partisan abuse, our decision here furthers and does not threaten that purpose.

in the pursuit of expanding voting rights to their maximum possible extent. And Plaintiffs

do not (and could not) argue that the Board is specifically required by the Constitution to

permit EIP voting and to guarantee a certain degree of convenience to EIP voters. In

*Griffin*, the Seventh Circuit framed the question as follows:

> [P]laintiffs . . . are working mothers who contend that . . . it is
> a hardship for them to vote in person on election day[.] . . .
> [I]t is obvious that a federal court is not going to decree
> weekend voting, multi-day voting, all-mail voting, or Internet
> voting (and would it then have to buy everyone a laptop, or a
> Palm Pilot or Blackberry, and Internet access?). That leaves
> as the only alternative that will satisfy the plaintiffs a general
> hardship exemption from the requirement of in-person voting;
> and as a practical matter that means absentee voting at will. . .
> . [That] argument ignores a host of serious objections to
> judicially legislating so radical a reform in the name of the
> Constitution.

385 F.3d at 1129–30.

But a neutral and nondiscriminatory failure to extend constitutionally optional

voting rights is to be sharply distinguished from an arbitrary or discriminatory restriction

of voting rights (and from an arbitrary or discriminatory failure to extend voting rights to

some while extending them to others, though that is not this case, as the Board's action

affects every Marion County voter),[12] no matter whether those rights are constitutional

requirements or statutory entitlements. Once a unit of government has decided to

---

[12] In this connection, Plaintiffs raise a geographical-discrimination argument to the effect that
Marion County voters have been singled out for unfavorable treatment based solely on their
location. *See, e.g.,* Br. Supp. 21 (citing cases). Perhaps, but singled out by whom? *The Board*
cannot treat Marion County voters differently from other counties' voters because the Board only
has jurisdiction over Marion County. As a unit of government is liable only for its own
discrimination, *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014) (§ 2 VRA claim), and the
Board and its members are the only defendants here, Plaintiffs' argument on this score fails.

administer a benefit or impose a burden, it must do so rationally and equitably, without offense to independent constitutional prohibitions. *Harper*, 383 U.S. at 665 ("[T]he right to vote in state elections is nowhere expressly mentioned [in the Constitution]. . . . [I]t is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause . . . ."); *Cafeteria and Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 894 (1961) ("One may not have a constitutional right to go to Bagdad, but the Government may not prohibit one from going there unless by means consonant with due process of law." (quotations, citation omitted)); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) ("It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty." (citation omitted)); *Hand v. Scott*, No. 4:17cv128, —F. Supp. 3d—, slip op. at 18–20, 32–33 (N.D. Fla. 2018) (holding re-enfranchisement of lawfully disenfranchised felons may not be arbitrary or violative of First Amendment); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 933 (W.D. Wis. 2016) ("[P]laintiffs contend [and the Court agrees] that by choosing to give its citizens the privilege of in-person absentee voting, the state must administer that privilege evenhandedly.").[13]

---

[13] We do not disagree with the Sixth Circuit's dictum in *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016), that *Anderson-Burdick* is not "a one-way ratchet" and that a unit of government must be free to restrict earlier expansions of its voting regime in such a way as only "might arguably burden some segment of the voting population's right to vote[,]" given a sufficient justifying interest. *Id.* at 635. But what a unit of government *cannot* do is arbitrarily or discriminatorily revoke an expansion of voting rights without any justifying interest.

This answers the State's oft-rejected argument that, because there is no constitutional right to EIP voting, the Board's provisions for EIP voting are immune to constitutional scrutiny. There is neither a constitutional right to EIP voting nor a constitutional right to election-day polling-place voting; there is only "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Anderson*, 460 U.S. at 787 (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). But it is hardly worth the ink to note that the Board could open neither polling places nor satellite offices only to white voters, or only to Green Party voters, or only to voters selected by *sortes Vergilianae*.[14]

We accept for the purposes of the instant motion Plaintiffs' characterization of the Board's decision as a restriction of voting rights rather than a failure to expand them. But the propriety of that characterization is not beyond dispute. Plaintiffs are silent on the constitutional relevance, if any, of the fact that Indiana Code § 3-11-10-26.3(i) requires new annual resolutions to establish satellite offices and therefore new annual commitments to outlays of money and manpower sufficient to operate them. Plaintiffs select 2008 as "the baseline year," Br. Supp. 4, 9, but fail to explain *why*, as a matter of constitutional law.[15]

---

[14] A medieval practice of divination involving the selection at random of a passage from Virgil. *See, e.g,* Letter from John Adams to Abigail Adams (Sept. 16, 1774), *in The Letters of John and Abigail Adams*, 19 (Frank Shuffelton ed., Penguin Classics 2003).

[15] As opposed to a matter of an equitable determination of the *status quo* for the purposes of injunctive relief. *See Kimbley v. Lawrence Cty.*, 119 F. Supp. 2d 856, 874 (S.D. Ind. 2000).

Keeping the above considerations in view, while holding Plaintiffs only to a *prima facie* showing of entitlement to preliminary relief, we will allow Plaintiffs to proceed supported by the evidentiary designations now before the Court and relying on the seemingly self-evident proposition that a good idea in 2008 and 2009, as determined by the Board, is a good idea through 2016—unless conditions have materially changed by 2016. And, as explained further in the *Anderson-Burdick* balance below, the greater weight of the credible evidence suggests that satellite offices were a good idea in 2008 and 2009, and that no *neutral, nondiscriminatory* factors had materially changed by 2016. In this case, it would be hyperformalistic, and would suggest a rule liable to abuse, to permit the constitutional result to vary depending on whether the statutory scheme authorized annual resolutions or, for example, biannual resolutions terminable after one year. Accordingly, subject to the testimony of future evidence, we take 2008 as the point of departure. From that vantage, we view the Board's failure to re-establish satellite offices as a curtailment of the voting rights of Marion County voters.

### 1. First and Fourteenth Amendment Injury

We proceed to the *Anderson-Burdick* balance, "first consider[ing] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789.

### a. Generally Applicable Burdens on the Right to Vote

As to the magnitude of the asserted injury, without intending any denigration of the difficulties experienced by voters like Windle and Petrison in attempting, for good reason, to cast early-in person votes at the City-County Building, we assume that such

difficulties are a nonsevere, nonsubstantial, or slight burden on the general right to vote as a matter of law. *See Crawford*, 553 U.S. at 198 ("For most voters who need [photo identification], the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."). In *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014), presenting a challenge to a Wisconsin election law similar in operation to the Indiana election law sustained in *Crawford*, the Seventh Circuit adopted *Crawford*'s estimation of the severity of the burden imposed by the Wisconsin law. *See id.* at 746 ("Wisconsin's law differs from Indiana's, but not in ways that matter . . . ."), 748 (travel to government office, collection of documents, and "stand[ing] in line" deemed not "hard" under *Crawford*).[16]

As to the character of the asserted injury, there is evidence showing a marked decline in early in-person voting from 2008 to 2016, which does not appear to have been offset by a corresponding rise in votes cast absentee by mail. Dkt. 63 Ex. 7 (Fraga Rep.) 6–7. Thus it is fair to conclude that the Board's failure to re-establish satellite offices caused a substantial loss of early votes. *Id.* at 5. But there is little or no evidence that any Marion County voter actually lost the ultimate opportunity to cast a ballot due to the limited availability of EIP voting. *See Crawford*, 553 U.S. at 197–98 ("[T]he availability

---

[16] There is a monetary cost to taking public transportation to the City-County Building and to finding parking in downtown Indianapolis for voters with private transportation, which on the evidence before us ranges from $2 to $7. Dkt. 69 Ex. 11 (Petrison Aff.) ¶¶ 4–5; Dkt. 75 Ex. 13 (Vaughn Aff.) ¶ 20. But the documents required by the Indiana law sustained in *Crawford* cost from $3 to $100 to procure, exclusive of travel costs to the relevant government office. 553 U.S. at 215 (Souter, J., dissenting).

of the right to cast a provisional ballot provides an adequate remedy for problems" that are not "serious" or "frequent" but simply "aris[e] from life's vagaries," such as the loss or theft of documents required to vote.); *Frank*, 768 F.3d at 746 ("[T]he [district] judge did not find that substantial numbers of persons eligible to vote have tried to get a photo ID but been unable to do so[,]" and thus unable to vote.), 747 ("Did the requirement of photo ID reduce the number of voters below what otherwise would have been expected? . . . The record does not tell us.").[17]

The absence of such evidence weakens Plaintiffs' case. But at this preliminary stage, we do not find the weakness fatal. As *Griffin* suggests, only rarely will a given voting restriction have zero marginal impact on vote totals. 385 F.3d at 1130 ("Any such restriction is going to exclude, either de jure or de facto, some people from voting[.]"). It appears unlikely that each of the 25,557 EIP votes lost between 2008 and 2016 was effectively translated to election-day ballots, *see* Dkt. 63 Ex. 7 (Fraga Rep.) 6, especially in view of the decline in overall voter turnout over the same period. (As already noted,

---

[17] Despite multiple failed attempts to vote early in person, Windle found time to vote on election day, Dkt. 69 Ex. 10 (Windle Aff.) ¶ 8, and Petrison voted early in person despite her frustrations with the process. Dkt. 69 Ex. 11 (Petrison Aff.) ¶ 5. (No doubt her patients and their families would be grateful to learn that she chose this course rather than foregoing sleep on election day.) Petrison's mother did apparently find the burden of a trip to the City-County Building to be insurmountable, *id.* ¶ 7, but, at seventy-seven years old, she would appear to have been eligible to vote absentee by mail. *See* Ind. Code § 3-11-10-24(a)(5) ("elderly" voter entitled to vote absentee by mail); *id.* § 3-5-2-16.5 ("elderly" means at least sixty-five years of age). In any event, Petrison does not aver that her mother tried but failed to vote.

Plaintiffs have shown that overall voter turnout declined in 2016 relative to 2008 (perhaps a surprising fact inviting explanation, given that both years featured historic presidential contests which drew unusually intense public interest). Dkt. 63 Ex. 8, at 25. But they have only cursorily attempted to link this decline causally, in whole or part, to the Board's revocation of satellite offices. *See* Am Compl. ¶ 28.

the absence of a rise in mail-in ballots strongly suggests the lost EIP votes were not recovered by those means either.) Because we expect Plaintiffs' will be able to adduce evidence showing a connection between the Board's action and the lower vote totals, we reserve a determination of what consequence would follow if no such evidence appears in the record at the time of final judgment.

In sum, were we to cut off our analysis here, we would conclude that the Board's action imposes only a slight burden on the rights of Marion County voters.

### b. Disparately Impactful Burdens Implicating Equal Protection

But we may go further. Despite the Court's sharp divisions, *Crawford* found a six-Justice majority for the general proposition that it "matters" in the *Anderson-Burdick* analysis, *id.* at 216 (Souter, J., dissenting), whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed[18] across identifiable groups "whose

---

[18] Though the Indiana law considered in *Crawford* was neutral and nondiscriminatory on its face, *compare Anderson*, 460 U.S. at 792 ("It is clear . . . that the March filing deadline [expressly imposed only on independent candidates] places a particular burden on an identifiable segment of Ohio's independent-minded voters."), the lead opinion in *Crawford* did not deem immaterial the fact "that a somewhat heavier burden may [have been] placed on a limited number of persons[,]" specifically the elderly, "persons who because of economic or other personal limitations may find it difficult . . . to assemble the . . . required documentation . . . ; homeless persons; and persons with a religious objection to being photographed." 553 U.S. at 199. The lead opinion found, however, "that on the basis of the evidence in the record it [was] not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id.* at 200. The Court concluded that the record before it could not defeat the statute's "plainly legitimate sweep[,]" *id.* at 202 (quotations, citation omitted), and therefore could not entitle plaintiff-petitioners to the facial invalidation they sought. *Id.*

The two dissenting opinions viewed the disparate impact of the burdens imposed by the Indiana law with an eye at least as skeptical as the lead opinion's. *See id.* at 216 (Souter, J., dissenting, joined by Ginsburg, J.) ("[I]n the *Burdick* analysis it matters that both the travel costs and the fees are disproportionately heavy for, and thus disproportionately likely to deter, the poor, the old, and the immobile."), 237 (Breyer, J., dissenting) ("I believe the statute is

members share a particular viewpoint, associational preference, or economic status[,]" *Anderson*, 460 U.S. at 793 ("especially difficult" for state to justify restrictions on such groups), or are delineated by "capricious or irrelevant factors" such as "[w]ealth, . . . race, creed, or color[.]" *Harper*, 383 U.S. at 668. To this list may be fairly added, in the ordinary case and within limits, age and health.

This was the approach taken in *One Wisconsin Institute, Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016). There, the Wisconsin district court, following a bench trial, considered *inter alia* the constitutionality under *Anderson-Burdick* of Wisconsin's regulation of EIP voting. Wisconsin's scheme "limited municipalities to one location for [EIP] voting" (the "one-location rule"), "narrowed the window for [EIP] voting to 10 days and prohibited municipal clerks from offering [EIP] voting on weekends on or the Monday before an election[,]" and "limited the hours available for [EIP] voting to between 8:00 a.m. and 7:00 p.m." *Id.* at 931. The court struck down each restriction save the prohibition on EIP voting Mondays before election days. *Id.* at 904.

The court found, on the one hand, that use of absentee voting had increased across Wisconsin during the period under consideration, and that "[t]he challenged provisions [did] not categorically bar individuals from voting[;]" they had merely "shrunk the window" in which EIP voting could take place. *Id.* at 933. "If the shortened period [was]

---

unconstitutional because it imposes a disproportionate burden upon those eligible voters who lack a driver's license or other statutorily valid form of photo ID."). *Compare id.* at 205 (Scalia, J., concurring in the judgment, joined by Thomas, Alito, JJ.) ("The Indiana photo-identification law is a generally applicable, nondiscriminatory voting regulation, and our precedents refute the view that individual impacts are relevant in determining the severity of the burden it imposes.").

not convenient for certain voters, then they [could] vote using mail-in absentee voting or vote on election day." *Id.* at 933. These findings point to a slight burden under *Crawford* and *Frank*.

But the court also found, on the other hand, that the EIP limitations had worked "profound effects" in Wisconsin's larger municipalities, "home to populations of voters who disproportionately lack the resources, transportation, or flexible work schedules necessary to vote in-person absentee during the decreased timeframe." *Id.* at 931. These "pre-existing disadvantages interact[ed] with the [EIP restrictions] to make it more difficult for these voters to vote" early in person. *Id.* at 932. As examples, the court noted the difficulty imposed by limited EIP hours on those "whose job or class schedule[s] are less flexible[,]" the burden imposed by longer lines resulting from the one-location rule on the same voters, and the burden imposed by the one-location rule on "voters who lack access to transportation." *Id.* Taking this evidence together, the court found that "the challenged in-person absentee voting provisions place[d] a *moderate* burden on the right to vote." *Id.* at 931 (emphasis added). *See also, e.g., Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 666 (6th Cir. 2016) ("Although this burden is not severe, it is also not slight.").

Following *Crawford* and *One Wisconsin*, we draw the same conclusion here. Taken in relation to its "broad application to all [Marion County] voters" we conclude, on the record before us, that the Board's action "imposes only a limited burden on voters' rights." *Crawford*, 553 U.S. at 202. But taken in relation to its disparate impact on voters who lack the financial means or flexible schedules (*i.e.*, those with little power over their

own conditions of work, study, or travel) to surmount the obstacles of time and expense imposed by the Board's one-location rule, we conclude, as did the *One Wisconsin* court, that the Board's action imposes a burden freighted with equal protection concerns. It is thus more "severe[]," *Common Cause Ind.*, 800 F.3d at 917, for the purposes of assessing the character of an injury to rights protected by the First and Fourteenth Amendments, than a general inconvenience.

Further buttressing this point is Plaintiffs' evidence of a disproportionate impact of the Board's action on black voters. *Compare Frank*, 768 F.3d at 747 ("Did the requirement of photo ID reduce the number of voters below what otherwise would have been expected? *Did that effect differ by race or ethnicity?* The record does not tell us." (emphasis added)). As Plaintiffs' expert Prof. Fraga opines, "After the [Board's] failure to approve any satellite voting locations in 2012 and 2016, rates of early in-person absentee voting among African-American absentee voters declined to a greater degree than rates of early in-person absentee voting for non-Hispanic whites, relative to 2008." Dkt. 63 Ex. 7 (Fraga Rep.) 5. Prof. Fraga therefore concludes, "[T]he [Board's] failure to approve any satellite voting locations for the 2012 and 2016 elections likely had a disproportionate, negative impact on African-Americans in Marion County relative to non-Hispanic whites." *Id.*

Accordingly, we conclude that Plaintiffs have shown a better than negligible chance of proving that the Board's action imposes a moderate burden on Marion County voters' First and Fourteenth Amendment rights.

c.  Targeted Burden on Association and Expression Rights

One final consideration merits comment. Plaintiffs' allegation of a partisan motivation underlying the Board's action arguably finds its proper analytical place in the assessment of the magnitude and character of the alleged injury to First and Fourteenth Amendment interests. A burden on a group of voters imposed solely in virtue of the political beliefs and affiliations of a majority of the group's members by its nature impinges on freedoms protected by the First Amendment, inviting a searching standard of review. *See Anderson*, 460 U.S. at 793 ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment."); *id.* at 786 n.7 (noting Court's prior election cases have "appl[ied] the 'fundamental rights' strand of equal protection analysis" to "identif[y] the First and Fourteenth Amendment rights implicated by" voting restrictions). *See also Vieth v. Jubelirer*, 541 U.S. 267, 315 (2004) (Kennedy, J., concurring in the judgment) (redistricting case) ("If a court were to find that a State did impose burdens and restrictions on groups of persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest."), *quoted in Shapiro v. McManus*, —U.S.—, 136 S. Ct. 450, 456 (2015) (finding Justice Kennedy's suggestion in *Vieth* "uncontradicted by the majority in any of our cases" and therefore not "constitutionally insubstantial" under *Goosby v. Osser*, 409 U.S. 512 (1973)).

Nevertheless, the Court's opinion in *Crawford* forecloses that approach. There, the Court observed that Judge Evans had dissented from the Seventh Circuit's decision upholding the Indiana law, disparaging it as "a not-too-thinly-veiled attempt" to suppress

the vote share of the minority party to which Judge Evans would have applied a standard of review "close to 'strict scrutiny light.'" *Crawford*, 553 U.S. at 188 (quoting *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 954, 956 (7th Cir. 2007) (Evans, J., dissenting)) (quotations omitted). The lead opinion disagreed:

> It is fair to infer that partisan considerations may have played a significant role in the decision to enact [the Indiana law]. If such considerations had provided the only justification for [it], we may also assume that [it] would suffer the same fate as the poll tax at issue in *Harper*. But if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators.

*Id.* at 203–04. Nothing in the concurring and dissenting Justices' separate opinions suggests that a contrary approach found majority support.

Accordingly, we reserve analysis of Plaintiffs' partisan-considerations allegation for our evaluation of the governmental interests supporting the Board's action.

### 2. Governmental Interests

We proceed to consider the "'precise interests' advanced by [the Board]" in justification of its action, *Crawford*, 553 U.S. at 203 (quoting *Burdick*, 504 U.S. at 434), "not only determin[ing] the legitimacy and strength of each of those interests[,]" *Anderson*, 460 U.S. at 789, but also "consider[ing] 'the extent to which those interests make it necessary to burden [Plaintiffs'] rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Three candidates for a legitimate, neutral justification of the Board's action appear from the record before the Court. On those facts, none is credible. Rather, it is evident that a constitutionally "capricious or irrelevant factor," *Harper*, 383

U.S. at 668—the political beliefs and affiliations of a majority of Marion County

voters—provided the only "justification" for, and was the but-for cause of, the Board's

action.

a. "Phone Tag"

First, one of the "two main points" Ping raised with Hoff in their consultation on

Hoff's vote on the spring 2016 satellite-office resolution was "that the resolution had

solely been drafted by the Democrat[ic] Party and had not been discussed with [Ping.]"

Dkt. 63 Ex. 9 (Hoff Dep.) 16:9–18. Similarly, when Hoff instructed Fox, her proxy, to

vote nay on the fall 2016 resolution, Hoff explained that she had "[been] told" that a

planned round of discussions between "the Republican Party and the Democratic Party"

had "never happened, that there was a round of phone tag between [Ping] and [Eldridge]

and they never got ahold of one another[.]" *Id.* at 25:13–18.

This is an astonishing argument for the Board's decision, and so obviously and

thoroughly deficient ("not a governmental interest at all," as Plaintiffs correctly point out,

Br. Supp. 23) that we will not long linger over it. It is enough here to say that neither Ping

nor any other functionary of the major-party county organizations had any right of

consultation on the resolutions; that satellite-office resolutions are not complex pieces of

legislation requiring minute inspection and negotiation of "language," Dkt. 63 Ex. 9

(Hoff Dep.) 16:12, but simple and functional documents stating the number, location, and

operating times of satellite offices established by them, *see* Dkt. 63 Ex. 1 (other counties'

satellite-office resolutions), all of which may be considered without reference to the

"language" of the resolutions; and that the business of the Board is most naturally

discussed, not before, but *at* its meetings, and indeed, as Plaintiffs' counsel suggested at

Ping's deposition, *only* at its meetings, in observance of Indiana's "Open Door Law."

Dkt. 66 Ex. B (Ping Dep.) 20:21–25. *See* Ind. Code ch. 5-14-1.5. In any event, there is no

showing (and none is conceivable) of any extent to which Ping's inability to review the

proposed resolution made it necessary to burden Plaintiffs' rights.

### b. Preventing Voter Confusion

Second, preventing voter confusion was recited by Hoff in opposition to satellite

offices, Dkt. 63 Ex. 9 (Hoff Dep.) 26:3–9, but this argument fares no better than the first.

Eldridge's view was that voters are not confused about the nature of EIP voting. Dkt. 63

Ex. 8 (Eldridge Dep.) 20:10–13. We find that testimony more credible than Hoff's, which

itself appears to be the product of confusion about the nature of EIP voting. Whatever

Hoff may have meant when she said that EIP voting is "not actually voting . . . , it's

filling out an absentee ballot in another location[,]" Dkt. 63 Ex. 9 (Hoff Dep.) 26:5–6, she

clearly erred in asserting that "an absentee [by mail] ballot can be filled out at your home,

which is even more convenient," on the same terms as EIP voting. *Id.* at 26:7–9. *See* Ind.

Code § 3-11-10-24(a)(1) through (13) (restricting entitlement to absentee by-mail voting

to voters satisfying one of thirteen conditions). And again, even if Hoff had been correct

that the public fails to understand that voting absentee by mail is "even more convenient"

than EIP voting, Dkt. 63 Ex. 9 (Hoff Dep.) 26:8–9, there is no showing of why or how

such confusion would be cured or mitigated by restricting EIP voting.

### c. Cost Avoidance

Third is "the [monetary] cost and administrative headache that [satellite offices] would bring[,]" two related factors we assess together. Here, a word about the judicial role in assessing these interests is in order.

A unit of government cannot, of course, defeat every constitutional challenge to voting restrictions, no matter how capriciously enacted, on the plea that fewer voters mean cheaper elections. If such a bare gesture toward the public fisc could justify an otherwise invidious discrimination, Justice Black's dissent would have carried the day in *Harper*, *see* 383 U.S. at 674 (Black, J., dissenting) ("State poll tax legislation can . . . be found to rest on a number of state policies including . . . the State's desire to collect its revenue . . . ."), and the "'hard judgment' that our adversary system demands" would be set at nothing. *Crawford*, 553 U.S. at 190 (quoting *Storer*, 415 U.S. at 730).

Rather, as the lead opinion in *Crawford* makes clear, there must be a "*demonstration* of . . . interest[s] sufficiently weighty to justify" a burden on voting rights, 553 U.S. at 190 (quoting *Norman*, 502 U.S. at 288–89 (1992)) (emphasis added), and those interests must be "precise," *id.* (quoting *Burdick*, 504 U.S. at 434), and "relevant." *Id.* While the concurrence suggested that the lead opinion had been too searching in its scrutiny of the asserted governmental interests, *see id.* at 208 (Scalia, J., concurring in the judgment) (state legislative judgment "must prevail" unless voting-rights burden "severe"), Justices Souter and Ginsburg faulted the lead opinion for not being searching enough. *Id.* at 209 (Souter, J., dissenting) (invocation of "abstract interests" insufficient; only "particular, factual showing" sufficient). *Crawford* therefore supports continuing adherence to the approach set forth in *Anderson* that considers both

the "legitimacy and strength" of the asserted governmental interest, *Anderson*, 460 U.S. at 789, and "the extent to which those interests make it necessary to burden [Plaintiffs'] rights." *Common Cause Ind.*, 800 F.3d at 917 (quoting *Burdick*, 504 U.S. at 434) (quotations omitted).

The Board's asserted interest in cost avoidance withers in this light. As to the asserted burden on election administration, the Board has already conceded before this Court that, as a result of its action, "early voters and Election Day voters are likely to experience longer lines and wait times than would otherwise exist . . . ." Answer ¶ 26. This position finds support in Eldridge's testimony on the administrative efficiency and effectiveness of EIP voting in 2008, when Eldridge served as the Board's deputy director, *see* Dkt. 63 Ex. 8 (Eldridge Dep.) 8:1–9:17, as well as in her testimony on the ease with which the satellite centers were staffed and operated. *See id.* at 7:20–25, 12:7–16. It finds further support in the Board's own decision to expand the use of satellite offices from two in 2008 to four in 2009 for a local, nonpartisan referendum. Dkt. 66 Ex. A (Eldridge Dep.) 13:2–14:1. Similarly, none of the other thirteen Indiana counties for which there is record evidence abandoned the use of satellite offices after their introduction. Dkt. 63 Ex 1. The consistent testimony of this evidence is that, for Marion and counties like it, the benefits of satellite-office EIP voting outweigh the administrative costs.

We do not find Ping's and Hoff's contrary testimony to be the more credible evidence. Ping reported "chaos for the workers . . . as well as the voters" when she voted early in person at the Southport Government Center satellite office in 2008. Dkt. 66 Ex. B (Ping Dep.) 14:7–8. But, as there is no evidence that Ping was anything other than a

private voter in 2008 or had any involvement in the administration of that election, we cannot perceive a basis for Ping's knowledge of "chaos" generally in the operation of the Southport satellite office, or specifically due to the demands of ballot-printing there. *See id.* at 14:5. Similarly, Hoff adduced the burden of Marion County's use of paper poll books, but the weight of this testimony is slight because it does not appear to come from Hoff's personal knowledge. *See* Dkt. 63 Ex. 9 (Hoff Dep.) 26:14–17 ("And we [*who?*] knew that . . . —I'm going to try to word this correctly. I hope that I understood it correctly.").

Moreover, both Ping's and Hoff's explanations for the perceived administrative burden, so far as they are clear from the face of the record, relate to perceived defects in early voting generally or Marion County election administration generally, not to the operation of satellite offices in particular. Finally, neither Ping's nor Hoff's testimony suggests any respect in which or any reason why the operative facts justified two satellite offices in 2008, four in 2009, and none thereafter.

As to the monetary cost, the only available evidence is Eldridge's estimation that it would cost "[p]robably more" than $100,000 to operate two satellite offices, assuming their use could be procured at no cost to the Board as it had been in 2008. Dkt. 66 Ex. A (Eldridge Dep.) 38:25. But Eldridge was clear that budgeting problems have never stood in the way of the establishment of satellite offices in Marion County. Funds for satellite offices in 2010 had already been set aside when that year's resolution failed. *Id.* at 16:1–8. Such funds apparently continued to be set aside until as late as 2015, *see id.* at 37:22–23, when the practice was abandoned as futile. *Id.* at 37:24–38:4. Nevertheless, Eldridge

had no concern that, if a satellite-office resolution were passed today, it would not be fully funded. *Id.* at 38:5–14. There is no evidence that the financial position of Marion County or the Board in 2010 through 2016 was worse that their position in 2008 and 2009 (which, indeed, would be a surprising finding).

In sum, it is of course incontestable that a unit of government has a legitimate interest in the health of its finances. But, on the record before the Court, we cannot say that that interest was implicated by the Board's action. The greater weight of the credible evidence suggests that the Board found the benefits of satellite offices sufficiently outweighed their costs such that their use was initiated in 2008 and expanded in 2009. No consideration of administrative or monetary cost appears have operated differently from 2010 through 2016. The barest desire simply to spend less money cannot justify the Board's action here.

### d. Partisan Considerations

Plaintiffs' theory of why satellite offices have become a partisan issue in Marion County, as inferred from their briefing on the instant motion and from the *Amended Complaint*, is as follows. Early voting, including EIP voting, tends to be more popular with traditionally Democratic constituencies, particularly low-income and African-American voters. Any restriction on EIP voting, therefore, tends to depress Democratic voter turnout and vote share. Marion County as a whole tends to vote Democratic. Accordingly, say Plaintiffs, the Marion County Republican Party, driven by the political interests of the Indiana Republican Party, has opposed the expansion of EIP voting in Marion County in order to depress the statewide vote share of the Indiana Democratic

Party and so "achiev[e] partisan advantage . . . ." Br. Supp. 4. Plaintiffs allege further that

the Board's post-2008 refusal to establish satellite offices in general federal election years

"was in retaliation for Marion County voters having voted in large numbers and

overwhelmingly in favor of the Democratic Party's nominee for President, Barack

Obama," in 2008. Am. Compl. ¶ 30.

The uncontradicted evidence in the record is that "partisan politics probably plays

a hand in decision making" with respect to satellite offices. Dkt. 63 Ex. 9 (Hoff Dep.)

48:11–12. Indeed, it could hardly be otherwise where, contrary to the form of the

applicable statute, Ind. Code § 3-6-5-2(2), the county clerk has routinely outsourced the

appointment of the other two Board members to the respective county-party chairs.

At least in the case of the Republican Board member (the only Board member for

which there is evidence before the Court), she appears in turn to have outsourced her

decision-making to the Marion County Republican Party. When Hoff needed a proxy to

cast her vote on the fall 2016 satellite-office resolution, she contacted county-party

leadership to secure one. Hoff "defer[red] to the opinion of [her] party" on matters before

the Board, Dkt. 63 Ex. 9 (Hoff Dep.) 11:4, but it is not clear what legitimate basis such

deference rested on. "By contrast [to the redistricting process, which is inherently

political,] . . . election administration should not be political at all[.]" *One Wis.*, 198 F.

Supp. 3d at 929. Hoff denied that partisanship had been "a reason [she] was given" for

voting against satellite offices, Dkt. 63 Ex. 9 (Hoff Dep.) 32:6–7, (thereby appearing to

contradict herself somewhat, for, if not by her vote, how did partisanship "play a hand" in

decision-making on satellite offices?), but did concede that, "[i]f [the Board's rejection of

satellite offices was related to partisan politics], that decision was made by someone else." *Id.* at 32:3–6. We cannot perceive how any "decision" embodied in Hoff's nay vote could have been "made by someone else" unless Hoff was effectively taking instruction from party officials.

With respect to the nonpartisan reasons given for Hoff's vote, Hoff did not know how great the expense of satellite offices would be and made no independent effort to find out, and it appears that Hoff never brought these matters to the Board for discussion and resolution. Nor to the public. Hoff refused to state her own reasons for voting against the fall 2016 resolution when asked to do so by a local journalist. Rather, again, she contacted county-party leadership to ask "whether they wanted to make a *party* statement about the issue[.]" *Id.* at 25:3–4 (emphasis added). The party leadership preferred to keep silent, or more precisely, "advised that it would be better not to comment." *Id.* at 25:4–5. The clear inference from these undisputed facts is that nonpartisan reasons did not in fact play any significant role in Hoff's decision, that Hoff's decision was effectively the county party's decision, and that the county party thought "it would be better" not to publicly disclose the basis for *its* decision because that basis would not be viewed by the public as a legitimate one.

In view of the absence of any credible neutral and nonpartisan explanation for the Board's failure to re-establish satellite offices after 2008 and 2009, as discussed above, the record permits only one conclusion: partisanship motivated, and indeed was the but-for cause of, the Board's action. We note that the evidentiary designations to the Court do not reveal a full picture of the Board's decision-making in 2010, 2012, or 2014. It may be

that the Board's decisions in those years were affected by significantly different considerations than in 2016. But, at this stage, the record supplies no reason to believe that they were.

### 3. Balance of Injury and Interest

We conclude that the legitimate governmental interests appearing from the face of the designated materials cannot justify the moderate burden on Plaintiffs' First and Fourteenth Amendment rights imposed by the Board's action. On this record, those interests are in fact illusory and irrelevant to any restriction on EIP voting in Marion County. The Board's action is thus unsupported by any "valid neutral justifications[.]" *Crawford*, 553 U.S. at 204. Rather, far from playing a merely "significant role" in the Board's decision to restrict EIP voting, *Crawford*, 553 U.S. at 203, partisan considerations "provided the only justification" for that restriction. *Id.* Accordingly, it must "suffer the same fate as the poll tax at issue in *Harper*" as a constitutionally capricious burden on voting rights. *Id.*

In sum, we find that Plaintiffs have made out a *prima facie* case of a better than negligible chance of success on the merits of their constitutional claim.

## II. Irreparable Harm

"[F]or some kinds of constitutional violations, irreparable harm is presumed." *Planned Parenthood of Ind. and Ky., Inc. v. Comm'r*, 194 F. Supp. 3d 818, 835 (S.D. Ind. 2016) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)). This is true of violations of the First, *Christ. Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006), and Fourteenth Amendments. *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 2028 (S.D.

Ind. 2014). "[C]ompensation in money cannot atone" for the loss of the right to

participate in the democratic process on equal terms with other citizens, *Graham v. Med.*

*Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997) (quotations, citation omitted), "a

"fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118

U.S. 356, 370 (1886).

We conclude Plaintiffs have adequately shown that, unless an injunction issues,

they will suffer harm which money damages could not remedy.

## III. Balance of Equities

Here, we

> must somehow balance the nature and degree of [Plaintiffs']
> injury, the likelihood of prevailing at trial, the possible injury
> to [the Board] if the injunction is granted, and the wild card
> that is the "public interest[.]" Specifically, the court weighs
> the irreparable harm that the moving party would endure
> without the protection of the preliminary injunction against
> any irreparable harm the nonmoving party would suffer if the
> court were to grant the requested relief.

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086

(7th Cir. 2008) (other quotations, citations omitted). In this analysis, we employ the

sliding-scale approach, discounting the degree to which the balance must tip in Plaintiffs'

favor by the degree of their likelihood of success on the merits. *Id.*

We find that Plaintiffs have shown a fair likelihood of success on the merits. As

noted above, Plaintiffs' case at this stage does suffer from evidentiary weaknesses,

though we expect those weaknesses to be remediable. Moreover, the Court welcomes

further development of evidence and argument on the nature of the Board's action *qua*

restriction of voting rights, and on the role of disparate impacts in the *Anderson-Burdick* balance. Against these potential roadblocks for Plaintiffs, however, we set the utter absence of any legitimate justification for the Board's action. Accordingly, we conclude that Plaintiffs' chances are better than slight, worse than strong. We address the balance of equities in this light.

The instant motion seeks an order establishing two satellite offices for both the May primary and November general elections of this year, the same number as were established in 2008. Though four satellite offices were used in 2009, Plaintiffs' claim relates chiefly to the use of satellite offices in general federal election years. Thus we agree with Plaintiffs that 2008, rather than 2009, better represents "the last peaceable uncontested status that existed before the dispute arose." *Kimbley v. Lawrence Cty.*, 119 F. Supp. 2d 856, 874 (S.D. Ind. 2000) (quotations, citation omitted). We find a mandatory injunction to be an appropriate vehicle for restoring this *status quo*. *See id.*

As to the May primary, we find that the balance of equities tips in the Board's favor. The Board details the efforts it will be required to undertake to establish the satellite offices. Br. Opp. 5; Dkt. 66 Ex. C (Delaney Decl.). Writing as of February 15, 2018, the Board observes that "the May election takes place fewer than 90 days from this submission. Election administration activities are well underway . . . ." Br. Opp. 5. Even then, a judicially decreed obligation to establish satellite offices would have thrown the Board's election preparation efforts into disarray. *A fortiori* now: after awaiting full briefing on the instant motion, which was completed on February 22, 2018, and after devoting the careful consideration and deliberation demanded by the important issues in

this case, this *Order and Opinion* issues with fewer than two weeks remaining before the primary on May 8, 2018. The benefits to Plaintiffs at this late hour, meanwhile, would be comparatively modest. Finally, while the character and magnitude of Plaintiffs' injury does not vary with the type of election (primary or general), the public's interest in an electoral market free from arbitrary governmental interference in favor of one political party over another is less impaired in the primary-election context. And the public, too, would be ill served by last-minute upheaval and confusion in the administration of the May primary.

As to the November general election, however, we find that the balance of equities tips in Plaintiffs' favor. The Board "acknowledges that while the same planning and election administration challenges are presented by an injunction requiring establishment of satellite offices for the November 2018 general election, the burden on the [Board] would be far less without a compressed timeframe[.]" *Id.* Plaintiffs' fair likelihood of success on the merits, and the constitutionally fundamental nature of their asserted injury, justify the imposition of this reduced burden. Both Plaintiffs and the public are positioned to enjoy the full benefits of EIP voting restored to its 2008 levels, while the public will suffer minimal disruption to any ongoing election preparation efforts, and will reap the harvest of an electoral contest conducted without a governmental thumb on the scale.

The Board concedes that Plaintiffs should not be required to post bond. Br. Opp. 6. On this question, we accept its concession without further discussion.

## Conclusion and Order

For the above reasons, we DENY Plaintiffs' motion as it relates to the May 2018 primary election. We GRANT Plaintiffs' motion for a preliminary injunction as it relates to the November 2018 general election. The injunction will issue by separate order.

We DENY the State's motion to file a brief as *amicus curiae*.

IT IS SO ORDERED.

Date: _____4/25/2018_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Daniel Bowman
FILLENWARTH DENNERLINE GROTH & TOWE LLP
dbowman@fdgtlaborlaw.com

Anthony Scott Chinn
FAEGRE BAKER DANIELS LLP (Indianapolis)
scott.chinn@faegrebd.com

Bryan Findley
INDIANA ATTORNEY GENERAL
bryan.findley@atg.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE LLP
wgroth@fdgtlaborlaw.com

Vilda Samuel Laurin, III
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
slaurin@boselaw.com

Andrew J. Mallon
OFFICE OF CORPORATION COUNSEL
andy.mallon@indy.gov

Tyler John Moorhead
BOSE MCKINNEY & EVANS LLP
tmoorhead@boselaw.com

Donald Eugene Morgan
OFFICE OF CORPORATION COUNSEL
donald.morgan@indy.gov

Aleksandrina Penkova Pratt
INDIANA ATTORNEY GENERAL
aleksandrina.pratt@atg.in.gov

Daniel E. Pulliam
FAEGRE BAKER DANIELS LLP (Indianapolis)
daniel.pulliam@faegrebd.com

Anne Kramer Ricchiuto
FAEGRE BAKER DANIELS LLP (Indianapolis)
anne.ricchiuto@FaegreBD.com

Kelly Suzanne Thompson
INDIANA ATTORNEY GENERAL
kelly.thompson@atg.in.gov